# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO RUIZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>AFFINITY LOGISTICS CORPORATION,<br><br>Defendant. | CASE NO. 05CV2125 R (CAB)<br><br>ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT |

## I. Introduction

Defendant Affinity Logistics ("Affinity") moves for summary judgment as to Count I of the complaint filed by plaintiff Fernando Ruiz ("Mr. Ruiz"), an employee of Affinity. Count I alleges that Affinity has violated the Fair Labor Standards Act ("FLSA") by failing to pay Mr. Ruiz for overtime worked. For the reasons set forth below, the motion for partial summary judgment is granted.

## II. Statement of Facts

Affinity "is a motor carrier engaged in the business of providing regulated, for-hire transportation services in interstate commerce operating under the authority of the Federal Motor Carrier Safety Administration." Affinity's Ex. 1, Hitt Decl. ¶ 2. Affinity hauls and delivers a variety of products, including appliances, for companies such as Sears.[1] Hitt Decl.

---

[1] Kmart Corp. and Sears, Roebuck and Co. merged to become Sears Holding. See Inwood Depo. at 5:17-20. Because, for purposes of this motion, the court need not distinguish between Sears, Roebuck and Co. and Sears Holding, the court will use the term "Sears" to

- 1 -   05CV2125

¶ 3. Mr. Ruiz was, at all relevant times, a driver for Affinity. See Affinity's Ex. 2, House Decl. ¶ 5. As such, Mr. Ruiz would deliver appliances to Sears' customers.

Greg Inwood, formerly the Divisional Vice President, Inventory Management, for Sears, Roebuck and Co. and currently a Divisional Merchandise manager with Sears, orders the appliances that are sold at Sears' retail outlets. See Affinity's Ex. 3, Inwood Decl. ¶¶ 1, 5; Inwood Depo. 5:15-24. According to Mr. Inwood, "[t]he orders are based on the forecasting of sales that will be made by the stores." Inwood Decl. ¶ 5. "The forecasts are based on historical sales information and anticipated appliance promotions." Id. The objective of the forecasts is to have enough appliances available to fill all customer orders without running out of appliances while, at the same time, not stocking any excess inventory." Id. Forecasts "are reviewed and adjusted as needed on a weekly basis." Id.

Appliances sold by Sears are manufactured at various locations throughout the United States, including Iowa, Indiana, Ohio, Kentucky, Arkansas, and Minnesota, as well as Mexico. Id. ¶ 4. "Sears takes title to and control of the appliances from the manufacturers through to home delivery." Id. ¶ 7. Sears is responsible for the shipment of these appliances although Sears' wholly-owned subsidiary, SLS, assists Sears in arranging for the shipment of the appliances. See Id. ¶¶ 4, 7; Affinity's Ex. 4, Miranda Decl. ¶ 9. In most cases, appliances are shipped from the manufacturers' locations to Sears' Direct Distribution Centers ("DDCs"), which are located through the United States and Canada. Miranda Decl. ¶ 6. Then the appliances are shipped from the DDCs to local "MDOs" for delivery to Sears' customers' homes. Id. However, special orders are shipped directly from the manufacturer to the MDO, from which they are delivered to the customer's home. Inwood Depo. at 31:3-13; 108:15-22.

When appliances arrive at the Ontario, California DDC from the manufacturing plant, they are checked in. Christina Miranda, the General Manager of the Ontario, California DDC that supplies the San Diego MDO, explains in her declaration that when appliances have already been sold, the turnaround time between the arrival of the appliances at the DDC and delivery to the MDO is generally between one and three days. Miranda Decl. ¶ 6. When

---

refer to both entities.

appliances have not been sold by the time they reach the DDC, they are offloaded and "stored in the warehouse temporarily until the appliances are sold." Id. ¶ 7. "The appliances that have not already been sold remain at the Ontario DDC for generally no longer than two to three weeks before they are sold, delivered to one of the Sears retails stores or the MDOS and then delivered to the Sears retail customer." Id. It is undisputed that Mr. Ruiz delivered appliances from the San Diego Market Delivery Operation ("MDO") in San Diego, California, to Sears' customers within California.

According to Mr. Inwood, it is Sears' intent "that the appliances move from the manufacturers' facilities. . . . to its DDCs and then to its MDOs for delivery to Sears retail customers while stopping only long enough to maintain control over the inventory." Inwood Decl. at ¶ 8.

## III. Analysis

Whether Mr. Ruiz is exempt from the FLSA overtime provision is a question of law. See Jones v. Giles, 741 F.2d 245, 248 (9th Cir. 1984) ("The district court's holding on the applicability of the 29 U.S.C. § 213(b)(1) exemption is a question of law and therefore we review de novo.").

### A.     Independent Contractor Exception to the FLSA

Affinity argues in a conclusory fashion that Mr. Ruiz is not covered by the FLSA because he is an independent contractor, as supposedly evidenced by the fact that Mr. Ruiz signed an "Independent Truckman's Agreement" in which he acknowledges he is an independent contractor. "[C]ontractual language, however, is not conclusive . . . . Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA." Real v. Driscoll Strawberry Associates, Inc., 603 F.2d 748, 755 (9th Cir. 1979). As explained in Real,

> The courts have identified a number of factors which may be useful in distinguishing employees from independent contractors for purposes of social legislation such as the FLSA. Some of those factors are:
>
> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed;

```
1           2) the alleged employee's opportunity for profit or loss depending upon his
               managerial skill;
2           3) the alleged employee's investment in equipment or materials required for his
               task, or his employment of helpers;
3           4) whether the service rendered requires a special skill;
            5) the degree of permanence of the working relationship; and
4           6) whether the service rendered is an integral part of the alleged employer's business.
```

Id. at 754. "The presence of any individual factor is not dispositive of whether an employee/employer relationship exists." Id. "Such a determination depends "upon the circumstances of the whole activity." Id. (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)).

Because Affinity does not undertake to explain why, as a matter of law, these factors establish that Mr. Ruiz is an independent contractor, the court concludes that Affinity has not met its burden of demonstrating it is entitled to summary judgment on this ground.

### B. Motor Carrier Exemption

Affinity also argues that it is entitled to summary judgment because, as a driver in interstate commerce, Mr. Ruiz falls under Section 13(b)(1) of the FLSA (known as the "motor carrier exemption") and, therefore, is not entitled to overtime compensation. Mr. Ruiz, on the other hand, contends that because he does not cross state lines when he delivers Sears appliances from the San Diego MDO to customers' homes, he is not engaged in interstate transportation, and, therefore, the motor carrier exemption does not apply.

Section 7 of the FLSA, codified at 29 U.S.C. § 207, requires employers to pay overtime wages to certain employees who work more than forty hours in a week. However, pursuant to § 13(b)(1) of the FLSA, codified at 29 U.S.C. § 213(b)(1), this overtime provision does not apply to employees for whom the Secretary of Transportation may prescribe requirements for qualifications and maximum hours of service under the Motor Carrier Act of 1935, 49 U.S.C. § 31502. See 29 U.S.C. § 213(b)(1). As set forth in 29 C.F.R. § 782.2, an employee's exemption pursuant to FLSA § 13(b)(1) "depends on both the class to which his employer belongs and on the class of work involved in the employees's job." For the "motor carrier exemption" to apply, (1) the employee must be employed by an employer subject to the

jurisdiction of the Secretary of Transportation (which it is agreed that Affinity is), and (2) the employee must be "engaged in activities of a character directly affecting the safety of operations of motor vehicles in the interstate transportation of passengers and property." 29 C.F.R. § 782.2.

As for the second requirement, a "driver" is expressly identified in the federal regulations as an occupation that directly affects the safety of motor vehicles, see 29 C.F.R. § 782.2(b)(1), and "driver" is defined for Motor Carrier Act jurisdiction as "an individual who drives a motor vehicle in transportation which is, within the meaning of the Motor Carrier Act, in interstate or foreign commerce." 29 C.F.R. § 782.3(1). As the parties recognize, the sole issue confronting the court is whether Mr. Ruiz is an individual who drives a motor vehicle in interstate transportation when he delivers appliances from the San Diego MDO to Sears' customers without traveling across state lines.

The motor carrier exemption "is construed narrowly, and the employer seeking the exemption has the burden of proving entitlement." Klitzke v. Steiner Corp., 110 F.3d 1465, 1468 (9th Cir. 1997) (internal citation omitted). "Whether any particular shipment is interstate is determined on an ad hoc basis . . . ." Klitzke, 110 F.3d at 1469. "'Whether transportation is interstate or intrastate is determined by the essential character of the commerce, *manifested by shipper's fixed and persisting transportation intent at the time of the shipment*, and is ascertained from all of the facts and circumstances surrounding the transportation.'" Id. (quoting Southern Pac. Trans. Co. v. ICC, 565 F.2d 615, 617 (9th Cir.1977) (citation omitted) (emphasis in original)). Importantly, the in-state transportation of goods after the goods have come to rest in a warehouse may be deemed interstate commerce where the in-state transportation is but a leg of an interstate journey. As explained in Walling v. Jacksonville Paper, Co., 317 U.S. 564 (1943)

> The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer 'in commerce' within the meaning of the Act . . . . if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points.

Id. at 568. Finally, as explained in Reich v. American Driver Service, Inc., 33 F.3d 1153, (9th Cir. 1994):

> Although many motor carriers engage in both interstate and intrastate commerce, a motor carrier cannot be subject to the jurisdiction of both the Secretary of Labor and the Secretary of Transportation. When determining to which Secretary's jurisdiction such a motor carrier's employees are subject, courts have consistently looked to the Supreme Court's decision in Morris v. McComb, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947). *Under Morris, even a minor involvement in interstate commerce as a regular part of an employee's duties can subject that employee to the Secretary of Transportation's jurisdiction.*

Id. at 1155 (internal citations omitted).

In determining whether Mr. Ruiz is a driver transporting goods in interstate commerce, the court looks to the 1992 Interstate Commerce Commission ("ICC") Policy Statement regarding motor carrier transportation from out-of-state locations through warehouses to points within the same state. As the Supreme Court has explained:

> [I]t is important to recognize that, by virtue of the unique provisions of § 13(b)(1) of the Fair Labor Standards Act, we are not dealing with an exception to that Act which is to be measured by regulations which Congress has authorized to be made by the Administrator of the Wage and Hour Division, United States Department of Labor. Instead, we are dealing here with the interpretation of the scope of the safety program of the Interstate Commerce Commission,[2] under § 204 of the Motor Carrier Act, which in turn is to be interpreted in the light of the regulations made by the Interstate Commerce Commission pursuant to that Act." Id.

Levinson v. Spector Motor Service, 330 U.S. 649, 676-677 (1947). The 1992 ICC Policy Statement, which is derived from "an unbroken string of Commission, Federal Court and Supreme Court decisions," is the most recent and relevant statement by the ICC regarding "the difference between interstate and intrastate trucking services provided within a single State." 1992 MCC Lexis 50, * 1. As explained in the 1992 ICC Policy Statement, where goods are transported intrastate after coming to rest, the "essential and controlling element in determining

---

[2] Public Law 89-670 transferred to and vested in the Secretary of Transportation all functions, powers, and duties of the Interstate Commerce Commission under § 204(a)(1) and (a)(2) of the Motor Carrier Act of 1935 related to qualifications and maximum hours of service of employees and safety of operations and equipment.

whether the traffic is properly characterized as interstate is whether the shipper has a 'fixed and persistent intent' to have the shipment continue in interstate commerce to its ultimate destination." Id. at *3. The 1992 ICC Policy Statement sets forth seven factors that suggest a shipper has such an intent.

Mr. Ruiz contends that the court should apply the "Petroleum Products test"[3] rather than the 1992 ICC Policy Statement in order to determine the essential nature of the commerce in which he is engaged. "Pursuant to the Petroleum Products test, the ICC examines three particular indicators of a shipper's intent: (1) the absence of a specific order being filled for a specific quantity at the time of shipment; (2) the status of the terminal storage as a distribution point or local marketing facility; and (3) the arrangement of further transportation only after sale or allocation from storage." International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America and Teamsters Joint Council No. 7 v. I.C.C., 921 F.2d 904, 908 (9th Cir. 1990). However, as the Ninth Circuit has noted, "'[e]ven though the ICC has never explicitly stated that it was abandoning the more structured [Petroleum Products] test, it appears that its use of that standard has been refined, if not phased out.'" Id. (quoting California Trucking Ass'n v. I.C.C., 900 F.2d 208, 213 (9th Cir. 1990)). Thus, the Ninth Circuit has concluded that "where the ICC applies the fixed and persisting intent rule to determine the essential nature of commerce, it need not apply the Petroleum Products test." Id. (quoting California Trucking, 900 F.2d at 212). In light of the foregoing, the court will determine Sears' fixed and persisting intent by applying the 1992 ICC Policy Statement rather than the Petroleum Products test. The court now turns to the relevant factors, as set forth in the 1992 ICC Policy Statement, for determining the essential nature of the commerce at issue here.

First, according to the 1992 Policy Statement, in-state transportation is a part of a continuing movement in interstate commerce where, "[a]lthough the shipper does not know in advance the ultimate destination of specific shipments, it bases its determination of the total

---

[3] See Ex Parte No. MC-48, Determination of Jurisdiction Over Transportation of Petroleum and Petroleum Products by Motor Carriers Within a Single State, 71 M.C.C. 17, 29 (1957).

volume to be shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State." Id. at *4. "The factual basis for projecting customer demand may include but is not limited to, historic sales in the State, actual present orders, [and] relevant market surveys of need." Id. Here, according to the declaration of Mr. Inwood, Sears' orders " are based on the forecasting of sales that will be made by the stores."[4] Inwood Decl. ¶ 5. "The forecasts are based on historical sales information and anticipated appliance promotions." Id. This first factor weighs in favor of a finding that the appliances delivered by Mr. Ruiz were delivered as part of a continuous movement in interstate commerce.

Moreover, even though a shipper need not know the ultimate destination of specific shipments, Sears does, in fact, know the ultimate destination of at least some of the appliances at the time they are shipped from the manufacturer. As explained by Mr. Inwood in his declaration,[5] sales occur on appliances that "have a release date but are still on the manufacturers' production line . . . ." Id. ¶ 6. Moreover, approximately 2 to 3½ percent of Sears product is special orders. Inwood Depo. at 30:25-31:13. If something is a special order, it comes directly from the manufacturer and goes directly to the MDO for delivery to the

---

[4] Mr. Ruiz takes issue with the fact that neither Mr. Inwood's nor Ms. Miranda's declaration is accompanied by supporting documentation. However, Mr. Ruiz has failed to cite a single case holding that a defendant seeking summary judgment must accompany declarations with supporting documentation, and the court is not aware of any authority so holding. In fact, it has long been the rule that a defendant need not file *any* evidence in support of a motion for summary judgment. See Rule 56(a) (explaining that party may move for summary judgment "with or without supporting affidavits"); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim."). Moreover, if Mr. Ruiz's objection is that Affinity has failed to establish a foundation for this testimony, such an objection is not well-taken given that a review of their declarations establishes that both declarants have sufficient on-the-job experience with Sears' procedures and the procedures at the DDC to render an opinion regarding the topics on which they opine.

[5] Mr. Ruiz contends that "Affinity has not offered a scintilla of evidence that a specific customer order exists for the product when SLS picks up the merchandise from the vendor's manufacturing facility." Opposition at 10:2-4. However, Mr. Inwood's and Ms. Miranda's testimony is such evidence.

customer. Inwood Depo. at 31:3-13; 108:15-22. Clearly, at the time of shipment from the manufacturer, Sears has a fixed intent regarding the destination of appliances that are special orders.

Mr. Ruiz contends that when Sears places its firm orders with the manufacturers, it cannot have the intent to ship to a specific customer because a customer cannot order an appliance for which there is not a firm order. However, this argument ignores the fact that Sears' intent at the time of shipment, not at the time of placing its order, is the relevant intent. See Klitzke, 110 F.3d at 1468. To the extent that Watkins v. Ameripride Services, 375 F.3d 821, 826 (9th Cir. 2004) suggests otherwise, it does so in *dicta* and without considering the 1992 ICC Policy Statement and the authority upon which it relies. Moreover, one Ninth Circuit panel cannot overrule another panel. See In re Smith, 305 F.3d 1078, 1085 (9th Cir.2002).

Mr. Ruiz also contends that because, *on average*, appliances stay at the DDC for between 21 and 28 days, this demonstrates that "there is no customer order for the product even when it arrives at the DDC." Opposition at 10:13-15. However, it does not follow from the fact that there is no outstanding order for certain products that sit at the DDC for several weeks that there is never a customer order for an appliance at the time it is shipped from the manufacturer.

The second factor identified in the 1992 ICC Policy Statement as demonstrating that in-state transportation is simply a continuation of interstate commerce is that "[n]o processing or substantial product modification of substances occurs at the warehouse or distribution center." 1992 MCC Lexis at *4. Here, it is undisputed that no processing, repackaging or product modification occurs at the Ontario DDC. Miranda Decl. ¶ 8. Moreover, there is no evidence that the appliances are processed, repackaged or modified at the San Diego MDO. Thus, this factor weighs in favor of a finding that the appliances delivered by Mr. Ruiz were delivered as part of a continuous movement in interstate commerce.

The third factor identified in the 1992 ICC Policy Statements is that "[w]hile in the warehouse, the merchandise is subject to the shipper's control and direction as to the

- 9 - 05CV2125

subsequent transportation." 1992 MCC Lexis at *5. Here, both Mr. Inwood and Ms. Miranda represent that "Sears takes title to and control of the appliances" from the manufacturing facility to its customers' homes. Inwood Decl. ¶ 7; Miranda Decl. ¶ 9. Thus, this factor also weighs in favor a finding that the appliances delivered by Mr. Ruiz were delivered as part of a continuous movement in interstate commerce.

The fourth factor identified in the 1992 ICC Policy Statement as demonstrating that the movement of goods through a warehouse does not break the continuity of the transportation is that "[m]odern systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center." According to Mr. Inwood, "Sears tracks the shipments of the appliances from the time the manufacturer gives Sears a release date for the appliances to be shipped through the DDCsand the MDos and then on through the deliverty to its customers." Inwood Decl. ¶ 8. Thus, this factor also weighs in favor of a finding that the appliances delivered by Mr. Ruiz were delivered as part of a continuous movement in interstate commerce.

The fifth factor identified in the 1992 ICC Policy Statement as demonstrating that the movement of goods through a warehouse does not break the continuity of the interstate nature of the transportation is that the shipper "bear[s] the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier." 1992 MCC Lexis at *5. Here, although SLS hires the carriers to transport the appliances, Sears pays SLS, its wholly-owned subsidiary, for the services it provides in distributing the appliances. Miranda Decl. ¶ 9. Thus, this factor also weighs in favor of a finding that the appliances delivered by Mr. Ruiz were delivered as part of a continuous movement in interstate commerce.

The sixth factor identified in the 1992 Policy Statement as establishing that the in-state transportation of goods constitutes the continuation of an interstate journey is that "[t]he warehouse utilized is owned by the shipper." 1992 MCC Lexis at * 5. Here, SLS, a wholly-owned subsidiary of Sears, owns the San Diego MDO and either SLS or Sears leases the Ontario DDC. See House Decl. ¶ 3; Miranda Depo. at 10-15. Thus, this factor also weighs

1  in favor of a finding that the appliances delivered by Mr. Ruiz were delivered as part of a
2  continuous movement in interstate commerce.

3  The final factor identified in the 1992 ICC Policy Statement – that the shipments move
4  through the warehouse pursuant to a storage in transit tariff provision – is not addressed by the
5  parties and, therefore, does not appear to weigh in favor of either parties' position.

6  In summary, all of the relevant factors point to the conclusion that Mr. Ruiz's in-state
7  transportation of appliances from the San Diego MDO to the homes of Sears' customers was,
8  as a matter of law, transportation in interstate commerce. This is so because the transportation
9  of the appliances from the MDOs to customers' homes was the last leg of what Sears, at the
10 time of the shipment from the manufacturer, intended to be a journey of the appliances in
11 interstate commerce. A review of the factors relied upon by Mr. Ruiz does not alter this
12 conclusion.

13 Mr. Ruiz contends that, because the DDC is a warehouse that is "designed, in part, to
14 hold inventory," Miranda Depo. at 103:8-10, Sears does not have a fixed and persistent intent
15 that the appliances move beyond the DDC. However, as the ICC Policy Statement notes,
16 "[t]he case law establishes that the absence of time limitations on storage and the absence of
17 storage-in-transit receipts issued by the warehouse or distribution center are not sufficient to
18 establish that the continuity of interstate commerce is broken at the warehouse." 1992 MCC
19 Lexis at *5; see also Roberts v. Levine, 921 F.2d 804, 810-11 (8th Cir. 1990) (concluding that
20 intrastate shipment of urea after storage in warehouse constituted a continuation of the urea's
21 interstate journey, where urea could remain at warehouse for as long as six months); Merchants
22 Fast Motor Lines, Inc. v. I.C.C., 5 F.3d 911, 917 (5th Cir. 1993). Thus, that some appliances
23 are temporarily stored at the DDC does not alter the conclusion that Sears possesses the
24 requisite "fixed and persistent intent" that the appliances "continue in interstate commerce"
25 past the DDC to their "ultimate destination." 1992 MCC Lexis at *3.

26 Mr. Ruiz also contends that even though certain appliances may be designated for a
27 customer at the time of shipping, Sears does not possess the requisite "fixed and persistent
28 intent" because it retains the ability to divert the products to another customer prior to delivery.

See Ruiz Ex. E, House Depo. at Ex. p.200:1-201:7 (explaining that if a customer requests a different delivery date, depending on the new date, the appliance originally designated for that customer may be re-designated for a different customer). For this proposition, Mr. Ruiz relies on <u>Burlington Northern, Inc. v. Weyerhaeuser Co.</u>, 719 F.2d 304 (9th Cir. 1983); however, <u>Burlington Northern</u> is distinguishable on its facts.

Burlington Northern transported logs for Weyerhaeuser. The logs were transported from Weyerhaeuser's inland sort yards throughout Washington to its Tacoma, Washington sort yard (TSY). Burlington Northern initially billed Weyerhaeuser at intrastate tariff rates, but, upon learning that the Interstate Commerce Commission (ICC) was investigating the shipments, Burlington Northern rebilled Weyerhaeuser at the interstate tariff rates. Weyerhaeuser refused to pay the additional amount and litigation ensued.

On appeal, the Ninth Circuit affirmed the district court's conclusion that the logs were not moving in interstate commerce pursuant to the Interstate Commerce Act. The Ninth Circuit concluded that "the intrastate transportation of logs from the inland sort yards to TSY was merely an interior movement, separate and distinct from the ultimate transportation to a final destination, undertaken for the purpose of preparing the logs for final disposition." <u>Id.</u> at 310. It explained:

> While Weyerhaeuser generally expected to export most of the logs delivered to TSY, it also expected to transship some of them to other Weyerhaeuser facilities intrastate. Weyerhaeuser could not designate with certainty at the inland sort yards which logs would eventually be exported *because independent Puget Sound Bureau scalers made the final determination based on quality standards*. Therefore, when the logs left the inland sort yards their ultimate destination was still unknown.

<u>Id.</u> (emphasis added). It concluded that

> [u]nder these circumstances, the principles set forth in *Southern Pacific* govern our determination. *The only intent manifested by Weyerhaeuser at the time of shipment from the inland sort yards was to deliver the logs to TSY for eventual reshipment to an as yet unknown destination.* At that point, the logs had not yet embarked on a journey in interstate or foreign commerce. Accordingly, the essential character of the transportation was intrastate and Weyerhaeuser was initially billed at the proper intrastate tariff rates.

1 | Id. (emphasis added).

2 | The key difference between Burlington Northern and the present case is that in Burlington Northern, the shipper could not have an intent to ship the goods to a specific destination past its sort yards because an independent party always made the ultimate determination regarding where the goods would be shipped once they reached the sort yard. Here, in contrast, at the time certain appliances are shipped from the manufacturer, Sears has an intent to ship them to a specific destination. Although in certain instances the appliances are ultimately rerouted to a different consumer (where, for example, a customer requests a different delivery date), that does not negate the fact that Sears has the requisite intent at the time of shipment – an intent that the shipper in Burlington Northern did not, and could not, have.

Besides the fact that Burlington Northern is not on point, as recognized in Galbreath v. Gulf Oil Corp., 413 F.2d 941 (5th Cir. 1969), there is no relevant distinction between fungible and non-fungible goods for purposes of determining the nature of their transportation. Therefore, the fact that Sears can "divert" an appliance from one customer to another at any time prior to delivery does not change the conclusion that, with respect to certain appliances, Sears does have an intent at the time of shipment to ship the appliances to a specific destination. See Id. at 946 (concluding that the transportation of gasoline after being delivered to a plant from which it was distributed was interstate in nature even though gasoline is a fungible product).

Finally, as noted in the 1992 ICC Policy Statement, the requisite "fixed and persisting intent" is not an intent that the appliance be delivered to the specific customer for whom it was originally designated but, rather, an intent that the appliance "continue in interstate commerce to its ultimate destination." 1992 MCC Lexis at *3. Even if one customer is substituted for another after shipment, this does not change Sears' intent that the appliance not stop its journey at the DDC or the MDO but rather that it continue in interstate commerce to a customer's home.

Mr. Ruiz, citing Foxworthy v. Hiland Dairy Co., 997 F.2d 670, 673 (10th Cir. 1993),

also makes much of the fact the Sears appliances that are designated for specific customers are "commingled" with other Sears appliances for which there is not a specific customer. While it is true that the Tenth Circuit in Foxworthy noted that the goods at issue had not been commingled, the court did not explain the relevant analysis with respect to commingling. Moreover, a review of the cases cited by Foxworthy reveals that the appliances in the present care not "commingled" in any manner that would suggest their transportation from the San Diego MDO to California customers is intrastate in nature.

For example, the Fifth Circuit in Galbreath v. Gulf Oil Corp., 413 F.2d 941, 946 (5th Cir. 1969), cited by Foxworthy, distinguished an ICC ruling finding the transportation of petroleum products to be intrastate commerce on the ground that in that case petroleum product was commingled with the petroleum products of *other companies*. Here, Sears' appliances are not commingled with the appliances of other companies.

Moreover, State of Texas v. United States, 866 F.2d 1546, 1559 (5th Cir. 1989), also cited by Foxworthy, is authority for the proposition that the commingling of goods in a warehouse *after* the interstate shipment of the goods does not necessarily transform the subsequent intrastate transportation of the goods into shipment in intrastate commerce. Moreover, its holding is not helpful to Ruiz. State of Texas involved the shipment of carpet manufactured by a single manufacturer. The carpet was shipped from Georgia and Tennessee to a "service center" in Arlington, Texas. Id. at 1549. At the time of shipment from the manufacturer, 30% of the carpet was designated for particular customers while the remaining carpet was not. The carpet designated for particular customers was referred to as "sidemarked" carpet, and the parties agreed that the sidemarked carpet was moving in interstate commerce until it reached the consumer even if the consumer was located in Texas.

The remaining carpet was designated as "non-sidemarked carpet." It usually remained at the service center for two to three months before being shipped to a customer. Over 90% of the non-sidemarked carpet was ultimately delivered to a customer in Texas. The non-sidemarked carpet was shipped from Georgia to Texas "on the basis of E & B's projections from its past dealing with its 'major customers,'" who accounted for 80% its overall sales. Id.

at 1549. The ICC concluded that the shipments of the non-sidemarked carpet were interstate in nature. The Fifth Circuit affirmed.

The Fifth Circuit explained that commingling is an issue because there is a concern that shippers might commingle products in order to use cheaper interstate rates to ship goods that are never intended to move out of the state. See State of Tex., 866 F.2d at 1560. However, the Fifth Circuit concluded that the fact that the sidemarked and non-sidemarked carpet was commingled at the Texas service center did not transform the shipments of the non-sidemarked carpet from the service center to Texas customers into intrastate shipments. As the court explained in State of Texas:

> Shipments that move from a factory in state A to a warehouse in state A, when some of it is never shipped out of that state, are not analogous to shipments from state A to a warehouse in state B, when some of it later moves to final destinations within state B. In the former case, goods bound for local markets are commingled with goods bound for interstate markets, with the potential for deviously using interstate storage-in-transit privileges on the initial part of the trip. In the later case, all goods are bound for interstate markets, and there is no potential for manipulative commingling.

Id. at 1559. Noting that "[t]he market for all of the carpet shipped by E & B from Georgia is in another state, Texas" and that the carpet moved in interstate commerce before coming to rest at the service center, the Fifth Circuit concluded that the non-sidemarked carpet traveled in interstate commerce to Texas customers despite the commingling. Given the factual similarity between State of Texas and the present case, State of Texas supports Affinity's position that all of the appliances Ruiz delivers are delivered in interstate commerce.

Mr. Ruiz also takes issue with Ms. Miranda's statement regarding the percentage of appliances that are earmarked for customers. Although a question from Mr. Ruiz's counsel during Ms. Miranda's deposition suggested that Ms. Miranda testified that 30-40% of the appliances arriving at the DDC are earmarked for particular customers, see Miranda Depo. at 103: 11-104:3, a close review of Ms. Miranda's testimony reveals that she actually testified that in her experience 60% of the appliances coming into the DDCs goes to the MDO's and that 30-40% of the appliances going to the MDOs would be earmarked for customers, see

Miranda Depo. 100:16-101:18, which would suggest that 18-24% (30-40% of 60%) of the appliances coming into the DDC are earmarked for customers. However, any discrepancy in Ms. Miranda's testimony is not material to the present analysis. First, because appliances can be sold between the time they leave the manufacturer and the time the arrive at the DDC, and because special orders do not pass through the DDCs on their way to the MDOs, the percentage of appliances destined for customers at the time the appliances arrive at the DDC is not the relevant inquiry. Second, and perhaps most importantly, as recognized in the 1992 ICC Policy Statement, a shipper need not know in advance the ultimate destination of a shipment of goods in order for the intrastate transportation of the goods from a warehouse to consumers to be deemed a continuation of the goods' interstate journey. See 1992 MCC Lexis at *4. Third, even if there were a requirement that Sears know in advance the ultimate destination of its appliances at the time they are shipped from the manufacturer, the undisputed evidence reveals that, at a minimum, 2 to 3 ½ % of the appliances are specifically destined for customers at the time they leave the manufacture. Under Morris v. McComb, 332 U.S. 422, 423-424 (1947), this is clearly sufficient to trigger application of the motor carrier exemption.

In Morris, the Court was confronted with two questions: whether the ICC "has the power, under § 204 of the Motor Carrier Act, 1935, to establish qualifications and maximum hours of service with respect to" full-time drivers employed by a common carrier by motor vehicle when only 3% to 4% of the carrier's total carrier services are in interstate commerce "and the performance of such services is shared indiscriminately among such employees and mingled with their performance of other like services for such carrier not in interstate commerce"; and (2) whether, if the ICC has such power, "the overtime requirements of § 7 of the Fair Labor Standards Act of 1938 apply to such employees in view of the exemption stated in § 13(b)(1) of that Act." Id. at 423-24.

The Supreme Court held that ICC does have such power "and that the overtime requirements of § 7 of the Fair Labor Standards Act therefore do not apply to such employees." Id. at 424. The Court explained that "[u]nder the tests of the Commission's power, as approved in both the majority and minority opinions in the Levinson case, and, under the analysis of that

power developed by the Interstate Commerce Commission and cited in that case, it is 'the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the Commission's power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment.'" Id. at 431-32.

Since McComb, Congress has vested in the Secretary of Transportation all of the ICC's duties, functions and powers regarding the establishment of qualifications and maximum hours of serve for employees. See Public Law 89-670. However, McComb remains applicable here.

Again, the uncontradicted evidence is that 2 to 3½ % of the shipments from the manufacturers are special orders so that at the time the appliances leave the manufacturer's facilities, Sears intends that the appliances will be shipped in interstate commerce to an ultimate consumer. Moreover, it is undisputed that other appliances can be, and at times are, designated for a particular consumer once the firm order has been placed but before the appliance is shipped from the manufacturer. Pursuant to McComb, a sufficient number of appliances delivered by Mr. Ruiz are traveling in interstate commerce so as to render him ineligible for overtime under motor carrier exemption.

Finally, Mr. Ruiz contends that Ms. Miranda's and Mr. Inwood's testimony conflicts; however, Mr. Ruiz has failed to identify any relevant conflicts in the testimony of these individuals that changes the conclusion that the transportation of the appliances from the MDOs to the homes of Sears' customers is interstate in nature.

**VI.  Conclusion**

For the reasons set forth above, the motion for summary judgment as to Count I is granted.

**IT IS SO ORDERED.**

DATED: November 6, 2006

John S. Rhoades, Judge
United States District Court