# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO RUIZ, individually and on behalf of all others similarly situated<br><br>                                          Plaintiff,<br><br>         vs.<br><br>AFFINITY LOGISTICS CORP.,<br><br>                                          Defendant. | CASE NO. 05CV2125 JLS (CAB)<br><br>**MEMORANDUM DECISION AND ORDER FINDING PLAINTIFF AND ABSENT CLASS MEMBERS PROPERLY CLASSIFIED AS INDEPENDENT CONTRACTORS** |

The above-captioned class action came before the Court without a jury on December 14, 15, and 16, 2010.  Attorneys Daniel A. Osborn, Elic Eliahu Anbar, and Adrianne J. Leven appeared on behalf of Fernando Ruiz, individually and on behalf of all others similarly situated ("Plaintiffs"). Attorneys James H. Hanson and Adam Carl Smedstad appeared on behalf of Affinity Logistics Corp. ("Defendant" or "Affinity").  The Court heard testimony from witnesses Fernando Ruiz, Alfonso Sanchez, Oscar Arturo Reyes, Charles Hitt, Danny Lee Hansen, Robert William Crandell, and Gabriel Mejia.  The Court heard opening arguments from counsel and admitted exhibits into evidence.  At the close of trial, the parties waived oral argument, electing instead to file "final briefs" with the Court. (Doc. Nos. 178 & 180.)

This memorandum decision constitutes the Court's findings of fact and conclusions of law. These are based on the testimony and evidence admitted at trial and the principles of law that apply to those facts.

**FINDINGS AND CONCLUSION**

## I.   Background

Defendant Affinity Logistics[1] was a Georgia corporation with its principal office located in Marietta, Georgia.  (Joint Pretrial Order, Section III,  6.)  Affinity provided regulated, for-hire home delivery and transportation logistics support services to various home furnishing retailers, including Sears, Home Depot EXPO, J.C. Penney, Wickes and Brueners.  (*Id.*, Section III,  7; *see also* Transcript at 169-70, 200-01, 219, 245-46, 296.)

In November 2003 and again in 2006, Affinity entered into a Home Delivery Carrier Agreement with Sears to arrange for drivers to perform home delivery services out of the San Diego MDO, located at 960 Sherman Street.  (*See* Ex. 56 (2006 Sears Agreement); *see also* Transcript at 41-42, 118-, 171-72, 375-76, 727; Joint Pretrial Order, Section III,  5, 18.)  Sears owned the San Diego Market Delivery Operation (MDO), but provided Affinity with offices at the warehouse.  (Transcript at 304-05, 376.)

In late 2003, Plaintiff Ruiz met with Danny Hansen, who managed the Sears account for Affinity at the San Diego MDO.  (Transcript at 414, 470.)  After deciding to work for Affinity, Ruiz formed R&S Logistics ("R&S") by obtaining a Federal Employer Identification Number and establishing a separate business banking account for R&S.  (Transcript at 544, 546-47, 549-51; *see also* Ex. 25.)  Ruiz thereafter entered into the Independent Truckman's Agreement ("ITA") and Equipment Lease Agreement ("ELA") with Affinity.  (Exs. 77, 78.)  Both the ITA and the ELA provided that the parties intended to create an independent contractor relationship.  (See Ex. 77, ¶ 9, Ex. 78, ¶ 2.)  Ruiz thereafter began making deliveries for Affinity to Sears' customers, the details of which are discussed below.

This putative class action was transferred to this Court from the Northern District of California on November 14, 2005.  (Doc. No. 1.)  Plaintiff, on behalf of himself and all others similarly situated, alleged that Defendant misclassified the drivers as independent contractors, contending that they should have been classified as employees.  (*Id.*)  On January 28, 2009, this Court granted in part and denied in part Plaintiffs' motion for class certification.  (Doc. No. 105.)

---

[1] In June 2007, Affinity was acquired by 3P Delivery, Inc.  (Joint Pretrial Order, Section III, ¶ 29.)

1  The Court denied class certification on all issues except for whether Affinity should have

2  classified the class members, defined as all current and former delivery drivers who made home

3  deliveries for Affinity in the State of California between May 18, 2001 and the resolution of the

4  complaint, as employees rather than independent contractors.  (*Id.*)  This limited issue went to trial

5  before the Court without a jury on December 14, 15, and 16, 2010.

6  **II.      Independent Contractor Presumption and Governing Law**

7         The sole issue to be determined at trial is whether Plaintiffs were misclassified as

8  independent contractors versus employees.  Georgia law governs this determination.  (*See* Doc.

9  No. 79 at 6; Doc. No. 154 at 2 n.1.)  Under Georgia law, if the contract designates the relationship

10  between the parties to be one of principal and independent contractor, this designation is presumed

11  to be true "unless other evidence is introduced to show that the employer exercised control as to

12  the time, manner and method of performing work sufficient to establish an employer-employee

13  relationship."  *Fortune v. Principal Fin. Group, Inc.*, 465 S.E.2d 698, 700 (Ga. Ct. App. 1995).[2]

14         Here, the Independent Truckman's Agreement ("ITA"), the controlling contract entered

15  into between the drivers and Affinity, explicitly states that "[t]he parties intend to create an

16  independent contractor relationship and not an employer-employee relationship." (Ex. 77, ¶ 9.)

17  The Equipment Lease Agreement ("ELA") also states that "[i]t is expressly understood and agreed

18  that Contractor is an independent contractor of Affinity . . ." (Ex. 78, ¶ 2.)[3]  Accordingly, the

---

20  [2]   "On the other hand, where the contract specifies that the employee's status shall be that of
21  independent contractor but at the same time provides that he shall be subject to any rules or policies
of the employer which may be adopted in the future, no presumption arises." *Larmon v. CCR Enters.*,
22  647 S.E.2d 306, 3017 (Ga. Ct. App. 2007) (quoting *Ross v. Ninety-Two West*, 412 S.E.2d 876, 881
(Ga. Ct. App. 1991)).  There are no such provisions in this case.

23  [3]   Plaintiffs repeatedly assert that the ELA was used to "create a fiction of operating via
24  independent contractors instead of employees."  (Pl. Final Argument at 11.)  Specifically, Plaintiffs
contend that because Affinity leased the truck from Ryder Truck Rental (Transcript at 519-20), then
25  subleased that truck to the drivers, who in turn leased this truck *plus a driver* back to Affinity pursuant
to the ELA (Ex. 78), the ELA misstates the actual relationship between the parties.  (Pl. Final
26  Argument at 11.)  The Court disagrees.  The ELA provides that "Affinity hereby leases from
Contractor, the equipment and driver." (Ex. 78.)  According to Mr. Hitt, this is a standard contractual
27  relationship in the delivery business.  (Transcript at 363.)  The fact that the trucks were originally
leased to the drivers does not negate the fact that the ELA provided that the drivers leased to Affinity
28  the truck *and* the driver. (*See* Ex. 78.)  This is consistent with the Federal Leasing Regulations, which
define the "owner" of the truck as one "(1) to whom title to equipment has been issued, or (2) who,
without title, has the right to exclusive use of equipment, or (3) who has lawful possession of
equipment registered and licensed in any State in the name of that person."  49 C.F.R. Part 376.2(d);

1 Court finds that the presumption arises and the burden shifts to Plaintiffs to rebut the presumption

2 that Plaintiffs are indeed independent contractors.[4]

3       To prove an employer-employee relationship, Plaintiffs must show that "the contract gives,

4 or the employer assumes, the right to control the time, manner, and method of executing the work

5 as distinguished from the right merely to require certain definite results in conformity to the

6 contract." *Larmon*, 647 S.E.2d at 307; *see also McLaine v. McLeod*, 661 S.E.2d 695, 699 (Ga. Ct.

7 App. 2008). Further expanding on this test, Georgia law provides:

8     The right to control the time means the employer has assumed the right to control the
person's actual hours of work. The right to control the manner and method means the
9     employer has assumed the right to tell the person how to perform all details of the job,
including the tools he should use and the procedures he should follow.

10 *Palma v. Ga. Farm Bureau Ins. Co.*, 606 S.E.2d 341, 344 (Ga. Ct. App. 2004) (citations omitted).

11
Courts, including Georgia courts, have also looked to so-called "common law factors" "when
12
deciding whether one acting for another is an independent contractor or an employee." *Murphy v.*
13
*Blue Bird Body Co.*, 429 S.E.2d 530, 532 (Ga. Ct. App. 1993) (citing *Moss v. Central Ga. R. Co.*,
14
219 S.E.2d 593 (Ga. Ct. App. 1975)). These factors include:
15

16     (1) the extent of control which, by agreement, the employer may exercise over the details
of the work; (2) whether or not the one employed is engaged in a distinct occupation or
17     business; (3) whether or not the work to be performed is usually done under the direction
of the employer or by a specialist who needs no supervision; (4) the skill required in the
particular occupation; (5) whether the employer supplies the tools and the place of work for
18     the one employed; (6) the length of time for which the person is employed; (7) the method
of payment, whether by the time or by the job; (8) whether or not the work to be performed
19     is a part of the regular business of the employer; (9) whether or not the parties believe they

20 ────────────────

21 *see also Owner-Operator Indep. Drivers Ass'n v. Ledar Transp.*, 2004 U.S. Dist. LEXIS 7869, *4
(W.D. Mo. Jan. 7, 2004); *Dart Transit Co.*, 9 I.C.C.2d 701, 1993 WL 220182 (1993). Thus, the Court
22 finds that the ELA does not create a "fiction" of an independent contractor relationship.

23     [4] The quantum of evidence necessary to rebut the presumption is not clear under Georgia law.
The Court believes that the appropriate standard is by a preponderance of the evidence. Plaintiffs'
24 contention that "all that is necessary to rebut the presumption is to 'indicate' or identify the contrary
evidence one intends to counter the presumption" is unpersuasive. Applying such a low burden would
25 render the presumption under Georgia law superfluous. Moreover, the cases cited by Plaintiffs in
support of this proposition addressed the standard for overcoming a motion for summary judgment.
26 At trial, however, Plaintiffs bear the burden of demonstrating an employee-employer relationship by
a preponderance of the evidence. *See Fortune v. Principal Fin. Group, Inc.*, 465 S.E.2d 698, 700 (Ga.
27 Ct. App. 1995). Accordingly, Plaintiffs either bear the burden of overcoming the presumption by a
preponderance of the evidence or, at the very least, must establish the employer-employee relationship
28 by a preponderance of the evidence. Plaintiffs appear to agree, recognizing that even once the
presumption is rebutted, "the ordinary rules of evidence" apply. (Pl. Final Argument at 5.)
Regardless, the Court finds that Plaintiffs have neither rebutted the presumption by a preponderance
of the evidence or supported their misclassification assertions by a preponderance of the evidence.

1    are creating an agency relationship; and (10) whether the employer is or is not in business.

2    *Id.* (citations omitted); *see also* Restatement (Second) of Agency § 220(2).

3    The Court has examined the evidence submitted at trial and the relevant case law.  While

4    some factors support a finding of an employer-employee relationship, the Court finds that

5    Plaintiffs have not established this by a preponderance of the evidence, especially in light of the

6    independent contractor presumption.  Instead, the predominant evidence supports a finding that

7    Ruiz and the unnamed class members were correctly classified as independent contractors.

8    **III.    Plaintiffs Were Not Required to Perform the Work Themselves**

9    The most prominent evidence that Affinity did not control the time, manner and method of

10   the drivers is that Ruiz and the other drivers did not themselves have to do the work for which they

11   were hired—the drivers could hire other drivers to load the trucks, drive the trucks, run the routes,

12   make the deliveries, unload the trucks, and perform virtually all other aspects of the job.  (*See*

13   Transcript at 83-84, 87, 140-42, 527-28, 535, 545, 557-60, 580, 620, 713-14.)  In fact, some of the

14   drivers operated multiple trucks to complete the deliveries on any given day and hired drivers and

15   helpers to staff those extra trucks.  (Transcript at 86-87, 140-42, 527-28, 535, 713-14).  One

16   witness driver, Mejia, operated up to four trucks at one time.  (*Id.* at 713-14.)  Plaintiffs presented

17   evidence that Affinity encouraged or repeatedly asked some drivers to drive extra trucks in an

18   attempt to establish control; yet, these drivers testified that they were the ones who ultimately

19   made the decision to run, or stop running, multiple trucks.  (*See id.* at 80-81, 90-91, 139-41, 714.)

20   The Court finds that the Plaintiffs' ability to hire others to operate the trucks and perform the

21   services they contracted with Affinity to performs is highly indicative of an independent contractor

22   relationship.  An employee is not able to hire a substitute to do their work as these drivers were

23   permitted, and even encouraged, to do.

24   Plaintiffs argue that, despite the drivers' ability to run extra trucks and hire other drivers

25   and helpers, Affinity asserted control over Plaintiffs by requiring them to have all their helpers and

26   second drivers approved.  (*See* Transcript at 502-03.)  Each helper had to submit to a background

27   check.  (Ex. 76; *see also* Transcript at 284-85, 319, 512, 736.)  Second drivers were subject to the

28   same hiring criteria and had to fill out the same application as the original driver.  (*Compare* Ex. 3

*with* Ex. 51; *see also* Transcript at 100-01, 160, 527-528.)  Further, Affinity monitored the

performance and appearance of the helpers and second drivers, as set forth in a two-page "Delivery Team and Staff Appearance Policy" section of the application. (*See* Ex. 51.)  Driver witnesses Reyes and Sanchez both testified that they were told by Affinity that their helpers did not meet the appearance requirements and that if this was not corrected, the helpers and/or the drivers would not be able to go on the route that day or perhaps the next day.  (*See* Transcript at 61, 129.)

Initially, the fact that the second drivers are required to complete substantially the same application in order to be hired by Plaintiffs weighs in favor of finding the requisite control of an employee relationship.  Upon closer review of the application, however, the Court finds that the application requirements were largely dictated by federal regulations and that compliance with federal regulations does not sufficiently establish employer-employee control under these circumstances.  Moreover, any monitoring of the drivers' and helpers' performance after Plaintiffs hired them can be properly attributed to Sears, not to Affinity.

This Court has previously held that an employer cannot simply pass through third party requirements to its workers and then argue that it is not asserting control over its worker sufficient to establish an employer-employee relationship (*see* Doc. No. 79 at 7-8 (Summary Judgment Order); *see also* Doc. No. 95 at 4-5.)  However, in its Motion in Limine Order, the Court allowed evidence of Sears' alleged requirements to be introduced at trial, finding it necessary for the Court to "thereafter consider whether this 'control' by Sears can be attributed to Defendant or otherwise relates to the employee-independent contractor" determination.  (Doc. No. 154 at 7-8.)  On similar grounds, the Court denied Defendant's motion to exclude evidence of compliance with federal regulations, as Defendant contended that compliance with these regulations does not evidence its alleged control over its drivers.  (*Id.* at 10-13.)  The Court allowed evidence of the federal regulations at trial and now assesses "the weight, if any, such compliance shall be given under the case law guiding the Court's analysis."  (*Id.* at 13.)

Having done so, the Court finds that the application and approval process for helpers and second drivers are the product of Sears' and federal regulation requirements and that these do not evidence the requisite "control" sufficient to negate the fact that Plaintiffs were permitted to hire helpers, drivers to run their own routes, or second drivers to operate multiple trucks.  In regards to

the helper and second driver applications, the majority of these requirements were imposed upon

Affinity by the government.  Affinity, as a regulated motor carrier, is subject to the Federal Truth-

in-Leasing Regulations ("Federal Leasing Regulations"), 49 C.F.R. Part 376, and the Federal

Motor Carrier Safety Regulations ("Federal Safety Regulations"), 49 C.F.R. Parts 382-397.

The Federal Leasing Regulations explicitly address the issuance of weekly settlement

regarding compensation, the signing of contracts such as the ITA and ELA, the furnishing of time

sheets and manifest logs, and the deductions from the weekly settlement payments.  *See generally*

49 C.F.R. §§ 376.11 and 376.12.  These aspects of the relationship between Defendant and

Plaintiffs, therefore, are not sufficient evidence of control.  In fact, the regulation itself specifies

that the lease "shall provide that the authorized carrier lessee shall have exclusive possession,

control, and use of the equipment for the duration of the lease" but that this does not "affect

whether the lessor or driver provided by the lessor is an independent contractor or an employee of

the authorized carrier lessee."  49 C.F.R. § 376.12(c)(1), (4); *see also Upshaw v. Hale Intermodal

Transport Co.*, 480 S.E.2d 277, 278 (Ga. Ct. App. 1997).

Similarly, the Federal Safety Regulations require all drivers to: (1) undergo drug testing

(*see* Ex. 15); (2) undergo a background check, including previous work history (*see* Exs. 9-12); (3)

submit to a medical examination and drug testing (*see* Ex. 14); (4) confirm that the driver is a legal

resident (*see* Exs. 6-7); (5) require the drivers to comply with vehicle maintenance and inspection

requirements (*see* Transcript at 91, 602); and (6) require review of the drivers' driving record (*see*

Exs. 18, 19).  (*See also* Ex. 51.)  *See generally* 49 C.F.R. Parts 382-97.  In fact, the application for

both drivers and second drivers contain many citations to these federal regulations within them.

(*See, e.g.,* Exs. 7, 10, 12, 13, 14, 15, 16, 17, 18, 19.)  Consistent with Georgia law and the law of

other jurisdictions, this Court holds that the exercise of control over the drivers, second drivers,

and helpers in compliance with government regulations does not establish an employer-employee

relationship standing alone.[5]  *See, e.g.*, *Larmon*, 647 S.E.2d at 307-08; *Upshaw*, 480 S.E.2d at 278;

---

[5]   In its response to Affinity's final argument brief, Plaintiffs contend that they are not using such evidence as evidence of control.  (Doc. No. 185 at 7.)  Instead, Plaintiffs argue that the "layer of carrier regulation put upon the contractor [is] beyond what was required by government regulation, impairing the contractor's independence."  (*Id.* (quoting *Local 814, International Brotherhood of Teamsters (Santini Bros., Inc.)*, 208 N.L.R.B. 184, 197 n.18 (1974).  The Court agrees – to the extent the requirements imposed upon the drivers exceed those required by federal regulations, these

1   *SIDA of Hawaii, Inc. v. NLRB*, 512 F.2d 354, 359 (9th Cir. 1975); *Local 777 v. NLRB*, 603 F.2d

2   862, 875 (D.C. Cir. 1978).

3         To the extent Affinity monitored the helpers' and second drivers' performance and

4   appearance, the Court attributes this to Sears' requests and not Affinity's assertion of control over

5   Plaintiffs' manner and method of work.  The Court examines these requirements at great length

6   *infra* in relation to Plaintiffs, as these same requirements were imposed upon the drivers, helpers,

7   and second drivers, and thus will not be discussed here.  It is sufficient to say at this time that the

8   Court, consistent with Georgia law, finds that Defendant's approval and monitoring requirements

9   of Plaintiffs' helpers and second drivers is not sufficient to establish the requisite "control" of an

10   employer-employee relationship over Plaintiffs.  *See infra* Section VI.  That said, the effect Sears'

11   requirements and federal regulations have on the Court's analysis of the control over Plaintiffs

12   directly is much more complex.  Plaintiffs themselves were subject to more alleged "control" than

13   the mere approval and monitoring of their employees, which the Court must consider in

14   determining the overall level on control exerted.  Thus, the Court will examine the other

15   circumstances surrounding the relationship between Defendant and Plaintiffs.

16   **IV.     Plaintiffs Established Their Own Businesses**

17         The second most prominent evidence establishing an independent contractor relationship is

18   that all drivers established their own business prior to working for Affinity.  This fact goes directly

19   to the question of *who* (Affinity or Plaintiffs) controlled the time, manner and method of the work

20   performed and is intricately related to the fact that Plaintiffs themselves did not have to perform

21   the work at all.  Notably, all alleged control over the hours worked, tools used, and procedures

22   followed, *see Palma*, 606 S.E.2d at 344, was not necessarily over Plaintiffs, but over whoever

23   Plaintiffs hired to perform that work if they chose to do so.  These employees were paid out of the

24   drivers' business accounts, and the drivers withheld their employees' taxes, as established by

25   Ruiz's testimony.  (*See* Ex. 115; Transcript at 549-50, 554, 470-71, 577, 584.)  Affinity paid

26   Ruiz's business (R&S) for the work Ruiz's employee drivers and helpers performed, and Ruiz in

27

28   requirements may be evidence of employee-employer control.  However, as discussed more below,
      the Court rejects the contention that obligations such as how and when to make deliveries, when to
      arrive at the warehouse, the approval of helpers and second drivers, and grooming standards and
      uniforms (*see* Doc. No. 185 at 8) establish this control.  *See infra* Sections V, VI.

1    turn paid his employees from R&S's account.  (Transcript at 561, 551, 554, 562, 570-71, 577, 584;

2    *see also* Joint Pretrial Order, Section III, ¶ 21.)  While Affinity management suggested reasonable

3    amounts to pay the drivers and helpers, Ruiz testified that he ultimately decided to pay his helpers

4    and drivers an amount he believed was fair.  (Transcript at 570-71, 580-81, 583-84.)  Further, Ruiz

5    testified that when he was injured and thereafter hired a driver to operate his truck for many

6    months, R&S sometimes lost money and therefore Ruiz took money out of his own pocket to pay

7    for his helper and driver.  (*Id.* at 561.)

8        Plaintiffs contend that the drivers' businesses were only set up because Affinity required

9    them to do so as a condition of employment.  In fact, several drivers testified that they would not

10   have established their business but for their relationship with Affinity.  (Transcript at 41, 116-118,

11   470-71, 474.)  The evidence also shows that Affinity management substantially aided the drivers

12   in setting up their businesses by helping them complete the necessary forms, going so far as filling

13   out the forms for Ruiz except for his signature.  (*Id.* at 439, 473-75, 548-49.)  The Court finds that

14   Affinity was substantially involved in helping the drivers establish their businesses.  However, this

15   evidence does not negate the fact that Plaintiffs did in fact establish their own business and paid

16   employees and taxes from a separate business account.  It also does not negate the fact that this

17   business had the potential for profit, and that Plaintiffs' operation of the business, such as deciding

18   whether to operate the truck themselves,[6] operate second trucks, how much to pay their drivers and

19   helpers, and other managerial decisions[7] potentially influenced this profit.  Defendants' expert

20   witness, Robert Crandall testified to that effect.[8]  (Transcript at 628-31; *see also* Exs. 85, 86, 87,

21   88.)

22       Furthermore, the record shows that Ruiz handled issues pertaining to his hired helpers and

23   second drivers, not Affinity.  For example, when Ruiz was injured and could not drive his truck,

24   _____

25       [6] Ruiz testified it was more difficult to make money if he did not operate the truck himself.
     (Transcript at 561-62.)

26       [7] For example, Ruiz testified that he fired one of his employees because he spent too much
27   time on the phone making personal phone calls, thus hurting the profitability of R&S.  (Transcript at
     578.)

28       [8] Crandall is a partner at Resolution Economics, an economic consulting firm which provides
     consulting in litigation of class action employment disputes.  (Transcript at  622; *see also* Ex. 85 &
     86.)

1    he arrived at the San Diego MDO each morning and supervised the loading of his truck to insure it

2    was properly loaded.  (Transcript at 596, 557-58.)  The employee helpers and drivers then ran the

3    route throughout the day.  (*Id.* at 559-60.)  However, if the helper or driver had trouble with their

4    route, such as failing to meet delivery windows or an issue with a customer, Affinity contacted

5    Ruiz and Ruiz handled the problems.  (*Id.* at 559-61.)

6        Accordingly, the Court finds that the establishment, operation, and management of

7    Plaintiffs' individual businesses weighs heavily in favor of finding an independent contractor

8    relationship.

9    **V.    Defendant Did Not Control Actual Hours Worked**

10       Furthermore, even assuming *arguendo* that Affinity directly controlled Plaintiffs[9], there is

11   not sufficient evidence to support a finding that Affinity did indeed control the hours worked, the

12   tools used, or the exact procedures to be followed by Plaintiffs.  Under Georgia law, "the right to

13   control the time means the employer has assumed the right to control the person's actual hours of

14   work."  *Palma*, 606 S.E.2d at 344.  Plaintiffs contend that, because Ruiz and the absent class

15   members arrived at the same warehouse around the same time everyday or faced potential

16   consequences, Defendant controlled the actual hours worked.  The Court finds that the only

17   evidence of control over the actual hours worked were that the drivers had to show up prior to the

18   stand-up meeting or risk losing their routes (or getting a less preferable one), and that they were

19   told by Affinity whether they would be working the next day depending on how many routes were

20   available.[10]  (Transcript at 75, 78, 136-37, 556, 720.)

21       On the other hand, however, the drivers could control the exact time they showed up at the

22

23

24

25

26       [9]  This is a big assumption, considering Plaintiffs were free to substitute others to do their
     work, hire other drivers, and operate multiple trucks, all through their individual businesses.

27       [10]  Plaintiffs also contend that, if the drivers wanted a day off, they had to request it in advance
28   and Affinity would often not approve if there were not enough drivers scheduled for that day.
     (Transcript at 78-79, 136-37, 735.)  However, the evidence shows that even if the trucks were needed
     to run routes on those requested days off, the drivers were able to substitute other drivers in to do their
     work or could pay for standby drivers to do their work.  (Transcript 531-32, 536.)

05cv2125

1   warehouse[11], the roads to take to make the deliveries, and the end of each day depended on how

2   quickly and efficiently the route was completed.  (Transcript at 42, 118-19, 156, 330-31, 515-16,

3   563-64, 590, 597.)  In other words, the actual numbers of hours worked depended on the efficiency

4   of the deliveries, and not on a set number of hours required by Affinity.

5          Furthermore, all driver witnesses except for Ruiz testified that they had the ability to select

6   their routes based on scores they received from Sears' customer surveys—the higher the score, the

7   higher the priority in selecting routes.  (Transcript at 101, 150, 154-55, 434-45, 489, 525, 592,

8   738.)  The surveys were conducted by a company selected by Sears, who telephoned Sears'

9   customers and asked them various questions regarding customer satisfaction.  (*Id.* at 435.)  The

10  routes varied as to the number of stops or miles needed to be traveled to make all of the stops, thus

11  effecting the drivers' opportunity to make money and making certain routes more or less desirable.

12  (*Id.* at 489, 525-26.)

13         Ruiz, however, testified that he never personally chose a route, but instead was given the

14  downtown route because no one else wanted it.  (*Id.* at 489-90, 494, 589-90, 592, 595.)  Ruiz

15  testified that he believed he was given the downtown route because he knew the route better than

16  the other drivers, knew where to park, and knew how to talk to the customers.  (*Id.* at 592.)  At his

17  deposition, Ruiz stated that he liked the downtown route, but at trial he testified that he did not

18  actually like this route.  (*Id.* at 594-95.)  Moreover, Ruiz testified that he understood the

19  importance of the survey scores and its impact on the drivers' ability to pick the better routes.  (*Id.*

20  at 592.)  The Court is concerned about the conflicting testimony.  However, despite Ruiz's

21  testimony to the contrary, the predominant evidence indicates that the drivers, for the most part,

22  selected their routes based on their survey scores.  The circumstances surrounding Ruiz and the

23  downtown route are less than clear, but that does not negate the fact that all other drivers,

24  including Ruiz, recognized that the higher the survey score, the higher priority they received in

25  selecting their preferred route.  Thus, the Court finds that this selection process, and the effect the

26  selected routes and the performance of those routes had on the hours spent working, weighs

27

28         [11] Ruiz testified that he chose to show up at 5:30, instead of 6:30, as the other drivers testified.
    (*see* Transcript at 42, 118-19, 590.)  Mr. Hansen testified that the drivers were free to arrive at 9:00,
    but this would impact their ability to choose their routes for the day.  (*Id.* at 381.)

1   against a finding that Affinity controlled Plaintiffs' actual hours worked.

2          Plaintiffs also argue that Affinity controlled the actual hours worked by Plaintiffs or their

3   second drivers by setting the manifest and that the drivers could not change the order of deliveries

4   without first seeking permission from Affinity.  The Court agrees that this was the case, but finds

5   that this does not evidence the requisite control over the actual hours worked because this was

6   necessary to ensure that the deliveries could in fact happen.  In fact, Ruiz and the other witness

7   drivers themselves admitted that it was important to inform Affinity and/or Sears of any change in

8   the delivery schedule to ensure that the customer was home for the delivery, and therefore the

9   customers would need to be contacted prior to changing the delivery window.  (Transcript at 69-

10  70, 97, 106, 109, 250, 523-24, 609-10, 617-19, 715-16.)  This is exemplified by witness driver

11  Mejia's testimony: Mejia testified that, so long as the deliveries were completed during the

12  original two-hour window, no authorization was needed prior to changing the order of the

13  deliveries.  (*Id.* at 715; *see also id.* at 109 (driver Sanchez, in deposition, said approval was not

14  necessary).)  The Court therefore finds that the necessity of ensuring the customer's presence at

15  the home at the time of the delivery weighs against a finding that this is evidence of the requisite

16  "control" over the drivers.

17         The drivers also testified that they could decide how many days a week they or their

18  secondary trucks could work.  Some of the drivers ran their trucks, operated by themselves or their

19  employees, four or five days a week, while others ran their trucks seven days a week.  (Transcript

20  at 631, 639.)  To be sure, whether or not the drivers were able to run their routes on any given day

21  depended on the number of trucks needed, which depended on the number of deliveries that

22  needed to be made.[12]  But, the number of routes available depended on Sears' needs, *i.e.* the

23  amount of merchandise purchased by Sears' customers needing delivery, and thus was not in

24  Affinity's control.  Plaintiffs were also given the opportunity to be on the "standby" list and could

25  pick up the route in the event one of the scheduled drivers did not arrive that morning.  (*Id.* at 382,

26  401-02.)   In fact, the drivers who performed "standby" runs received the per-stop compensation

27  as well as additional compensation.  (*Id.* at 382-84.)

28

---

[12]  Affinity notified the drivers whether they were scheduled to drive the next day.  (Transcript at 75, 78, 136-37, 556, 720.)

1        Accordingly, the Court finds that the evidence does not support a finding that Defendant

2    controlled the time by "assuming the right to control the person's actual hours of work" by a

3    preponderance of the evidence.  *Palma*, 606 S.E.2d at 344.

4    **VI.    Defendant Did Not Control the Manner and Method of Work**

5        Defendant's alleged right to control the manner and method of Plaintiffs' work is supported

6    by evidence that Defendant "assumed the right to tell the person how to perform all details of the

7    job, including the tools he should use and the procedures he should follow."  *Palma,* 606 S.E.2d at

8    344.  Plaintiffs rely extensively on the mandatory language in the Procedures Manuals, which

9    Plaintiffs contend is "[t]he most compelling piece of evidence demonstrating Affinity's control. .

10   ." (Pl. Final Argument at 7.)  The manuals were prepared by Defendant and a copy was supposed

11   to be given to each driver.  (Transcript at 230, 390.)  Though the manuals vary slightly depending

12   on which of Defendant's clients they pertain to, they are substantially the same.  (*See* Exs. 45, 46,

13   47, 48, 49, 63; *see also* Class Cert Order, Doc. No. 105, at 7-8.)  The Sears Procedures Manual

14   was twenty-seven pages long and had various sections including, but not limited to, manifests,

15   loading the trucks, protecting the merchandise, customer procedures, reporting requirements after

16   delivery, returns, property damage, and accidents.  (*See* Ex. 49.)  The Manuals also provided

17   installation instructions for the various appliances which the drivers may deliver and install.  (*Id.*)

18   The language within these Manuals appear mandatory, using language such as "must," "required,"

19   "should not," and "exactly as specified."  (*Id.*)  At trial, however, Charles Hitt, chief operating

20   officer of Affinity, testified that the drivers were not required to comply with the Procedures

21   Manuals other than to the extent they required a driver to comply with legal requirements.

22   (Transcript at 253-54.)  Instead, the Manual, according to Mr. Hitt, was a "statement of wishes" or

23   a document which states that "this is how [Affinity] would like to see this done."  (*Id.* at 252, 255,

24   256.)

25       The Court agrees with Plaintiffs that these requirements set forth in the Procedure Manuals

26   were more than mere "suggestions."  These "mandatorily-written 'suggestions'"could be a  means

27   to control the drivers, especially considering that a failure to follow these "statement of wishes"

28   would likely result in a termination of their relationship with Affinity because the drivers would

     not be "successful."  (Transcript at 391.)  *See Ledbetter v. Delight Wholesale Co.*, 380 S.E.2d 736,

- 13 -

739-40 (Ga. Ct. App. 1989) (reversing trial court's grant of summary judgment in favor of

defendants, finding that "[t]he mandatorily-written 'suggestions' also were a means to control a

vendor's method and manner of work since the customer complaints that would arise due to a

vendor's failure to follow the 'suggestions' would, in all likelihood, result in contractual

termination should the vendor not agree to conduct business according to the 'suggestions.'")[13]

The problem, however, is that the evidence does not support that Plaintiffs received these

manuals, or, if they did, that they read or referred to them.  (Transcript at 98, 150-51.)  If they did

not read them or otherwise rely on them, then the existence of the Manuals themselves cannot be

evidence of "control" over the drivers.[14]  Instead, the Court finds that it must look to the evidence

which supports the control "assumed" by Defendant – whether set forth in the Manuals or not –

and whether this meets the requisite level of control sufficient to establish that Defendant

controlled the drivers' manner and method of work.[15]

Thus, turning to whether the evidence shows that Defendant assumed " the right to tell the

person how to perform all details of the job, including the tools he should use and the procedures

he should follow," the Court finds that it does not.  *Palma*, 606 S.E.2d at 344.  Key to this

determination is that the level of control must be "distinguished from the right merely to require

certain definite results in conformity to the contract."  *Larmon*, 647 S.E.2d at 307; *see also*

*McLaine,* 661 S.E.2d at 699.  As already alluded to *supra* and discussed more below, the

procedures to be followed were, for the most part, dictated by Sears and Sears' customers, not by

---

[13] However, while *Ledbetter* is analytically helpful, its ultimate holding is not persuasive.  The court in *Ledbetter* reversed the trial court's summary judgment order which found that plaintiffs were correctly classified as independent contractors, holding that the defendant did not carry its burden on motion for summary judgment.  The *Ledbetter* court did *not* find that this evidence of control actually created an employer-employee relationship.

[14] In *Ledbetter*, the court noted that the workers were not required to read the booklets setting forth these "suggestions."  380 S.E.2d at 738.  However, the Court also noted that the workers had to watch a video, which was mandatory, and that this video covered "basically the same points" as the booklet.  *Id.*

[15] Plaintiffs argue that the drivers' lack of reliance on the Procedures Manuals is irrelevant because it is the right to control, and not the exercise of control, that indicates that employer-employee relationship.  (Response at 2.)  This may be true; however, the Court finds that the Procedures Manual also do not create a *right* to control the drivers, given that the evidence does not even support a finding that each driver was given the manuals by Affinity, much less expected to comply with each and every requirement set forth in the Manual.  (*See* Transcript at 230 (Mr. Hitt, testifying that he was "not sure" if each driver was given a manual).)

- 14 -

1   Affinity.  However, there was some evidence that Affinity, not Sears, controlled the manner and

2   method of Plaintiffs' work, which the Court will address first.

3          First, the evidence shows that Affinity required the drivers to attend the so-called stand-up

4   meetings in the morning, which were conducted by Affinity management. (Transcript at 50-51,

5   121, 275, 350, 384, 495-96, 727.)  At these meeting, the managers addressed negative comments

6   received from post-delivery surveys, problems encountered throughout the day, and protocols

7   regarding safety.  (*Id.* at 384.)    At trial, Defendant sought to downplay the mandatory nature of

8   these meetings.  However, Affinity witnesses testified that Affinity may give away a route to a

9   stand-by or substitute driver if the scheduled driver did not attend the meeting, and that the

10  scheduled driver may be charged for the cost of procuring a replacement driver.  (Transcript at

11  382-84, 402, 503-04.)  This effectively makes such meetings mandatory, and they were ran by

12  Affinity, not Sears.

13         Second, the record shows that the drivers were not permitted, or at best highly encouraged

14  not to, use their trucks in any capacity other than in making their runs for Affinity.  The delivery

15  truck was the main tool which Plaintiffs used to conduct their business.  It seems to the Court that,

16  as independent contractors, Plaintiffs would be able to use the truck for whatever purposes they

17  wished, *i.e.* to run routes for another company and make more profits or even to help friends move

18  on a day off.  However, the evidence shows that, after the deliveries were completed, the drivers

19  were not allowed to take their trucks home with them, or to operate them for other companies or

20  for their personal use.  (Transcripts 522, 71-72.)  Affinity manager Mr. Hansen confirmed that he

21  "strongly discouraged" the drivers from taking the trucks, claiming that Affinity wanted to keep

22  the trucks in the secured lot to prevent graffiti or damage to the trucks overnight.  (Transcript at

23  394, 398-99; *see also id* at 68-69, 133, 732.)  Furthermore, Affinity would on occasion allow other

24  drivers to use their trucks to make deliveries on days the drivers were not operating their trucks

25  themselves.[16]  (*Id.* at 398, 519, 65-66, 132.)  Plaintiffs were not compensated for this use.  (*Id.* at

26  132, 523.)  The Court finds this evidence troubling, as this tends to show Affinity's control over

27  _____

28         [16] There is a question of whether Affinity asked the drivers for their permission to have others
    use the trucks.  Ruiz testified that he was not asked permission; Mr. Hansen testified that the trucks
    were only used by others if the driver gave his permission.  (*See* Transcript at 398 (Hansen), 519
    (Ruiz).)

                                        - 15 -

the one essential tool Plaintiffs used in conducting their work.  Despite this evidence, however, the Court finds that the majority of the evidence regarding the "procedures" and tools used do not establish an employee-employer relationship, as the Court will explain.

To begin, to the extent the drivers and helpers were given delivery and installation procedures to follow, the Court finds that these procedures were the services for which Plaintiff agreed to provide and thus were necessary to obtain "certain definite results in conformity to the contract." *Larmon*, 647 S.E.2d at 307.  For example, Plaintiffs were required to follow the manifests prepared by Sears in order to deliver the merchandise within the time frame given to Sears' customers.  (Transcript at 305-07, 523, 647-48; *see also supra* Section V.)  After completing the delivery, Plaintiffs and second drivers were to get the customer's signature on the manifest, and then telephone a Sears customer service number to confirm completion of the delivery.  (Transcript at 93-94, 103-04, 313, 338, 438, 501, 513, 560-61.)  To the extent Plaintiffs were provided with installation procedures, the driver witnesses testified that they already knew how to install the merchandise, did not read the procedure manuals, and, moreover, the correct installation was part of the services Plaintiffs and their employees were to provide.  (Transcript at 98-99, 150-51; *see also* Ex. 77).

Thus, the Court finds that all of this alleged evidence of "control" were in reality compliance with Sears' requirements, such as when and where to pick up and load the merchandise and when and where to deliver said merchandise, and that these third party requirements are not evidence of an employer-employee relationship.  This conclusion is consistent with Georgia law and the law of other jurisdictions.  *See Larmon*, 647 S.E.2d at 307-08 (rejecting the argument that requirements imposed by third parties, such as government agencies and customers, constituted evidence of defendant's control over the putative employees); *McLaine*, 661 S.E.2d at 700; *see also FedEx Home Delivery v. NLRB*, 563 F.3d 492, 497 (D.C. Cir. 2009) (noting that "constraints imposed by customer demands and government regulations do not determine the employment relationship"); *see also C.C. Eastern v. N.L.R.B.*, 60 F.3d 855, 859 (D.C. Cir. 1995) ("[W]here a company's control over an aspect of the workers' performance is motivated by a concern for customer service, that control does not suggest an employment relationship."); *Herman v. Mid-Atlantic Installation Servs.*, 164 F.Supp.2d 667,  672-73 (D. Md.

1  2000) ("It is in the nature of a contract that the contractor promises to deliver the performance

2  bargained for by the client . . . . [R]equiring a contractor to meet the client's technical

3  specifications is not the type of 'control' which bestows 'employee' status on the contractor");

4  *Penn v. VA Int'l Terminals, Inc.*, 819 F.Supp. 514, 524 (E.D. Va. 1993).

5        Further, the fact that Plaintiffs were required to wear a uniform while making deliveries

6  and to maintain grooming standards is attributable to Sears as well, and not Affinity.  The record

7  indicates that the drivers delivering Sears merchandise were expected to wear certain clothing: a

8  blue shirt with stripes and the words "Sears Authorized Carrier" on the back, dark blue pants,

9  black shoes and belt, and a cap with the Sears logo.  (Transcript at 499, 287, 126, 55-56, 731, 386-

10  87.)  At trial, Mr. Hitt testified that Sears required the uniforms in order to put the customers at

11  ease when they arrived at and entered their homes; to make the customers feel safe.  (*Id.* at 319,

12  369.)  The record also shows that Affinity provided the uniforms to its drivers from stock

13  inventory if needed, but Affinity did not require the drivers to purchase the uniforms from it, nor

14  did Affinity profit off of the uniforms.  (*Id.* at 319-20, 340-42, 387-89.)  Mr. Hansen testified that

15  he knew of drivers embroidering their hats with "Sears Authorized Carrier" outside of Affinity.

16  (*Id.* at 461.)

17        The drivers and helpers were also subject to various grooming requirements.  Facial hair

18  was expected to be neatly groomed, and Affinity even supplied shaving kits in case drivers came

19  to work with a 'five o'clock' shadow.  (Transcript at 387-88.)  The drivers and helpers were also

20  expected to not have any visible body piercing or tattoos.  (*Id.* at 387.)  These grooming standards

21  and uniforms were inspected and enforced by Mr. Hansen.  (*Id.*)

22        Plaintiffs assert that requiring workers to wear uniforms is evidence of an employer-

23  employees relationship, citing *Corporate Express Delivery Services v. NLRB*, 292 F.3d 777, 780

24  (D.C. Cir. 2002).  The Court disagrees.  Indeed, the D.C. Circuit in *Corporate Express* noted that,

25  unlike in *C.C. Eastern*, the *Corporate Express* alleged employer "imposed a dress code upon the

26  drivers."  292 F.3d at 780.  The D.C. Circuit, however, ultimately upheld the Board's decision as

27  reasonable, focusing more on the "significant entrepreneurial opportunity for gain or loss" instead

28  of the "control of the means and manner of work."  *Id.*  Thus, *Corporate Express* is of limited

assistance to this Court's analysis.  More helpful is the D.C. Circuit's later case of *FedEx Home*

- 17 -

*Delivery*, which expressly noted that customer demands such as safety do not determine the employment relationship.  563 F.3d at 501.  "[A] uniform requirement often at least in part is 'intended to ensure customer security rather than control the [driver].'"[17]  *Id.*; *see also Hilldrup Transfer & Storage of New Smyrna Beach, Inc. v. Dep't of Lab. & Employment Sec.*, 447 So.2d 414, 417 (Fla. Ct. App. 1984) (finding that "the requirement that the operators wear uniforms and paint their tractors with Hilldrup's colors and name is merely designed to assure the carrier's customers that the operators are representatives of Hilldrup" and thus did not evidence control).  Therefore, the Court finds that the uniform and grooming requirements were to identify Plaintiffs, their helpers, and second drivers as representatives of Sears to ensure the customers' safety and security.  (Transcript at 319-20.)  As such, the uniform requirement is not evidence of Affinity's control over Plaintiffs or their employees.

Further, Plaintiffs contend that Defendant asserted control over the drivers by requiring them to carry specific tools and equipment on their trucks and to pass equipment and vehicle inspections.  As already discussed, the vehicle and equipment inspections are dictated by federal regulations, and the Court will not attribute these regulations as evidence of Affinity's direct control over Plaintiffs.  (*See supra* Section III.)  As to the tools allegedly required to be carried, such as protective blankets, pads, tie down straps and other tools, the evidence shows that such tools such were furnished and paid for by the drivers, not Affinity.  (*See* Transcript at 63, 83, 130, 141, 314, 388-89, 520, 522, 555, 627, 680, 684-85.)

Plaintiffs further argue that Defendant controlled the manner and method of Plaintiffs' work by supervising and monitoring them throughout the day, including occasionally following contractors on their routes.  (*See* Transcript at 47-49, 126, 439-40, 451-52.)  Mr. Hansen even took photographs of the drivers throughout the workday, which could later be discussed at the stand up meetings.  (*Id.* at 451-52, 147-48.)  The alleged monitoring throughout the day including the requirement that drivers call in each delivery, which updated the drivers' location and delivery completion.  (*Id.* at 379.)

---

[17]  The *FedEx Home Delivery* court went on to explain: "And once a driver wears FedEx's logo, FedEx has an interest in making sure her conduct reflects favorably on that logo, for instance by her being a safe and insured driver—which is required by [Department of Transportation] regulations in any event."  563 F.3d at 501 (citations omitted).

1    This was discussed above, and the Court again finds that this was a requirement of Sears in

2    order to ensure timely deliveries, not Affinity.  In the event Affinity intervened when the drivers

3    fell behind schedule (*id.*), this is not sufficient evidence of control to establish an employee

4    relationship.  Courts have indicated that supervision of the manner and methods of work must be

5    distinguished from Affinity's efforts merely "to monitor, evaluate, and improve the results or ends

6    of the worker's performance."  *North American Van Lines, Inc. v. NLRB*, 869 F.2d 596, 599 (D.C.

7    Cir. 1989); *see also Lockett v. Allstate Ins. Co.*, 364 F. Supp. 2d 1368, 1377-78 (M.D. Ga. 2005)

8    (finding that monitoring results is not evidence of controlling the manner and means of how those

9    results are achieved).  This Court agrees.

10    This same finding applies to the so-called "follow-alongs" sometimes performed by

11    Affinity management.  Mr. Hansen testified that these follow-alongs were requested be Sears, and

12    that about once a month he would "follow the driver for a few stops, make sure that they were in

13    the field in uniform, make sure they were using proper techniques for delivery to prevent damage

14    to the customers' homes."  (Transcript at 439.)  The Court finds that this observation and

15    monitoring of the drivers' performance in order to ensure that Plaintiffs and/or their employees

16    were successfully performing their tasks (Transcript at 47-49, 126, 439-40, 451-52) is not evidence

17    of control over how the workers performed those tasks.[18]  *See North American Van Lines, Inc.*, 869

18    F.2d at 599; *Lockett*, 364 F. Supp. 2d at 1377-78.

19    Finally, Plaintiffs argue that Affinity controlled the drivers by requiring them to pay for

20    and carry various types and amounts of insurance, including Worker's Compensation insurance,

21    Commercial General Liability insurance, Automobile Liability insurance, Fire, Theft, Car and

22    Collision insurance, and Cargo Liability Insurance.  (Ex. 78, Ex. D; *see also* Transcript at 228,

23    287, 327, 394.)  Plaintiffs contend that "[w]hile independent contractors might ordinarily be asked

24    by an employer to have insurance, Affinity demanded that the policies have minimum coverage

25

26    [18]   Furthermore, the record indicates that these "follow-alongs" happened infrequently.
Approximately 15 delivery teams operated out of the San Diego MDO with approximately 18 stops
27    a day, ranging from five to seven days a week. (Transcript at 75, 136, 321, 393, 525-26, 572-73, 631.)
Mr. Hansen testified that Sears wanted them to conduct the follow-alongs once a week, but that they
28    did so closer to once or twice a month.  (Transcript at 439-40.)   This is a small percentage of the total
number of deliveries originating out of the San Diego MDO and thus, even if evidence of control,
would be given little weight considering the infrequency.

- 19 -

amounts . . . and that the drivers purchase their insurance through Affinity." (Pl. Final Argument at 22.) First, the Court notes that Plaintiffs assert this alleged evidence of control without explaining why requiring insurance creates an employee relationship, especially in light of the concession that independent contractors are often asked to be insured. Second, the record does not support the contention that Affinity required the drivers to purchase the insurance through Affinity. To be sure, Affinity provided insurance policies for Plaintiffs if they wanted them, (Transcript at 225-28, 392-94), but the drivers could look around for cheaper policies as well and Affinity generated no profit from the insurance facilitated by Affinity.[19]  (*Id.* at 430-31, 320.)

Accordingly, given the evidence presented and the case law, the Court finds that Plaintiffs have not established by a preponderance of the evidence that Defendant controlled the manner and method of Plaintiffs' work sufficient to establish an employer-employee relationship.

**VII.    Common Law Factors Weigh In Favor of Independent Contract Relationship**

The Court finds that the Georgia test regarding Defendant's control over the Plaintiffs' time, manner, and method of work indicates an independent contractor relationship, especially in light of the presumption arising from the language in the ITA. The Court, however, will also address the so-called "common law factors" which may guide the Court's analysis. Because many of the factors overlap with the analysis above, the Court will only briefly address these factors. In doing so, the Court finds that these factors also weigh in favor of finding Plaintiffs were independent contractor relationship.

The first factor is the extent of control granted by agreement. *Murphy*, 429 S.E.2d at 532 (quoting Restatement (Second) of Agency § 220(2)). As discussed above, the ITA and ELA assert that the drivers are independent contractors, not employees. Plaintiffs argue that, while this may be true, the Agreement exerts control over the drivers by incorporating Sections II, III, and IV of the Procedure Manuals. (*See* Ex. 77, Ex. A at 2; Ex. 78, Ex. B at 2.) A closer review of the agreements, however, indicate that these provisions are not incorporated, but are merely

---

[19]   The Court does find it troubling that the drivers may never have received or seen the insurance policies for which Affinity was deducting payments from their weekly settlements. (Transcript at 329, 392-94.) That alone, however, does not create an employee relationship. Further, Plaintiffs did receive Insurance Certificates to be carried in their trucks, as mandated by law, which were proof of the insurance obtained. (Transcript at 227-28, 393-94, 431, 538-40; *see also* Ex. 21.)

referenced.  (*Id.*)  Moreover, while the ITA may reference those Sections, the record shows that the Manuals were not necessarily distributed to the drivers, nor that they read them.  (*See supra* Section VI.)  Thus, the Court finds that the extent of control given under the ITA and ELA is that of independent contractor, not employee.

The second factor is whether Plaintiffs operated a distinct occupation or business.  *Murphy*, 429 S.E.2d at 532.  The Court discussed the formation and effect of Plaintiffs' individual businesses at length, *supra*.  The Court finds that Plaintiffs formed and operated a distinct business, which included a business name, a separate business banking account, and the responsibility to pay, out of that account, employee taxes and other expenses associated with running the business.  (*See* Transcript at 544, 546-50, 471-72, 522.)  Furthermore, Plaintiffs had the ability to expand their business by hiring more employees, operating multiple trucks, and making managerial decisions regarding the employment and performances of the employees hired.  (*See supra* Section IV.)  The distinct business is further exemplified by the fact that the drivers and their businesses were able to continue making deliveries for Sears even after Affinity lost their contract with Sears and therefore were unable to do so.  (Transcript at 650.).  Finally, the Court rejects, as explained above, Plaintiffs' argument that Defendant asserted control over Plaintiffs' business by first requiring Plaintiffs to establish that business and also by requiring all Plaintiffs' employees to be approved pursuant to federal regulations prior to their employment.  (*See supra* Section III, IV.)

The third factor which the Court may consider is whether the work is usually done without direction or supervision; if so, it weighs in favor of finding an independent contractor relationship.  *Murphy,* 429 S.E.2d at 532; *see also Larmon*, 647 S.E.2d at 595-96.  The Court finds, except for limited instances, that Affinity did not supervise the drivers while they were out in the field performing the necessary tasks to ensure completion of the deliveries.  As discussed above, Affinity and Sears monitored Plaintiffs' progress throughout the day by requesting the drivers to call in and give information about the progress of the deliveries, but this was to ensure that the deliveries were being timely completed, which the Court considered monitoring the performance, not overt "direction" or "supervision" controlling that performance.  (*See supra* Section VI.)  This is in contrast to the fact that Plaintiffs were free to make their own decisions regarding the roads

05cv2125

1   and highways taken, the decisions and interactions with the customers in their homes as the

2   delivery and installations were made, and that Plaintiffs did not return to the warehouse until all

3   deliveries were completed.  This evidence establishes that the work was done by a "specialist who

4   needs no supervision."  *Murphy*, 429 S.E.2d at 532.

5        Fourth, the Court may look at the skill required by the individuals performing the services.

6   *Murphy*, 429 S.E.2d at 532.  Plaintiffs argue that driving, delivering and installing the appliances

7   requires no specialized skill.  The record shows that the drivers needed no special driver's license.

8   (Transcript at 537.)  However, the skill required goes beyond the ability to drive the truck; the

9   proper delivery and installation of these appliances requires substantial skill, especially

10  considering the dangers involved in installing appliances hooked to gas lines, or the potential

11  water damage that may arise. (*Id.* at 610-11, 330; *see also id.* 515-16, 563-64[20].).  Ruiz's

12  contention that his work required no substantial training or expertise, but mere "common sense" is

13  unavailing.  (*Id.* at 537.)  Ruiz himself testified that he had extensive experience in installing the

14  appliances given his many years doing so prior to working for Affinity.  (*Id.* at 466-67, 544, 609.)

15       The fifth factor is whether the evidence demonstrates that Affinity furnished the tools and

16  place of work.  *Murphy,* 429 S.E.2d at 532.  The Court finds that it does not.  The evidence shows

17  that tools such as maps, drill, hand tools, pads, and ties were furnished by the drivers, not Affinity.

18  (*See* Transcript at 63, 83, 130, 141, 314, 388-89, 520, 522, 555, 627, 680, 684-85.)  Even if

19  Affinity made such tools available for purchase, they were not given to the drivers and therefore

20  were not Affinity's tools that were being used.  *See* Restatement (Second) of Agency, § 220,

21  comment k ("[I]f the worker is using his employer's tool or instrumentalities, especially if they are

22  of substantial value . . . this indicates that the owner is a master.")

23       Plaintiffs, as discussed above, argue that Affinity also furnished the "tool" of the truck,

24  which is certainly of substantial value.  While recognizing that Affinity controlled the use of the

25  trucks while not in use, the Court finds that the ELA, contrary to Plaintiffs' assertions otherwise,

26

27       [20]  Ruiz testified that he once told a customer that the water line was corroded and may leak,
    but the customer gave him permission to install the appliance despite this. (Transcript at 515-16, 563-
28  64.)  Later, when the line broke and water damaged the customer's home, Ruiz did not have to pay
    for the claim because he had warned the customer that this may happen.  (*Id.*)  This idicates the skill
    required to recognize potential complications and hazards.

- 22 -

1    appropriately established a leasing arrangement consistent with an independent contractor

2    relationship.  *See supra* Section VI and note 3.  Moreover, Affinity did not provide Plaintiff a

3    place of work, as Plaintiffs reported to the Sears warehouse at the beginning of the day, which was

4    owned by Sears, to pick up and load the appliances to be delivered, but then spent the majority of

5    the day on the road or in Sears' customers' houses.  (Transcript at 304, 559-60.)  Plaintiffs did not

6    return to the warehouse until all deliveries were completed in order to return the old appliances

7    picked up from the customers' homes.  (*Id.* at 518.)  Thus, the Court finds that Affinity did not

8    furnish or provide the tools and place of work sufficient to weigh in favor of an employee

9    relationship.

10          Sixth, the Court may consider "the length of time for which the person is employed."

11   *Murphy*, 429 S.E.2d at 532.  The ITA and ELA's provided a term of one year, automatically

12   continued from year-to-year unless terminated on 60 days written notice.  (Exs. 77, 78.)  The Court

13   finds that the evidence regarding this factor is neutral and does not establish either an independent

14   contractor or employee relationship.  Defendant points to the fact that the contractor "turn-over"

15   rate was about 60-65%, meaning that this percentage of drivers terminated their contracts prior to

16   the one-year term end.  (Transcript at 351-52, 455-66.)  Ruiz terminated his contract prior to the

17   end of the first year, as well.[21]  (*Id.* at 609.)  However, Plaintiffs contend that the term was not of

18   fixed duration because the term was automatically renewed each year, and both Sanchez and Mejia

19   worked for Affinity for 3 ½ and 4 years, respectively.  (*Id.* at 41, 705.)  Plaintiffs also contend that

20   "the ability to terminate the relationship at will without incurring liability is an indication that the

21   person employed is not an independent contractor."  *Cantor v. Cochran*, 184 So.2d 173 (Fla.

22   1966).  Thus, the evidence regarding the fixed nature of the ITA terms, the length of time the

23   workers worked for Affinity, and the ability to terminate the ITA at will is inconsistent and the

24   Court is unable to use this evidence as indicative of either an independent contractor or employee

25   relationship.

26          The seventh factor in this analysis is whether the workers are paid by the task or by the

27   hours worked.  *Murphy*, 429 S.E.2d at 532; *see also Moss v. Central of Ga. R.R. Co.*, 219 S.E.2d

28

_____

     [21]  Reyes worked for Affinity for approximately 9 months.  (Transcript at 113.)

593, 596 (Ga. Ct. App. 1975).  Affinity contends that each delivery was a separate "job" for which Plaintiffs was paid $23.50 for each "job" completed, which were paid through weekly settlements. (Transcript at 573, 287-88, 335-36, 431-32.)  As such, Affinity's position is that the drivers were not paid by the hour, which would be indicative of an employee relationship.  To the contrary, Plaintiffs contend that the drivers were more closely aligned with an employee relationship because they worked five to six days a week, worked at least 8 hours a day, and made around 18 deliveries per day.  (*See generally* Ex. 101.)  Moreover, the weekly payments were approximately three weeks in arrears.  (Transcript at 417.)

The Court finds that this factor weighs slightly in favor of independent contractor status. To be sure, the drivers were not hired to make single deliveries, but rather to make multiple deliveries each day, several days a week.  Thus, to construe each delivery as an individual "job" is unrealistic.  On the other hand, the evidence does not support a finding that the workers were paid hourly.  There were no set hours to the day, nor did each delivery take the same amount of time, even though the amount paid essentially remained the same.   Furthermore, the drivers were, on occasion, able to negotiate a higher payment for an individual delivery which proved to be particularly difficult.  (*See* Ex. 77.)  In contrast, an employee would not be able to ask for a higher hourly payment for a particularly difficult task.  Accordingly, the Court finds that the evidence, the per-delivery payment scheme, weighs slightly in favor of independent contractor status.

In analyzing the eighth factor, when the evidence demonstrates individuals performing the work are not part of the regular business of the alleged employer, the evidence weighs in favor of finding an independent contractor relationship.  *Murphy*, 429 S.E.2d at 532.  Affinity contends that it is in the business providing logistics managements services, which involves coordinating the delivery of the merchandise and procuring the equipment and labor necessary to facilitate such delivery.  (Def. Final Argument at 38; Transcript 170, 200-01, 219, 245, 246, 296.)  Affinity contends that it did not actually make deliveries or installations (Transcript at 297), instead entering into leases with drivers to subcontract out the actual deliveries.  (Def. Final Argument at 28; Ex. 78; Transcript at 165, 171-72, 318-19, 324-25, 333, 367.)  Affinity cites *FedEx Home Delivery*, which noted that the fact that the "contractor perform a function that is a regular and essential part of FedEx Home's normal operations, the delivery of packages . . . is not

- 24 -

determinative in the face of more compelling countervailing factors, . . . otherwise companies like FedEx could never hire delivery drivers who *are* independent contractors, a consequence contrary to precedent. . . ." 563 F.3d at 502.  The Court agrees, finding this factor neutral.  The drivers' role in Affinity's business is highly intertwined with what Affinity was hired to do, which is to coordinate the delivery of its clients' merchandise.  But, in the face of more "compelling countervailing factors" the Court does not find this factor indicative of an employee relationship.

The ninth "common law" factor is "whether or not the parties believe they are creating an agency relationship." *Murphy*, 429 S.E.2d at 532.  The record clearly indicates that Ruiz and Affinity both understood their relationship to be that of an independent contractor.  (Transcript at 165, 170-71, 297, 333-34, 367-68, 471-72, 474, 477; *see also* Exs. 77, 78.)  Thus, this factor weighs in favor of finding an independent contractor relationship.

Finally, the last factor is whether the alleged employer is in business. *Murphy*, 429 S.E.2d at 532.  Obviously, Affinity is in business.  This factor therefore weighs in favor of an employer-employee relationship.

**CONCLUSION**

Having duly considering the testimony and evidence admitted at trial and the law, the Court **HEREBY FINDS** that Plaintiffs have not met their burden of establishing that Plaintiffs were misclassified as independent contractors.  Under Georgia law and the language of the ITA and ELA, a presumption of independent contractor arises.  To rebut this presumption, Plaintiffs must establish that an employer-employee relationship did in fact exist.  Having considered the evidence, the Court find that the most telling evidence of an independent contractor relationship is that Plaintiffs themselves were not required, nor expected, to perform the work themselves.  In fact, Plaintiffs established and operated independent businesses by which they hired and paid employees to either perform the work for them or to aid them in performing that work.  Plaintiffs are unable to argue control over Plaintiffs when it was not Plaintiffs who were necessarily being controlled.

Furthermore, the Court has examined the evidence Plaintiffs contend establish an employer-employee relationship and finds that Plaintiffs have not sufficiently supported this assertion.  Case law indicates that the imposition of Affinity's clients' requirements and federal

regulations are not sufficient evidence to establish the requisite control.  Looking beyond these requirements and at the "common law" factors used to guide this Court's analysis, moreover, the Court finds that this evidence does not establish, by a preponderance of the evidence, an employer-employee relationship.  As such, the Court **FINDS IN FAVOR OF DEFENDANT**.  The Clerk shall close the file.


DATED:  March 22, 2010

_____
Honorable Janis L. Sammartino
United States District Judge