# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO RUIZ, individually and on behalf of all others similarly situated,<br><br>                            Plaintiff,<br><br>    vs.<br><br>AFFINITY LOGISTICS CORPORATION,<br><br>                       Defendant. | CASE NO. 05CV2125 JLS (KSC)<br><br>**MEMORANDUM DECISION AND ORDER FOLLOWING REMAND FINDING PLAINTIFF AND ABSENT CLASS MEMBERS PROPERLY CLASSIFIED AS INDEPENDENT CONTRACTORS** |

On remand from the Ninth Circuit, this matter is before the Court to resolve a limited issue that is central to this class-action lawsuit: Whether, under California law, Affinity Logistics Corporation ("Affinity") should have classified the class members—defined as all current and former delivery drivers who made home deliveries for Affinity in the State of California between May 18, 2001, and the resolution of the complaint—as employees rather than independent contractors. This Memorandum Decision and Order Following Remand is based on the testimony and evidence admitted at the December 2009 bench trial,[1] as well as the arguments presented in the parties' briefs following remand. (ECF Nos. 209, 210, 214, 215) Having considered the

---

[1] At the appeal mandate hearing on March 28, 2012, the Court inquired whether the parties sought to introduce any additional evidence to aid in the Court's analysis. The parties represented that no further evidence was necessary, and that the case would not need to be re-tried. Although Plaintiff's counsel hedged somewhat, he advised the Court that if he determined a need for further evidence he would let the Court know as soon as possible. As of the date this Memorandum Decision and Order Following Remand is electronically docketed, neither party has advised the Court of any need to take additional testimony or submit additional evidence. Further, the parties fully and completely addressed the issue in their briefs following remand.

1  evidence presented, the parties' arguments, and the law, the Court concludes that Affinity met its

2  burden of establishing that Plaintiffs were correctly classified as independent contractors and finds

3  in favor of Affinity.

**BACKGROUND**

5  **1. Procedural Background**

6      This putative class action was transferred to this Court from the Northern District of

7  California on November 14, 2005.  (Transfer Order, ECF No. 1)  Plaintiff Fernando Ruiz ("Ruiz"),

8  on behalf of himself and all others similarly situated (collectively, "Plaintiffs"), alleged that

9  Affinity misclassified the drivers it hired to perform home delivery services as independent

10  contractors, contending that they should have been classified as employees.  On January 28, 2009,

11  the Court certified the class on the lone issue of whether Affinity should have classified the class

12  members as employees, rather than independent contractors, (Class Cert. Order 1, ECF No. 105),

13  and this limited issue went to trial.

14      Following a three-day bench trial in December 2009,[2] the Court—applying Georgia

15  law—found that Affinity properly classified Ruiz and the absent class members as independent

16  contractors, as summarized in a Memorandum Decision and Order Finding Plaintiff and Absent

17  Class Members Properly Classified as Independent Contractors ("Memorandum Decision").

18  (Mem. Decision, Mar. 22, 2010, ECF No. 186)  Ruiz appealed, and the Ninth Circuit—concluding

19  that California, not Georgia, law applied—vacated and remanded in a February 8, 2012, opinion.

20  *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318 (9th Cir. 2012).

21      Accordingly, the Court now revisits this issue, this time applying California law to the facts

22  as established at the December 2009 bench trial.  The Court accepted and reviewed briefs

23  following remand from Plaintiffs, (Pls.' Brief, ECF No. 210), and Affinity, (Def.'s Brief, ECF No.

24  209), and replies from both parties, (Pls.' Reply, ECF No. 214); (Def.'s Reply, ECF No. 215).

25  //

26  //

27  ─────────────────

28      [2] At the December 2009 bench trial the Court heard testimony from witnesses Fernando Ruiz,
Alfonso Sanchez, Oscar Arturo Reyes, Charles Hitt, Danny Lee Hansen, Robert William Crandell,
and Gabriel Mejia, heard opening arguments from counsel, and admitted exhibits into evidence.

**2. Factual Background**[3]

Affinity,[4] a Georgia corporation, provided regulated, for-hire home delivery and transportation logistics support services to various home furnishing retailers, including Sears, Home Depot EXPO, J.C. Penney, Wickes, and Brueners.  In November 2003 and again in 2006, Affinity entered into a Home Delivery Carrier Agreement with Sears to arrange for drivers to perform home delivery services out of the San Diego Market Delivery Operation ("MDO").  Sears owned the San Diego MDO, but provided Affinity with offices at the warehouse.

Ruiz worked as a driver for Affinity during the class period, making deliveries for Affinity to Sears customers.  Ruiz decided to work for Affinity in late 2003 after meeting with Dan Hansen, who managed the Sears account for Affinity at the San Diego MDO.  Before starting his work for Affinity, Ruiz formed his own business, R&S Logistics ("R&S"), by obtaining a Federal Employer Identification Number and establishing a separate business banking account for R&S.

To work as a driver for Affinity, Ruiz and the other Plaintiff drivers were required to enter into the Independent Truckman's Agreement ("ITA") and Equipment Lease Agreement ("ELA") with Affinity.  Both the ITA and the ELA provided that the parties intended to create an independent contractor relationship:

> **Control and Exclusive Use**. . . .  The parties intend to create an independent contractor relationship and not an employer-employee relationship. (Trial Ex. 77, at ¶ 9 (ITA))

> **Independent Contractor** (a) Contractor, in the performance of this Agreement, will be acting in his own separate capacity and not as an agent, employee, partner, joint venture or associate of Affinity.  It is expressly understood and agreed that Contractor is an independent contractor of Affinity in all manners and respects and that Contractor is not authorized to bind Affinity to any liability or obligation or to represent that it has any such authority. (Trial Ex. 78, at ¶ 2 (ELA))

Additionally, under the ELA, Affinity leased "the equipment with a driver" from Plaintiffs. (Trial Ex. 78, at ¶ 1)  Among the "equipment" Affinity leased from Plaintiffs under the ELA was the truck the drivers used to complete their deliveries.  In a somewhat circular arrangement,

---

[3] Facts contained in the Factual Background and throughout this Memorandum Decision and Order Following Remand are based on the factual findings as set forth in the Court's Memorandum Decision following the three-day bench trial, unless otherwise indicated.  (*See* Mem. Decision, Mar. 22, 2010, ECF No. 186)

[4] In June 2007, Affinity was acquired by 3P Delivery, Inc.

1   Affinity actually leased the trucks from Ryder Truck Rental and subleased the Ryder trucks to

2   Plaintiffs, who in turn leased the truck and driver back to Affinity under the ELA.

3          Although Ruiz and the other Plaintiff drivers could accomplish the deliveries themselves,

4   they were not required to do so.  Indeed, many Plaintiffs hired other drivers or operated multiple

5   trucks, hiring second drivers and helpers to run these additional delivery routes.  Further details of

6   the contractual arrangement for delivery services between Plaintiffs and Affinity are discussed

7   below.

8                                          **ANALYSIS**

9          "[U]nder California law, once a plaintiff comes forward with evidence that he provided

10  services for an employer, the employee has established a prima facie case that the relationship was

11  one of employer/employee."  *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010) (citing

12  *Robinson v. George*, 105 P.2d 914, 917 (Cal. 1940)).  "'[T]he fact that one is performing work and

13  labor for another is prima facie evidence of employment and such person is presumed to be a

14  servant in the absence of evidence to the contrary.'"  *Id.* (quoting *Robinson*, 105 P.2d at 116).

15  Under these principals—and as directed by the Ninth Circuit in applying these principals to the

16  facts of this case[5]—Affinity carries the burden to "prove, if it can, that the presumed employee was

17  an independent contractor."  *Id.* (citing *Cristler v. Express Messenger Sys., Inc.*, 89 Cal. Rptr. 3d

18  34, 43 (Cal. Ct. App. 2009)).

19         Under California law, that the parties placed a label on their relationship "is not dispositive

20  and will be ignored if their actual conduct establishes a different relationship."  *Estrada v. FedEx*

21  *Ground Package Sys., Inc.*, 64 Cal. Rptr. 3d 327, 335 (Cal. Ct. App. 2007) (citing *S.G. Borello &*

22  *Sons, Inc. v. Dep't of Industrial Relations*, 769 P.2d 399, 403 (Cal. 1989)).  Instead, "the most

23  important factor [informing the employee/independent contractor distinction] is the right to control

24

25         [5] As explained in the Ninth Circuit's opinion vacating and remanding the case, "the starting
    point from which the drivers begin their lawsuit is vastly different depending on whether California
26  or Georgia law applies."  *Ruiz*, 667 F.3d at 1323.  This is because, applying Georgia law, the Court
    found there was a presumption that Plaintiffs were independent contractors and that the burden was
27  on Plaintiffs to rebut that presumption. (Mem. Decision 3–4, ECF No. 86 (citing *Fortune v. Principal*
    *Fin. Grp., Inc.*, 465 S.E.2d 698, 700 (Ga. Ct. App. 1995)))  But, applying California law, "the
28  presumption is that the drivers are employees and the burden is upon Affinity to demonstrate that the
    drivers are independent contractors."  *Ruiz*, 667 F.3d at 1323.

                                          - 4 -                                          05cv2125

the manner and means of accomplishing the result desired." *Cristler*, 89 Cal. Rptr. 3d at 38

(internal quotation marks omitted); *accord Estrada*, 64 Cal. Rptr. 3d at 335 ("The essence of the

[common law] test [of employment] is the 'control of details'—that is, whether the principal has

the right to control the manner and means by which the worker accomplishes the work . . . .").

California courts also look to several secondary factors to ascertain the nature of a service

relationship. *Borello*, 769 P.2d at 404.  Thus, in addition to the control test, "strong evidence in

support of an employment relationship is the right to discharge at will, without cause." *Id.*

(internal quotation marks and brackets omitted).  And Courts also look to the following factors

derived from the Restatement Second of Agency:

> (1) whether the worker is engaged in a distinct occupation or business,
> (2) whether, considering the kind of occupation and locality, the work is usually
> done under the principal's direction or by a specialist without supervision, (3) the
> skill required, (4) whether the principal or worker supplies the instrumentalities,
> tools, and place of work, (5) the length of time for which the services are to be
> performed, (6) the method of payment, whether by time or by job, (7) whether the
> work is part of the principal's regular business, and (8) whether the parties believe
> they are creating an employer-employee relationship.

*Estrada*, 64 Cal. Rptr. 3d at 335 (citing *Borello*, 769 P.2d at 404 (citing Restatement (Second) of

Agency § 200)).  Finally, in addition to those factors covered by the Restatement, *Borello* noted

several other relevant factors including "the alleged employee's opportunity for profit or loss

depending on his managerial skill" and "the alleged employee's investment in equipment or

materials required for his task, or his employment of helpers." *Borello*, 769 P.2d at 407.

According to Affinity, "[a]pplying California law to [the Court's factual] findings will not

alter the conclusion this Court previously reached." (Def.'s Brief 1, ECF No. 209)  Affinity places

much emphasis on the fact that the Memorandum Decision "addressed and resolved" several of the

same factors that are applicable under California law. (Def.'s Reply 1, ECF No. 215 (referring to

Mem. Decision 5, ECF No. 186 (concluding that "some factors support a finding of employer-

employee relationship" but that "the predominant evidence supports a finding that Ruiz and the

unnamed class members were correctly classified as independent contractors")))  And, even for the

factors the Court did not previously consider, Affinity argues that "the evidence bearing on [these

factors] also weighs in favor of finding that Affinity properly classified Ruiz and the [drivers] as

independent contractors." (*Id.*)

1   Plaintiffs disagree, arguing that Affinity has failed to carry the burden that now falls on

2   them, and that "[t]he overwhelming weight of the evidence establishes that the drivers were

3   misclassified."  (Pls.' Brief 2, ECF No. 210)  Plaintiffs correctly point out that the above factors

4   should be applied by reference to and with deference for the remedial purposes of California's

5   protective legislation.  (Pls.' Brief 3–4, ECF No. 210); *see also Ruiz*, 667 F.3d at 1324 ("The

6   California Supreme Court recognized that [the multi-factor test for determining employment

7   status] 'must be applied with *deference to the purposes of the protective legislation*' that the

8   worker seeks to enforce." (quoting *Borello*, 769 P.2d at 406 (emphasis added))).  But Plaintiffs

9   also challenge the Court's prior credibility and evidentiary findings, apparently under the

10  assumption that the Court will revisit both the legal conclusions and factual findings of the

11  Memorandum Decision.  (*See, e.g.*, Pls.' Brief 19, 22, 29, ECF No. 210)

12  As between the parties' two positions—Affinity suggesting that many of the factors have

13  already been resolved[6] and Plaintiffs implying that the Court should reconsider its factual

14  findings—the appropriate balance is somewhere in the middle.  The Court will not alter its

15  previous factual findings, but the inferences to be made from those findings as applied to

16  California law will be considered anew, in light of the principals outlined above.  And so, the

17  Court now turns to California's multi-factor test to determine how the drivers should be classified.

18  **1.  Affinity's Control Over the Manner and Means of Performance**

19  The most important factor and the first factor that the Court considers in determining the

20  appropriate classification of the drivers is the level of Affinity's right to control the manner and

21  means of the drivers' performance.  *Cristler*, 89 Cal. Rptr. 3d at 38.  As explained, because

22  Plaintiffs have proffered evidence that they provided services for Affinity, the burden is on

23

24   [6] Indeed the Ninth Circuit already addressed and resolved Affinity's argument on this point:

25   Affinity asserts that any error in applying Georgia law was harmless because the
     district court applied the common law factors that California considers and
26   concluded that Ruiz was an independent contractor.  Such an assertion, however,
     disregards the district court's repeated references to the Georgia presumption of
27   independent contractor status and its general reliance on Georgia law to resolve the
     employee-independence contractor issue.

28  *Ruiz*, 667 F.3d at 1324 n.2.

1   Affinity to establish that Plaintiffs are independent contractors, rather than employees.

2   Accordingly, the Court begins its analysis of the control factor with the various arguments set forth

3   by Affinity in its brief following remand.

4        First, Affinity contends Ruiz and the other Plaintiff drivers controlled the manner, means,

5   and details of their own work, as evidenced by the fact that Affinity permitted the drivers to

6   choose their own routes and to hire others to complete the contracted work.  (Def.'s Br. 20–25,

7   ECF No. 209)  Affinity points out that Plaintiffs were free to and did hire their own employees to

8   perform the work Affinity hired them to do, even going so far as to operate multiple trucks with

9   multiple employees.  (*Id.* at 23–24)  Affinity notes that the time at which Plaintiffs started and

10  ended their days was also within their control: Ruiz elected to arrive to the warehouse earlier in the

11  morning than other drivers, and his "ending time depended solely on the speed and efficiency with

12  which [he] and his employees completed the deliveries."  (*Id.* at 23)  Moreover, Affinity contends

13  that it exercised little to no control over Plaintiffs' appliance installation services, and that "[t]o the

14  extent Ruiz was provided with any delivery or installation specifications, those specifications were

15  the very services R&S agreed to provide and . . . Ruiz's adherence to those specifications merely

16  shows that he provided the services for which he was engaged."  (*Id.*)

17       The Court agrees with Affinity that the fact that Ruiz and the other drivers were able to

18  hire others to complete the deliveries Affinity hired them to do is strong evidence suggesting that

19  Affinity did not have the requisite level of control over the manner and means of Plaintiffs' work.

20  As the Court previously found:

21         The most prominent evidence that Affinity did not control the time, manner and
       method of the drivers is that Ruiz and the other drivers did not themselves have to

22         do the work for which they were hired—drivers could hire other drivers to load
       the trucks, drive the trucks, run the routes, make the deliveries, unload the trucks,

23         and perform virtually all other aspects of the job. . . .  In fact, some of the drivers
       operated multiple trucks to complete the deliveries on any given day and hired

24         drivers and helpers to staff those extra trucks.

25  (Mem. Decision 5, ECF No. 186 (citing trial transcript))  Based on this evidence, the Court

26  found—and still finds—"that the Plaintiffs' ability to hire others to operate the trucks and perform

27  the services they contracted with Affinity to perform[] is highly indicative of an independent

28  contractor relationship.  An employee is not able to hire a substitute to do their work as these

drivers were permitted, and even encouraged, to do." (*Id.*)

Plaintiffs argue, however, that their ability to run multiple trucks and hire additional drivers and helpers is nevertheless within Affinity's control because "Affinity retained the right to approve or reject helpers and second drivers for any reason or for no reason at all." (Pls.' Br. 13, ECF No. 210) The Court agrees that to the extent Affinity required second drivers to complete substantially the same application in order to be hired and monitored their performance and appearance after they were hired, this suggests the type of control characteristic of an employment relationship. Affinity's requirements in this regard must be discounted to the extent they were driven by a need to comply with federal regulations or with Sears' requirements, however. (*See* Mem. Decision 6–8, ECF No. 186)[7] And as the Court has already found, "the application and approval process for helpers and second drivers are the product of Sears' and federal regulation requirements," (*id.* at 6), and Affinity's monitoring of the helpers' and second drivers' performance and appearance is "attribute[d] . . . to Sears' requests," (*id.* at 8).

This same reasoning applies to Plaintiffs' argument that Affinity exercised control over Plaintiffs by requiring them to adhere to specific uniform and grooming guidelines.[8] The Court has not overlooked the fact that California courts have found "control over every exquisite detail

---

[7] Apparently recognizing that the Court, as it did previously, is disinclined to give much—if any—weight to the requirements placed upon helpers and second drivers that are set by federal regulations, Plaintiffs state in a footnote that they "are not relying on any government regulations, but rather, the basic point that Affinity had to approve the drivers' helpers and second drivers." (Pls.' Br. 13 n.3, ECF No. 210) But the issues are inextricably intertwined: if Affinity's approval or disapproval of helpers and second drivers was rooted in compliance with federal regulations, then the "basic point that Affinity had to approve" cannot be untied from compliance with those regulations. Accordingly, the Court again holds that the exercise of control over the drivers, second drivers, and helpers in compliance with government regulations does not weigh heavily toward an employer-employee relationship. *See SIDA of Haw., Inc. v. NLRB*, 512 F.2d 354, 359 (9th Cir. 1975).

[8] For example, drivers were expected to wear blue shirts with stripes and the words "Sears Authorized Carrier" on the back, dark blue pants, black shoes and belt, and a cap with the Sears logo. Affinity provided the uniforms to its drivers from stock inventory if needed, but Affinity did not require the drivers to purchase the uniforms from it, nor did Affinity profit off of the uniforms. Some drivers even embroidered their hats with "Sears Authorized Carrier" outside of Affinity. (Trial Tr. 55–56, 126–29, ECF No. 168); (Trial Tr. 286–87, 319–20, ECF No. 169); (Trial Tr. 499–501, ECF No. 170); (Trial Tr. 731, ECF No. 170)

The drivers and helpers were also subject to various grooming requirements. Facial hair was expected to be neatly groomed, and Affinity even supplied shaving kits in case drivers came to work with a "five o'clock" shadow. (Trial Tr. 387–88, ECF No. 169) The drivers and helpers were also expected to not have any visible body piercings or tattoos. (*Id.* at 387)

of the drivers' performance, including the color of their socks and the style of their hair" to be the type of control germane to an employee-employer relationship. *Estrada*, 64 Cal. Rptr. at 336. But unlike in *Estrada*, where FedEx imposed such uniform and grooming requirements on its drivers directly, here these requirements were attributable to Sears and are therefore not evidence of *Affinity's* control. (Trial Tr. 386–87, ECF No. 169 (testimony of Danny Hansen indicating that in checking the drivers' appearance and uniform he was looking "to make sure that the uniform they were wearing complied with Sears' requirements")); (*id.* at 340–42) Moreover, as several Affinity representatives testified to, "a uniform requirement often at least in part is intended to ensure customer security rather than control the driver." *FedEx Home Delivery v. NLRB*, 563 F.3d 492, 501 (D.C. Cir. 2009) (internal quotation marks and brackets omitted).

As to Affinity's control over the hours worked, the evidence is mixed. The Court believes that Affinity did exercise some degree of control over the time that Plaintiffs began their day. For example, Affinity required the drivers to show up to the Sears warehouse prior to a morning stand-up meeting or they risked losing their routes (or getting a less preferable route). (Trial Tr. 41–42, 118–19, 154–55, ECF No. 168); (Trial Tr. 590–92, ECF No. 170) Although the drivers controlled the exact time they arrived at the warehouse—*e.g.*, Ruiz testified that he chose to show up earlier than other drivers, at 5:30a.m. rather than 6:30a.m., (Trial Tr. 590–92, ECF No. 170)—each testified that their decision for when to arrive was driven by Affinity's requirement that they be present for the stand-up meetings and to obtain their daily routes. (Trial Tr. 41–42, 118–19, ECF No. 168); (Trial Tr. 590–92, ECF No. 170) More evidence of Affinity's control over the drivers' hours is that drivers were told by Affinity whether they would be working the next day depending on how many routes were available, (Trial Tr. 75, 78, 136–37, ECF No. 168), and that in order to secure time off Plaintiffs had to request it several weeks in advance (and such requests were sometimes denied), (*id.* at 78–79).

Notwithstanding these measures of control, Affinity did not directly control the number of hours worked each day, or at what time Plaintiffs ended their day. Instead, the end of each day depended on how quickly and efficiently Plaintiffs completed their routes, and so the actual number of hours worked depended on the efficiency of the deliveries, and not on a set number of

hours required by Affinity.[9]  Similarly, the number of hours worked was in large part determined by the drivers' delivery routes.  This is because the routes varied as to the number of stops or miles needed to be traveled to make all of the stops.[10]  And, rather then being controlled by Affinity, the predominant evidence indicates that the drivers selected or were assigned their routes based on scores they received from Sears' customer surveys—the higher the score, the higher the priority in selecting routes.  (Trial Tr. 101, 150, 154–55, ECF No. 168); (Trial Tr. 434–45, ECF No. 169); (Trial Tr. 524–25, 592, ECF No. 170)

Affinity also asserts that it exercised no control over how Plaintiffs "perform[ed] the details of [their] job or the tools [they] use[d] or the procedures [they] follow[ed]."  (Def.'s Br. 23, ECF No. 209)  And, although Plaintiffs point to the Procedures Manuals as evidence of Affinity's control over these tools and procedures, (Pls.' Br. 14–16, ECF No. 210), Affinity asserts that the procedures manuals have no bearing on Affinity's right to control the drivers in light of the fact that they were "merely referenced" in the ITA and, "more importantly, Ruiz and the contractors either did not receive the manuals or did not read them, and none relied on their content or instructions in performing their work," (Def.'s Br. 21, ECF No. 209).

Based on the evidence presented, the Court agrees with Plaintiffs that the guidelines set forth in the Procedure Manuals were more than mere "suggestions," and that these guidelines were a means by which Affinity controlled the drivers, especially considering that a failure to follow these guidelines would likely result in a termination of the drivers' relationship with Affinity because the drivers would be deemed not "successful."  (Trial Tr. 391, ECF No. 169); (*but see* Trial Tr. 252–56, ECF No. 168 (testimony of Charles Hitt, chief operating officer of Affinity, explaining that the drivers were not required to comply with the Procedures Manuals other than to the extent they required a driver to comply with legal requirements))  That said, however, the

---

[9] The maximum number of hours the drivers were permitted to work was set by federal regulations, not by Affinity, (Trial Tr. 330–31, ECF No. 169), and therefore has no bearing on the control factor, *see supra* note 7.

[10] For example, Ruiz testified on cross examination that "[a] good route [is] 18 to 21 stops, everything in the area local in the range of 30 miles.  You got less driving, everything is compact, and then you probably finish your route around 4:30, 5:00 with 20 stops. . . .  The worst route you have to drive 130, 170 miles away from the warehouse for your first stop, and then the stop numbers is like 13 or 14 stops."  (Trial Tr. 526, ECF No. 170)

1  Procedure Manuals themselves cannot demonstrate Affinity's control over the drivers in any

2  significant way in light of the fact that the evidence does not support that Plaintiffs received these

3  manuals, or, if they did, that they read or referred to them.  (Trial Tr. 98, 150–51, ECF No. 168)

4  Thus, rather than rely on the guidelines as set forth in the Procedures Manuals, the Court

5  instead looks to the evidence of Affinity's right to control or exercise of its right to control the

6  details of Plaintiffs' work.  The Court finds two main practices most emphasize the degree of

7  control Affinity held over its drivers.  First, as discussed, Affinity required the drivers to attend

8  daily stand-up meetings, which were conducted by Affinity management.  *See supra* at 8–9;

9  (Mem. Decision 15, ECF No. 186)  Second, and even more compelling, Affinity prohibited or

10  highly discouraged Plaintiffs from using their trucks in any capacity other than in making

11  deliveries for Affinity.  As discussed *infra* at 15–16, the delivery truck was the main tool which

12  Plaintiffs used to conduct their business.  It seems to the Court that, as independent contractors,

13  Plaintiffs would be able to use the truck for whatever purposes they wished, *i.e.*, to run routes for

14  another company or to help a friend move on a day off.  But the evidence paints a different picture:

15  The drivers were not allowed to take their trucks home or to operate them for other companies or

16  for personal use; instead, drivers kept the trucks in a secured lot at the Sears warehouse when they

17  were not in use.  Although Affinity representatives testified that this was necessary to avoid

18  graffiti or other damage to the trucks, this is not the complete story.  On occasion Affinity actually

19  allowed other drivers to use the trucks on days the drivers were not operating their trucks

20  themselves, and Affinity did not compensate Plaintiffs for this use.  (Trial Tr. 65–66, 68, 71–72,

21  132, ECF No. 168); (Trial Tr. 398–99, ECF No. 169); (Trial Tr. 519, 521–23, ECF No. 170)

22  Even though Affinity necessarily exercised some level of control over Plaintiffs by virtue

23  of its limits on Plaintiffs' use of their trucks while they were not working, this does not necessarily

24  translate into the relevant inquiry of Affinity's control over the manner and means Plaintiffs use

25  *while they are working*.  *See Estrada*, 64 Cal. Rptr. at 335 ("The essence of the test is the 'control

26  of details'—that is, whether the principal has the right to control the manner and means by which

27  the worker *accomplishes the work* . . . ." (emphasis added)); *Borello*, 769 P.2d at 404.  And a

28  review of the control Affinity exercised while Plaintiffs worked—*i.e.* Affinity's control over the

1   manner and means by which Plaintiffs accomplished their deliveries and installations—convinces

2   the Court that, combined with consideration of the secondary factors California courts consider,

3   *see infra* at 12–20, Affinity carried its burden to demonstrate that it did not exercise the requisite

4   level of control that would suggest an employee-employer relationship.

5   **2. Secondary Factors**

6   *A. Right to Terminate at Will*

7          *Borello* noted that the right to terminate at will, without cause is "strong evidence" of an

8   employer-employee relationship.  *Borello*, 769 P.2d at 404.  California courts have noted since

9   *Borello* that where the parties' contractual agreement contains a "mutual termination provision,"

10   however, this arrangement "'is consistent either with an employment-at-will relationship or parties

11   in a continuing contractual relationship.'"  *Desimone v. Allstate Ins. Co.*, 2000 U.S. Dist. LEXIS

12   18097, at *44 (N.D. Cal. Nov. 7, 2000) (quoting *State Compensation Ins. Fund v. Brown*, 38 Cal.

13   Rptr. 2d 98, 105 (Cal. Ct. App. 1995)); *accord Arnold v. Mut. of Omaha Ins. Co.*, 135 Cal. Rptr.

14   213, 221 (Cal. Ct. App. 2011) ("[A] termination at-will clause for both parties may properly be

15   included in an independent contractor agreement, and is not by itself a basis for changing that

16   relationship to one of an employee."); *Varisco v. Gateway Sci. & Eng'g, Inc.*, 83 Cal. Rptr. 3d 393,

17   397–98 (Cal. Ct. App. 2008) ("An independent contractor agreement can properly include an at-

18   will clause giving the parties the right to terminate the agreement.  Such a clause does not, in and

19   of itself, change the independent contractor relationship into an employee-employer

20   relationship.").

21          Given this lay of the legal landscape, the parties here dispute the import of the contractual

22   provisions in the ITA and ELA allowing for termination without cause upon sixty-days written

23   notice.  (Trial Ex. 77 ¶¶ 2–3); (Trial Ex. 78 ¶ 9)  These provisions plainly provide that "either

24   party" may terminate the contract without cause, so long as it gives the other sixty days written

25   notice.  As many courts have held since *Borello*, this type of mutual termination provision does not

26   automatically transform the parties' relationship into an employment one.  As such, the Court

27   cannot conclude that this factor weighs in favor of one party or the other.

28   *//*

*B. Distinct Occupation or Business*

"If a worker is engaged in a distinct occupation or business, then that would suggest that the worker is an independent contractor rather than an employee." *Harris v. Vector Mktg. Corp.*, 656 F. Supp. 2d 1128, 1138–38 (N.D. Cal. 2009). Here, Plaintiffs formed and operated distinct businesses, which included a business name, a separate business banking account, and the responsibility to pay, out of that account, employee taxes and other expenses associated with running the business. Affinity paid Ruiz's business (R&S) for the work Ruiz's employee drivers and helpers performed, and Ruiz in turn paid his employees from R&S's account. These facts suggest that this factor weighs in favor of independent contractor status. *Cf. Borello*, 769 P.2d at 409 ("[Plaintiffs] do not hold themselves out in business."); *Antelope Valley Press v. Poizner*, 75 Cal. Rptr. 3d 887, 900 (Cal. Ct. App. 2008) ("[T]he evidence does not show that in making deliveries for AVP, the carriers are engaged in a distinct occupation or business of their own. There was no evidence that any of AVP's carriers hold themselves out as being an independent delivery service that happens to have AVP as one of its customers."); *Air Couriers Int'l v. Emp't Dev. Dep't*, 59 Cal. Rptr. 3d 37, 47 (Cal. Ct. App. 2007).

On the other hand, several drivers testified that they would not have established their businesses but for their relationship with Affinity, and Affinity management substantially aided the drivers in setting up their businesses. (Trial Tr. 116–18, ECF No. 168); (Trial Tr. 473–74, ECF No. 169) Regardless of the motive for forming their businesses, however, Plaintiffs ultimately had the ability to expand their businesses by hiring more employees, operating multiple trucks, and making managerial decisions regarding the employment and performances of the employees hired. In fact, the drivers and their businesses were able to continue making deliveries for Sears even after Affinity lost their contract with Sears and therefore were unable to do so. (Trial Tr. 650, ECF No. 170)

Thus, the Court concludes that this factor supports a finding that the drivers were properly classified as independent contractors. Given the testimony and evidence suggesting that Plaintiffs would not have formed their businesses absent their relationship with Affinity, however, the Court is hesitant to weigh this factor too heavily.

05cv2125

1    *C. Work Under Principal's Direction or by Specialist Without Supervision*

2         If the type of work performed is usually done under an employer's direction, it suggests an

3    employer-employee relationship; if the work is usually done by a specialist without supervision, it

4    suggests an independent contractor relationship.  Here, except for limited instances, Affinity did

5    not supervise the drivers while they were in the field performing the necessary tasks to ensure

6    completion of the deliveries.  Affinity did engage in infrequent "follow alongs" whereby drivers

7    were occasionally followed and photographed while on their delivery routes.  And Sears and

8    Affinity further monitored Plaintiffs throughout the day by requiring drivers to call in each

9    delivery, which updated the drivers' location and delivery completion.

10        The Court notes, however, that the drivers needed no special driver's license to drive the

11   delivery trucks, and therefore the lack of supervision might be better attributed to "the simplicity

12   of the work, not the [drivers'] expertise." *Borello*, 769 P.2d at 408.  But as explained *infra*, the

13   skill required goes beyond the ability to drive the truck; the proper delivery and installation of the

14   appliances requires substantial skill.  And there is no evidence that this aspect of the drivers' work

15   was supervised in any capacity.  Thus, the type of work Plaintiffs engaged in here is better

16   characterized as being performed by a specialist without supervision, which weighs in favor of a

17   finding that Plaintiffs were properly classified as independent contractors.

18   *D.  Skill Required*

19        "Where no special skill is required of a worker, that fact supports a conclusion that the

20   worker is an employee instead of an independent contractor." *Harris*, 656 F. Supp. 2d at 1139.

21   Several courts have found that this factor suggests an employee-employer relationship where

22   drivers are "not required to possess a special driver's license, and [have] no skills beyond the

23   ability to drive." *Narayan*, 616 F.3d at 903 (citing *Estrada*, 64 Cal. Rptr. 3d at 337; *JKH Enters.,*

24   *Inc. v. Dep't of Indus. Relations*, 48 Cal. Rptr. 3d 563, 579 (Cal. Ct. App. 2006)).  But here,

25   although the drivers need only a normal driver's license, their work is not limited to driving the

26   trucks from the pick-up to the drop-off locations.  In addition to delivering the appliances, the

27   drivers and helpers must install them, which requires substantial skill, especially considering the

28   dangers involved in installing appliances hooked to gas lines, or the potential water damage that

1    may arise.  Indeed, Ruiz had extensive experience installing such appliances prior to joining

2    Affinity, and testified to his acquired skill in recognizing potential complications and hazards.

3    Thus, this factor points toward an independent contractor relationship.

4    ***E.   Who Provides Instrumentalities, Tools, and Place of Work***

5           "[I]f the worker is using his employer's tool or instrumentalities, especially if they are of

6    substantial value . . . this indicates that the owner is a master."  Restatement (Second) of Agency

7    § 220 cmt. k.  The relevant tools and instrumentalities here include tools such as maps, drills, hand

8    tools, protective blankets, pads, and ties—all of which were furnished by the drivers—and,

9    importantly, the delivery truck.  The delivery truck was the main tool Plaintiffs used to conduct

10   their business.  Some of the drivers owned their own trucks, (Trial Tr. 393, 453, ECF No. 169), but

11   most leased them, either from Affinity under the ELA, or from some other entity, (Trial Tr. 682,

12   ECF No. 170).  For those drivers who leased the trucks, the Court finds that they—not

13   Affinity—furnished the "tool" of the truck.  As explained, pursuant to the ELA, Ryder leased the

14   truck to Affinity, Affinity subleased that truck to a driver, and ultimately the driver leased the

15   truck plus a driver back to Affinity.  As noted in the Memorandum Decision, this arrangement "is

16   consistent with the Federal Leasing Regulations, which define the 'owner' of the truck as one

17   '(1) to whom title to equipment has been issued, or (2) who, without title, has the right to exclusive

18   use of equipment, or (3) who has lawful possession of equipment registered and licensed in any

19   State in the name of that person.'"  (Mem. Decision 3 n.3 (citing 49 C.F.R. Part 376.2(d)).  Thus,

20   the Court concludes that Plaintiffs, not Affinity, provided the majority of the tools or

21   instrumentalities, including the delivery trucks.

22          Plaintiffs also point to the mobile telephones that Plaintiffs used to communicate with

23   Affinity throughout the day as part of the tools used, noting that Affinity required the drivers to

24   use a specific type of mobile telephone that allowed for two-way communication.  (Pls.' Brief 30,

25   ECF No. 210)  But Plaintiffs acknowledge that although the drivers obtained the mobile

26   telephones through Affinity, they were responsible for paying for the telephone as well as the

27   monthly costs of the telephone service, which was deducted from their paychecks.  (*Id.*); (Trial Tr.

28   135–36, ECF No. 168); (Trial Tr. 512–13, ECF No. 170)  Thus, the mobile telephones were not

given to the drivers, and therefore they were not Affinity's tools that were being used.  *See*

Restatement (Second) of Agency § 220 cmt. k.

Plaintiffs and Affinity also dispute whether, under these factual circumstances, Affinity can

be said to have provided Plaintiffs a place of work.  The drivers were generally on the road making

deliveries throughout the day, but were required to report to the Sears warehouse at the beginning

and end of the day in order to pick up the new appliances for the daily deliveries and to drop off

the old appliances at the day's completion.  To the extent requiring Plaintiffs to report to the Sears

warehouse each day for pick ups and drop offs constitutes providing a "place of work," the Court

notes that the warehouse was owned by Sears (though Affinity had offices there).  (Trial Tr. 52,

ECF No. 168); (Trial Tr. 305, 376, ECF No. 169); (Trial Tr. 487–89, ECF No. 170)

Upon consideration, the Court finds that Affinity did not furnish the majority of the tools

and instrumentalities, nor did Affinity provide Plaintiffs with a place of work.  Thus, this factor

weighs slightly in favor of an independent contractor relationship.

### F. Length of Time for Performance of Services

The Court next considers the length of time Plaintiffs worked for Affinity.  "Where a

worker is employed for a lengthy period of time, the relationship with the employer looks more

like an employer-employee relationship."  *Harris*, 656 F. Supp. 2d at 1140; *see also Narayan*, 616

F.3d at 902–03 ("Significantly, the contracts signed by the plaintiff Drivers contained automatic

renewal clauses and could be terminated by either party upon thirty-days notice or upon breach of

the agreement.  Such an agreement is a substantial indicator of an at-will employment

relationship.").  This is because "the notion that an independent contractor is someone hired to

achieve a specific result that is attainable within a finite period of time . . . is at odds with carriers

who are engaged in prolonged service to [an employer]."  *Antelope Valley Press*, 75 Cal. Rptr. 3d

at 855.

Here, the ITA and ELA provide for a term of one year, which is automatically continued

from year-to-year unless terminated on sixty-days written notice.  (Trial Ex. 77 ¶¶ 2–3); (Trial Ex.

78 ¶ 9)  Many Plaintiffs worked for Affinity for several years—*e.g.*, Sanchez and Mejia worked

for Affinity for three and a half and four years, respectively, (Trial Tr. 41, ECF No. 168); (Trial Tr.

705, ECF No. 171)—while others terminated their contracts prior to the one-year term end—*e.g.*, Ruiz terminated his contract after just nine months, (Trial Tr. 113, ECF No. 168).  In fact, it was estimated that just "20 to 30 percent of the [drivers] worked more than 12 months and that the remainder worked less than that."  (Trial Tr. 352, ECF No. 169); (*see also* Trial Tr. 455–56 (noting a "turn-over" rate of approximately 60 to 65 percent, meaning that this percentage of drivers terminated their contracts prior to the end of the initial one-year term))  Still, "[t]his was not a circumstance where a contractor was hired to perform a specific task for a defined period of time." *Narayan*, 616 F. 3d at 903.  When Affinity and the drivers entered into the relevant contractual agreements, "[t]here was no contemplated end to the service relationship," *id.*, and, indeed, the relationship often lasted months or even years.  Thus, the Court finds that this factor weighs in favor of finding an employer-employee relationship.

### G. Method of Payment

Turning to the method of payment factor, the Court looks to whether Affinity paid its drivers by time or by the job.  Where the worker is paid by the hour, it typically suggests an employment relationship; where the worker is paid by the job, it points toward independent contractor.  *See Harris*, 656 F. Supp. 2d at 1140.

According to Affinity, the drivers were paid by the job: "Affinity Logistics paid R&S $23.50 per delivery stop and made payments through weekly settlements. . . .  Because the number of stops on the routes varied, settlements likewise varied from week-to-week."  (Def.'s Br. 37. ECF No. 209 (citations omitted))  Indeed the "Contractor Compensation Schedule" of the ITA provides for compensation on a "'per Stop' rate," "regardless of the actual amount of time or people required for the Stop."  (Trial Ex. 77 Ex. A)  To the contrary, Plaintiffs contend that the drivers were more closely aligned with an employee relationship because they worked five to six days a week, worked at least eight hours per day, and made approximately eight deliveries per day. (Pls.'s Br. 31, ECF No. 210); (*See generally* Trial Ex. 101 (R&S manifests))  According to Plaintiffs, the fact that "the drivers were nominally paid by the delivery" is immaterial; "that was merely their **rate** of pay and there is no substantive difference between that pay scheme and one where an employee is paid on an hourly basis."  (Pls.' Br. 31, ECF No. 210)

1    The Court finds that this factor weighs slightly in favor of independent contractor status.

2    To be sure, the drivers were not hired to make single deliveries, but rather to make multiple

3    deliveries each day, several days a week.  Thus, to construe each delivery as an individual "job" is

4    unrealistic.  On the other hand, the evidence does not support a finding that the workers were paid

5    hourly.  There were no set hours to the day, nor did each delivery take the same amount of time,

6    even though the amount paid essentially remained the same.  Furthermore, the drivers were, on

7    occasion, able to negotiate a higher payment for an individual delivery which proved to be

8    particularly difficult.  (*See* Trial Ex. 77 Ex. A (explaining procedures for obtaining additional

9    compensation for special or difficult deliveries))  In contrast, an employee would not be able to

10   ask for a higher hourly payment for a particularly difficult task.  Accordingly, the Court finds that

11   this factor weighs in favor of independent contractor status, albeit only slightly.  *See Narayan*, 616

12   F.3d at 904 ("[T]he fact that the [drivers'] salary was determined [based on a percentage of each

13   delivery] is equally consistent with an employee relationship, particularly where other indicia of

14   employment are present.").

15   *H.  Work Part of Principal's Regular Business*

16   When the work being done is an "integral part" of the regular business of the purported

17   employer, this serves as a "strong indicator" that the worker is an employee.  *Borello*, 256 Cal.

18   Rptr. at 408.  Here, Affinity is in the business of providing logistics management services, which

19   involves coordinating the delivery of merchandise and procuring the equipment and labor

20   necessary to facilitate such delivery.  The parties contest whether and to what extent the drivers'

21   work constitutes an integral part of Affinity's business.

22   On the one hand, Affinity itself did not make deliveries or installations, instead entering

23   into leases with drivers to subcontract out the actual deliveries.  But on the other hand, "[t]he work

24   done by drivers like plaintiff Ruiz was the exact service (delivery of a retailer's merchandise) sold

25   by Affinity to [its] customers."  (Pls.' Br. 32, ECF No. 210)  Thus, as the Court previously

26   indicated, "[t]he drivers' role in Affinity's business is highly intertwined with what Affinity was

27   hired to do, which is to coordinate the delivery of its clients' merchandise."  (Mem. Decision 25,

28   ECF No. 186)  But this is the case with any business providing delivery services.  *Harris*, 656 F.

Supp. 2d at 1140 (finding this factor not dispositive where sales representatives were an integral part of the principal's regular business because "this is the case in any direct sales business"); *see also FedEx Home Delivery*, 563 F.3d at 502.  Thus, the Court finds this factor to be neutral.

### I. Parties' Belief

Next, the Court looks to the parties' belief as to their relationship status.  The record clearly indicates that Ruiz and Affinity both understood their relationship to be that of an independent contractor.  (Trial Tr. 165, 171, ECF No. 168); (Trial Tr. 297, 333–34, 367–68, 472–74, 477, ECF No. 169); (Trial Ex. 77, at ¶ 9); (Trial Ex. 78, at ¶ 2)  Perhaps in tacit acknowledgment that this factor weighs in Affinity's favor—*i.e.* toward a finding of independent contractor status—Plaintiffs did not address this factor whatsoever in their briefs following remand.  Thus, the Court concludes that this factor suggests that Plaintiffs were independent contractors rather than employees.

Again, however, the Court declines to weigh this factor too heavily in light of the circumstances surrounding the parties' contractual relationship.  *See Harris*, 656 F. Supp. 2d at 1140 ("[T]he context of the contractual relationship must be taken into account—*i.e.*, that Vector was largely contracting with young people with little to no business experience—and there is no evidence that the implications of the independent contractor status were explained to the trainees or Sales Reps.").  Here, the evidence shows that Affinity management played a significant role in helping the drivers to establish their own, separate business entities, even going so far as filling out the forms for Ruiz except for his signature.  (Trial Tr. 439, 473–75, ECF No. 169); (Trial Tr. 548–49, ECF No. 170)  And although Ruiz testified that he was excited about becoming an independent contractor—and thus plainly believed himself to be an independent contractor—there is no evidence in the record that Affinity "explained the legal and practical" implications of becoming an independent contractor, *Air Couriers Int'l*, 59 Cal. Rptr. 3d at 47, other than to highlight the advantages of forming one's own business and having opportunity for business growth, (Trial Tr. 474–78, ECF No. 170).  Thus, although the Court weighs this factor in favor of finding an independent contractor relationship, it does only slightly, with an eye toward this factual context.

***J. Opportunity for Profit or Loss Depending on Managerial Skill***

*Borello* cited with approval factors considered by other jurisdictions in determining whether a worker is an employee or an independent contractor, including the worker's "opportunity for profit or loss depending on his managerial skill." *Borello*, 769 P.2d at 407.  For this factor, Affinity points to the fact that drivers had the ability to negotiate higher rates for more difficult deliveries and that they often operated multiple trucks, among other things.  (Def.'s Br. 39, ECF No. 209)  Plaintiffs offer no argument as to this factor other than arguments the Court already addressed and disposed of *supra* at 13 (discussing the distinct occupation or business factor).

As the Court discussed above, Plaintiffs were required to and did form their own businesses before contracting with Affinity.  Once established, these businesses had the potential for profit, and Plaintiffs' operation of their businesses—such as deciding whether to operate the truck themselves, whether to operate multiple trucks, how much to pay helpers and second drivers, and other managerial decisions—potentially influenced this profit.  (Trial Tr. 628–31, ECF No. 170 (expert testimony of Robert Crandall))  Indeed, Ruiz testified that he determined how much to pay his helpers and drivers, and that he found it more profitable to operate the truck himself.  (*Id.* at 561–62, 570–71, 580–83)  Thus, as with the distinct occupation or business factor, the Court finds that this factor weighs in favor of Affinity.

***K. Investment in Equipment or Materials***

Finally, the Court examines the extent to which Plaintiffs invested in their own equipment or materials or employed helpers.  *See Borello*, 769 P.2d at 407.  As already noted, Plaintiffs can and did employ helpers.  More complicated is the extent to which Plaintiffs invested in their equipment and materials.  Plaintiffs acknowledge that the majority of the costs associated with Plaintiffs' businesses were ultimately borne by Plaintiffs, yet emphasize the fact that these costs were "advanced by Affinity."  (Pls.' Br. 34, ECF No. 210)  The Court recognizes that such a set up does smack as simply tiptoeing around treating the workers as employees.  *Cf. id.* ("Despite Borello's elaborate effort to deal with the cucumber harvesters as independent contractors, the indicia of their employment are compelling.").  But ultimately, whether Plaintiffs were required to

- 20 -

05cv2125

1    pay for their equipment and materials with cash up front or whether the costs of those materials

2    were deducted from their paychecks, either way it constitutes an "investment."  And, despite the

3    unique contractual arrangement, the Court has already concluded that Plaintiffs provide the tools

4    and instrumentalities of their work.  *Supra* at 15–16.  Thus, this factor too weighs in favor of

5    finding the drivers to be independent contractors.

6                                                    **CONCLUSION**

7            Following a complete and comprehensive review of the testimony and evidence admitted at

8    the three-day bench trial, and having duly considered the arguments raised by the parties in their

9    post trial briefs, the Court **HEREBY FINDS** that Affinity has carried its burden of establishing

10   that Plaintiffs were appropriately classified as independent contractors.  In light of the type and

11   extent of control Affinity had over the details of Plaintiffs' work, combined with the secondary

12   factors considered by the Court, on balance, the Court concludes that Plaintiffs are more

13   appropriately characterized as independent contractors.  Although Affinity did exercise some

14   control over Plaintiffs, for the most part this control was either unrelated to the manner and means

15   by which Plaintiffs accomplished their work, or it was a result of other factors—such as federal

16   regulatory requirements or Sears' preferences—rather than direct control by Affinity.  Moreover,

17   despite the fact that some of the secondary factors suggested an employee-employer relationship,

18   were neutral, or weighed only slightly in favor of independent contractor status, "no one factor is

19   decisive, and it is the rare case where the various factors will point with unanimity in one direction

20   or the other."  *Narayan*, 616 F.3d at 901 (quoting *NLRB v. Friendly Cab Co.*, 512 F.3d 1090, 1097

21   (9th Cir. 2007)).  Taken together, the Court finds that the secondary factors also indicate that the

22   drivers were independent contractors, not employees.  Thus, for all the reasons stated, the Court

23   **FINDS IN FAVOR OF DEFENDANT**.  The clerk shall close the file.

24

25   DATED:  August 27, 2012

26                                                    *Janis L. Sammartino*
                                                     _____
                                                     Honorable Janis L. Sammartino
27                                                   United States District Judge

28

05cv2125