UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO RUIZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>XPO Last Mile, Inc.,<br><br>Defendant. | Case No.:  5cv2125 JLS (KSC)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>(ECF No. 279) |

Presently before the Court are Plaintiff Fernando Ruiz's Motion for Class Certification (Motion), (ECF No. 279), Defendant's Opposition to Plaintiff's Renewed Motion for Class Certification, (ECF No. 280), and Plaintiff's Reply in Support of Motion for Class Certification, (ECF No. 284).

Because Plaintiff has demonstrated that all of the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3) are met, the Court **GRANTS** Plaintiff's Motion, and **APPOINTS** Plaintiff as the class representative and Plaintiff's counsel Elic Anbar and Osborn Law, P.C. as class counsel.

/ / /

/ / /

## BACKGROUND

Affinity Logistics Corporation[1] (Defendant), a Georgia corporation, provided for-hire home delivery and transportation services to retailers in California, including Sears, Roebuck, & Co.; Home Depot, EXPO; J.C. Penney; Wickes; and Brueners.  (Mot., ECF No. 279-1, at 8.)[2]  From May 2001 to 2008, Defendant employed approximately 250 delivery drivers (Drivers).  (*Id.*)  Fernando Ruiz (Plaintiff), who has made his living as a delivery truck driver since 1990, is one of those Drivers.  (2009 Class Cert. Order, ECF No. 105, at 2.)  Before working for Defendant, Plaintiff worked for Penske Logistics Corporation (Penske).  (*Id.*)  He began working for Defendant in late 2003, after Penske lost the contract with Sears, which had previously supplied Plaintiff's delivery jobs.  (*Id.*)  Defendant won that contract with Sears.  (*Id.*)

In 2009 the Court certified a class of Drivers for purposes of determining whether they were employees or independent contractors, but otherwise denied Plaintiff's motion for class certification.  (*Id.* at 15–16.)  After holding a bench trial, the Court found in 2010 that Georgia law applied and that, under Georgia law, the class members were independent contractors.  (Mem. Order, ECF No. 186, at 3, 25–26.)  The Ninth Circuit Court of Appeals reversed, holding that California law governed despite the choice of law provision in the parties' agreements.  *See Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1323 (9th Cir. 2012).  On remand, this Court concluded the drivers were independent contractors under California law.  (Mem. Order, ECF No. 216, at 21.)  The Ninth Circuit reversed again, concluding that the record evidence demonstrated the Drivers were employees of Defendant rather than independent contractors.  *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1105 (9th Cir. 2014).

In April 2015, the Court issued an Order clarifying that the certified classwide issue had been resolved—the Drivers were employees, not independent contractors—but that

---

[1] Affinity Logistics, through a series of transactions and name changes, is now XPO Last Mile, Inc.

[2] References to page numbers for docketed materials refer to the CM/ECF page number electronically stamped at the top of each page.

absent class members had not become parties to this case for purposes of liability and damages.  (Order, ECF No. 256, at 3.)  The Court concluded that under Federal Rule of Civil Procedure 23, Plaintiff could file a renewed motion for class certification.  (*Id.*)  Plaintiff so moved on October 22, 2015.  (Mot., ECF No. 279.)

### A. *Employment Agreements and Manuals*

The Drivers' employment relationship with Defendant was governed primarily by the Independent Truckman's Agreement (ITA) and the Equipment Lease Agreement (ELA).  (*Id.* at 8.)  The agreements state that Drivers were to be paid for services and that Drivers were responsible for costs incurred.  (*Id.* at 8.)  The Drivers were paid a fixed amount for each stop they made, which the ITA stated was "full compensation to the [Drivers] for all its costs, regardless of the actual amount of time or people required for the Stop."  (ITA, Pl. Ex. B, ECF No. 279-4, at 5.)  The ITA also provides: "CONTRACTOR [Driver] shall provide its own vehicle and shall pay all costs attendant to its operation and maintenance," and "CONTRACTOR will carry at its own expense public liability and property damage insurance upon any vehicles or other equipment used by it in carrying out its duties under this Agreement."  (*Id.* at 2, ¶¶ 5–6.)  Under this contract, the parties agreed that "Contractor will direct the operation of any equipment in all respects and will determine the means of performance including but not limited to such matters as choice of any routes, points of service of equipment, rest stops, and timing and scheduling of customer deliveries."  (*Id.* at 2, ¶ 9.)

The ELA likewise required Drivers to pay costs for maintenance of the trucks and insurance.  (ELA, Pl. Ex. C, ECF No. 279-5, at 2–4, ¶¶ 4, 11.)  In particular, this agreement stated that costs such as vehicle and workers compensation insurance may be charged back to the driver.  (*Id.* at 3, 8, ¶ 7 and Ex. C to ELA.)

Defendant gave Drivers various versions of the "Affinity Logistics Corporation Contractor Delivery Procedures Manual" (Procedures Manuals).  (Mot. at 10; Procedures Manuals, Pl. Exs. F, G, H, I, J, ECF Nos. 279-8, 279-9, 279-10, 279-11, 279-12.)  According to Plaintiff, the Procedures Manuals "varied slightly depending on which

1  Affinity customer they pertained to," but were all "substantially the same." (Mot. at 10.)

2  The Procedures Manuals required Drivers to maintain at their own expense "blankets, pads,

3  straps, hand trucks, proper tools (level, power drill, and drill bits), and uniforms." (*See*

4  *e.g.*, Pl. Ex. F, ECF No. 279-8, at 5, 7–8.)

5  Defendant did not provide Drivers any additional funds to cover expenses beyond

6  the flat per-delivery fee. (Mot. at 10.)  The Drivers bore the full expense for deliveries,

7  which Defendant maintained was because it paid them additional compensation per stop.

8  (Hitt Decl., Pl. Ex. K, ECF No. 279-13, at 4.)  Affinity Director of Operations James Harris

9  stated in his deposition that Drivers paid for their own expenses, including additional

10  workers, fuel, insurance, the truck itself, equipment, phones, truck rentals, tolls, and

11  uniforms. (Harris Dep., Pl. Ex. K, ECF No. 279-14, at 3–9, 12–13.)  In its Motion for

12  Summary Judgment filed in 2007 (Def. MSJ), Defendant acknowledged that Plaintiff in

13  fact paid to lease a truck and supplied his own tools and equipment, such as maps, a drill,

14  hand tools, hand truck, pads, and ties.  (Def. MSJ, ECF No. 59-1, at 10.)  Plaintiff's

15  corporation paid for fuel and damage claims caused by his operation, paid insurance

16  premiums, and hired employees to assist in deliveries, among other expenses.  (*Id.* at 10–

17  11.)

18  In many cases, Defendant provided these items to drivers and deducted the cost from

19  their paychecks.  (Hitt Decl. at 5, ¶ 12.)  For example, Plaintiff alleges that Defendant

20  leased trucks from a third party and then provided them to the Drivers.  (Mot. at 12.)

21  Defendant then deducted $350 per week from Drivers' paychecks for using the trucks,

22  although at trial Defendant appeared to acknowledge that no formal lease agreement for

23  the trucks existed between Defendant and the Drivers besides the ELA.  (Mot. at 10; Trial

24  Transcript, Pl. Ex. M, ECF No. 279-15, at 8–9.)  Defendant produced a spreadsheet

25  identifying the amount deducted from each of the Drivers' pay from 2005 to 2008.  (*See*

26  ADP Payroll Report, Pl. Ex. N, ECF No. 279-16.)

27  Defendant states that many Drivers were able to hire—or basically subcontract

28  with—other drivers to make deliveries, and the class member Drivers were still able to

make a profit.  (Opp'n, ECF No. 280, at 8–9.)  For example, one of the Drivers, Class member Gabriel Mejia, testified that he operated up to four trucks at a time, netting profits of $40,000 to $55,000 on the truck he drove, and presumably additional profits on the other trucks.  (Opp'n at 9 (quoting Mejia Dep., Def. Ex. 3, ECF No. 280-3, at 5–7).)  According to Defendant, "class members explained that they were able to avail themselves of these opportunities because Affinity augmented its compensation structure to allow the employees to cover the expense of operating their trucks."  (*Id.*)  In particular, Defendant states that many Drivers worked for delivery service provider Penske before working for Affinity.  (*Id.* (citing Ruiz Dep., Def. Ex. 1, ECF No. 280-1, at 5).)  At Penske, where delivery-related expenses apparently were not deducted from drivers' paychecks, drivers earned $6.82 per stop, whereas at Affinity Drivers earned $23.50 per stop.  (Ruiz Dep. at 12–13.)  In his 2007 deposition, Plaintiff agreed that, as he understood it, the higher pay rate at Affinity, as compared to Penske, was related to the costs he would incur by running his operation as his own business.  (*Id.* at 18. ("Q. You understood that you had to make more per stop because you had the expenses of running [your delivery corporation]?  A. That is correct.").)

The amount Defendant paid Drivers per delivery depended on the company for which the deliveries were performed.  For example, Drivers making deliveries for Sears were paid $23.50 per stop, whereas Drivers making deliveries for Home Depot EXPO were paid different amounts based on the type of product delivered.  (Opp'n at 10 (citing Hitt Decl., Def. Ex. 4, ECF No. 280-4, at 4, ¶ 8).)  Drivers delivering for Home Depot EXPO were paid $76.37 for "regular deliveries, and received additional compensation based on the type of product being delivered, (for example, $125 per stop for delivering grilling islands)."  (Hitt Decl., Def. Ex. 4, ECF No. 280-4, at 4, ¶ 8.)  Other factors could affect the rate, too, such as deliveries to a high rise, which added $20.  (*See id.*)  Similarly, the tools and skills required for deliveries varied depending on the retail customer and item delivered.  (*Id.* at 5, ¶ 9.)  According to Defendant, it explained to Drivers ahead of time "the anticipated expenses that each contractor would likely incur" and "provided a detailed

statement showing the items and amounts that ha[d] been deducted from their compensation." (*Id.* at 5, ¶¶ 11–12.)

### B.     *Meal and Rest Break Policies*

Plaintiff alleges Defendant did not have a policy to provide "off-duty meal periods of at least 30 minutes for each five hours of work, or rest periods of at least 10 minutes for every four hours of work or major fraction thereof," as required by California law.  (Mot. at 12.)  Neither the employment agreements nor the Procedures Manuals discuss meal and rest breaks, and, Plaintiff alleges, Defendant had no policy to ensure Drivers were taking these breaks.  (*Id.* at 12–13.)  Defendant gave Drivers a manifest each day detailing their delivery schedule.  Plaintiff contends the vast majority of these manifests do not identify any meal or rest breaks, although a few do, and that the delivery schedules typically made it infeasible to actually take a break.  (Mot. at 13; Driver Manifests, Pl. Ex. O, ECF No. 279-17; Reyes Dep., Pl. Ex. P, at 111–12.)[3]

---

[3] Driver Oscar Reyes testified as follows at his deposition:

> Q. Did you generally try to—did you—during the day when you had to stop and get something to drink and go to the restroom, those kinds of things, how did you do that during the day?
> A. Oh, trust me, it was really hard for us to do that.
> Q. Why is that?
> A. Because we were—like I said, that the manifest could say something, but they are not accurate.  There are never—you can't trust them because you're always behind on time, always out of the time window and stuff.  So it was really hard for someone to stop and get something to eat or—or—it was really hard for us to go to the bathroom or whatever.  We didn't have—we really didn't have time to do that."
> Q. Did you go all day without using the restroom?
> A. Well, we used it, but it was like an in-and-out thing.
> Q. And did you often eat lunch during the day?
> A. We hardly get lunch.
> Q. But did you eat lunch during the day?
> A. What I used to do, I used to get like something—I used to cook myself something and eat it on my way, but I—I couldn't get any break at all.
> Q. So you brought something with you to eat?
> A. Sometimes, yes.

(Reyes Dep., Pl. Ex. P, at 111–12.)

- 6 -

1    Plaintiff points out that Defendant, in its Opposition to an earlier class certification

2    motion, stated "Affinity Logistics did not have a policy prohibiting meal and rest breaks.

3    Rather, Affinity Logistics left it up to the contractor's discretion as to when and how long

4    the contractor should take meal and rest breaks." (*See* Opp'n, ECF No. 97, at 8.)   Plaintiff

5    contends that Defendant monitored the Drivers on a route monitoring screen throughout

6    the day and would call the driver if he or she fell behind schedule.  (Mot. at 14 (citing Trial

7    Trans., Pl. Ex. M, ECF No. 279-15, at 3–4).)   Accordingly, the Drivers could not turn off

8    their mobile phones.  (Mot. at 14.)   This created, Plaintiff alleges, a system of "constant

9    contact with dispatch and others, thus preventing [the Drivers] from being able to take an

10   off-duty meal or rest break as required by California law." (*Id.*)

11   Plaintiff points to deposition testimony and declarations of several Drivers to support

12   the notion that Drivers "often did not have an opportunity to take off-duty meal or rest

13   periods and that they consistently worked 12 hours without a break of any kind," (Mot. at

14   14 (citing Guzman Dep., Pl. Ex. Q, ECF No. 279-19, at 3; Melendez Decl., Pl. Ex. Y, ECF

15   No. 279-27; Torres Decl., Pl. Ex. Z, ECF No. 279-28; Montes-Barajas Decl., Pl. Ex. AA,

16   ECF No. 279-29)), and that drivers would eat lunch while driving, (*Id.* (citing Toledo Dep.,

17   Pl. Ex. R, ECF No. 279-20, at 3–4; Mejia Dep., Pl. Ex. S, ECF No. 279-21, at 3)).

18   Defendant created incentives for on-time deliveries.  For example, on-time deliveries

19   were one consideration in allowing Drivers to select the most desirable routes.  (Mot. at

20   15.)   This created an environment that discouraged Drivers from taking breaks, Plaintiff

21   argues.  (*Id.*)   Additionally, Plaintiff avers, Defendant had no system for keeping track of

22   when or if Drivers took breaks, and "there is no evidence that Defendant ever paid one

23   hour of premium pay when a meal/rest period was missed." (*Id.*)

24   Defendant contends that it allowed employees to decide when and how long they

25   should take meal and rest breaks.  (Opp'n at 10.)   When asked how he decided when he

26   was going to "take a break, get a Coke, or take a lunch break," Plaintiff responded:

27          Well, it is a hard one.  Sometimes we do not have no time to get a break or
            lunch.  They give you a scheduled window time.  If you come out of the
28

- 7 -

window time for delivery, you [would] be in red.  When you punch your time with the 1-800 number, you will be in red.  If you are red, your whole day [would] fall down.  So your numbers and your score will be low.  So you know the next day your route will be not the same route, local, it will be anywhere.

(Ruiz Dep., Def. Ex. 1, ECF No. 280-1, at 14.)  Plaintiff testified later in the deposition that he often ate lunch or a snack in the truck.  (*Id.* at 16–17.)

**LEGAL STANDARD**

**I.   Class Certification**

Class certification is governed by Federal Rule of Civil Procedure 23. Under Rule 23, the party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one of the three requirements of Rule 23(b) have been met.  In addition to the Rule 23 requirements, the party seeking class certification must provide a workable class definition by showing that the members of the class are identifiable.

Rule 23(a) provides four requirements that must be met in any class action: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

As to Rule 23(b), a plaintiff need only show that any one of the three described scenarios is satisfied.  Plaintiff seeks certification of the proposed class pursuant to Rule 23(b)(3), and must therefore demonstrate that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

"Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to

- 8 -

prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.* The Court must engage in a "rigorous analysis," often requiring some evaluation of the "merits of the plaintiff's underlying claim," before finding that the prerequisites for certification have been satisfied. *Id.*; *see also Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013). "Although some inquiry into the substance of a case may be necessary[,]" the court should not advance a decision on the merits at the class certification stage. *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003) (citations and internal quotation marks omitted).

## II.   California Employment Law

### A.   *Meal and Rest Break Claims*

California law requires employers to provide employees 10 minutes of rest break time for every four hours worked, "or major fraction thereof." *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1028 (2012) (citing IWC wage order No. 5–2001, Cal. Code Regs. tit. 8, § 11050). Employers are also obligated to provide meal breaks of 30 minutes for every five hours worked, with some caveats. *Id.* at 1034 (citing IWC wage order No. 5–2001, Cal. Code Regs. tit. 8, § 11050). An employer "satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." *Id.* at 1040. However, "an employer may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks." *Id.*

Although the employer must provide the opportunity for an uninterrupted break, employers are not obligated to ensure that employees do not choose to work during the break time they provide. *Id.* at 1038–39.

### B.   *Reimbursement Claims*

California Labor Code § 2802(a) provides: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties . . . ."

An employer may comply with § 2802 through a variety of payment methods.  For example, reimbursement for use of an automobile in performing duties could come in the form of mileage reimbursement, reimbursement for actual expenditures, or lump sum payments that increase the employee's overall salary, so long as the additional lump sum is "sufficient to provide full reimbursement" for the expenses.  *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 569–70 (2007).

If an employer uses a lump sum reimbursement method, to satisfy § 2802 the employer must have "a method to apportion the enhanced compensation payments between compensation for labor performed and expense reimbursement."  *Id.* at 576.  If the employer established such a method, the lump sum amount must be "sufficient to fully reimburse the employees for the automobile expenses they reasonably and necessarily incurred."  *Id.*

## ANALYSIS

Plaintiff is pursuing claims for (1) Defendant's alleged failure to reimburse Plaintiff for necessary expenses, and (2) Defendant's failure to provide meal and rest breaks or, alternatively, to pay one hour of premium pay for missed breaks. (Mot. at 7.)  Additionally, Plaintiff is pursuing "derivative claims" if liability is established on the first two claims. (*Id.* at 7 n.2.)  Those derivative claims are for (3) waiting time penalties pursuant to California Labor Code § 203 and (4) failure to provide accurate itemized wage statements under California Labor Code § 226(b).[4]   Plaintiff now asks the Court to certify the

---

[4] Defendant argues certification on the waiting time penalties and itemized wage statement claims is improper because Plaintiff did not properly raise them in his Complaint.  Plaintiff apparently concedes this point in his Reply, stating, "If liability is established on Plaintiffs['] unreimbursed expense and meal and rest break claims, . . . Plaintiffs likely will seek leave to amend their Complaint to add these claims." (Reply, ECF No. 284, at 3 n.1.)  Accordingly, the Court will not consider class certification with respect to these claims.  Although not discussed in the moving papers, Plaintiff stated at the hearing that he is also seeking class certification for his Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, claim.  The Court certifies the class for purposes of liability on Plaintiff's UCL claim to the extent that liability is co-extensive with liability for Plaintiff's expense reimbursement and meal and rest break claims.  Because the parties have not argued for or against certification with respect to any potential issues unique to the UCL, the Court in this Order renders no decision on them.

following class with respect to these claims: "All individuals who provided delivery services for Affinity Logistics Corporation ("Affinity") in California, on or after May 18, 2001." (Mot. at 7.)

Plaintiff must show that class certification is justified. *Dukes*, 131 S. Ct. at 2551.

## I.  Rule 23(a) Requirements

### A.  *Numerosity*

Rule 23(a)(1) requires the party seeking certification to show the "class is so numerous that joinder of all members is impracticable." "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw. v. Equal Emp't Opportunity Comm'n*, 446 U.S. 318, 330 (1980) (concluding that a class of 15 would not satisfy the numerosity requirement); *Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051–52 (9th Cir. 2003) (upholding class certification on numerosity grounds where the "members exceed sixty, and the defendants never presented any reason to the district court why they did not meet the numerosity requirement").

Plaintiff contends that the approximately 250 drivers is sufficiently numerous to justify class treatment. Defendant does not dispute this contention. Accordingly, the Court **FINDS** the class meets the numerosity requirement of Rule 23(a)(1).

### B.  *Commonality*

The commonality requirement of Rule 23(a)(2) requires that "class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.'" *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Dukes*, 131 S. Ct at 2551). The common issues do not need to be legally and factually identical. Rather, the "common questions may center on 'shared legal issues with divergent factual predicates [or] a common core of salient facts coupled with disparate legal remedies.'" *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998)); *Dukes*, 131 S.Ct. at 2556 ("[E]ven a single common question

will do."). In other words, the inquiry is whether resolution of a common issue will "drive the resolution of the litigation." *Jimenez*, 150 F.3d at 1165.

In this case Defendant misunderstood its working relationship with these delivery drivers. As it turns out, they were employees, not independent contractors. The putative class has that in common, and the resolution of this action now turns largely on the implications of that mistaken understanding under California employment law.

(i)     *Meal and Rest Break Claims*

Defendant argues that "[a]t best, Plaintiff's Renewed Motion asserts that the *handful* of drivers who were deposed 'reported that they often did not have an opportunity to take off-duty meal or rest periods,'" as opposed to an official or unofficial policy with a class-wide effect. (Opp'n at 12.) Plaintiff claims, however, that Defendant "lacked a general policy of permitting off-duty meal and rest breaks," (Mot. at 17–18), and in fact created an atmosphere that discouraged Drivers from taking breaks or made it difficult to do so, (*id.* at 12–13). If this claim proves true, it would establish liability. *See Brinker*, 53 Cal. 4th at 1028–40.

In *Jimenez*, the Ninth Circuit affirmed the district court's order certifying a class for "off-the-clock" claims, or claims for unpaid overtime. *Id.* at 1166. The common question was whether the defendant had an "unofficial policy of discouraging reporting of such overtime . . . ." *Id.* at 1165–66. The Ninth Circuit held that "proving whether such informal or unofficial policies existed will drive the resolution" of the plaintiffs' claim, as would determining whether the defendant "'knew or should have known' that the class was working unpaid overtime." *Id.* at 1166. These issues were susceptible to classwide proof using "either the testimony of managers who saw the class members['] work schedules or through an analysis of the telephone and computer systems used by class members." *Id.*

Defendant further argues, "[t]he fact that Plaintiff and his hand-picked declarants testified that they periodically missed breaks does not establish liability for the claims of the class." (Opp'n at 13.) But a plaintiff's burden at class certification is not to prove the defendant is liable to the entire class. *See Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1053

- 12 -

(9th Cir. 2015) ("A common contention need not be one that 'will be answered, on the merits, in favor of the class.'") (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013)).  Rather, the burden is to prove that there is a common issue, and depending on the resolution of that issue, the defendant may or may not be liable.  *See Jimenez*, 150 F.3d at 1066 n.5 (noting that the defendant's argument "that the alleged informal 'policy-to-violate-the-policy' does not exist" is an argument that is "appropriately made at trial or at the summary judgment stage, as it goes to the merits of the plaintiffs' claim").

Defendant cites the district court's class certification order in *Jimenez* for the proposition that a class asserting meal and rest break claims should not be certified where the plaintiff "has not identified any common policy or practice that interfered with [class members'] ability to take breaks."  *Jimenez v. Allstate Ins. Co.*, No. LA CV10-08486 JAK, 2012 WL 1366052, at *15 (C.D. Cal. Apr. 18, 2012), *aff'd* (Sept. 3, 2014).  The Court agrees that, absent such an allegation, class certification would be inappropriate.  Here, however, Plaintiff alleges that such policies existed and were applied to the entire class, albeit in the form of "informal or unofficial policies."  *Jimenez*, 765 F.3d at 1167.  The testimony of several Drivers, documentary evidence such as the manifests, and evidence about incentives for on-time deliveries show there is at least a question of whether Defendant structured its business in a way that gave rise to an unofficial policy of not providing breaks or created a work environment in which it was difficult for the Drivers to take breaks required by California law.

To be sure, the Court is not concluding that Plaintiff has concretely established the existence of such an unofficial policy, but the testimony and other evidence are sufficient to show the existence of a viable common question of whether such an unofficial policy existed, and the truth or falsity of that claim will drive the resolution of this case.[5]

---

[5] Defendant cites *Perez v. Safety-Kleen Sys., Inc.*, 253 F.R.D. 508, 514 (N.D. Cal. 2008), for the proposition that Plaintiff "must show that he was forced to forego his meal breaks as opposed to merely showing that he did not take them regardless of the reason."  The Court notes that this case predates

(ii)   *Reimbursement Claims*

Under California law, an employer may meet its § 2802 obligation to reimburse employees for necessary expenses by paying the employee a lump sum amount as long as that amount is sufficient to fully compensate the employee for the expense.  *See Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 573 (2007).   Where the employer elects to meet its § 2802 obligation using lump sum payments, the "employer must provide some method or formula to identify the amount of the combined employee compensation payment that is intended to provide expense reimbursement." *Id.*

In *Gattuso*, the California Supreme Court remanded the question of whether the trial court abused its discretion in denying class certification in light of the court's interpretation of § 2802. *Gattuso*, 42 Cal. 4th at 576.  Those questions were (1) whether the defendant adopted "a practice or policy of reimbursing [putative class members] for automobile expenses by paying them higher commission rates and base salaries"; (2) "if so, did it establish a method to apportion the enhanced compensation payments between compensation for labor performed and expense reimbursement"; and (3) "[i]f so, was the amount paid for expense reimbursement sufficient to fully reimburse the employees for the automobile expenses they reasonably and necessarily incurred?" *Id.*  The second and third inquiries were set off by the words "if so." *Id.*  The implication is that the third question only arises if the employer, first, had a lump sum policy, and second, had a legally satisfactory method or formula apportioning reimbursement for expenses. *See id.*  Thus, if an employer using a lump sum  payment method lacks an appropriate method or formula apportioning reimbursement, the employee may establish liability.

Defendant's position is that it satisfied its § 2802 obligation by paying Drivers more per stop.  Defendant's position therefore gives rise to the common question of whether the method it employed and applied to the entire class, albeit with some variance in the exact

---

*Brinker*, upon which the Court relies for providing the relevant standard for meal and rest break claims. *See Brinker*, 53 Cal. 4th at 1028–40.

per-stop rates, satisfies California law as provided by the California Supreme Court in *Gattuso*.  Defendant stands to answer for whether it had a practice or policy of reimbursing employees by paying them a higher wage and, if so, whether it had a "method or formula" it applied in reimbursing the employee Drivers for expenses.  *Gattuso*, 42 Cal. 4th at 573 ("[P]roviding an apportionment method is a practical necessity for effective enforcement of section 2802's reimbursement provisions.").  The answer to those common questions will help drive the resolution of this litigation.

Defendant's argument that resolution of this case turns on the adequacy of each of the Drivers' salary to compensate for expenses is more appropriately addressed on under the Rule 23(b)(3) predominance analysis.

(iii)   *Conclusion*

For the reasons mentioned above, the Court **FINDS** that Plaintiff's meal and rest break and expense reimbursement claims present questions common to the class, and that resolving these questions will help drive this litigation forward.

**C.   *Typicality***

Under Rule 23(a)(3), a party seeking class certification must show "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Plaintiff asserts that, because Plaintiff and the Drivers were "subject to the terms of the standard form ITA, ELA and Procedures Manuals," "were subject to the same policies and procedures," "and all were misclassified as independent contractors," Plaintiff's claims are typical of the class.  Defendant does not argue Plaintiff's claims were not typical.[6] Accordingly, the Court **FINDS** that Plaintiff's claims are typical of the putative class because Plaintiff and the putative class of Drivers were subject to the same contractual agreements and company policies and procedures.

/ / /

---

[6] Notably, in earlier class certification proceedings, Defendant argued Plaintiff's claims were not typical of the class.  (*See* Class Cert. Order at 6–9.)  The Court on that occasion concluded over Defendant's objection that Plaintiff met the typicality requirement.

- 15 -

**D.   *Fair and Adequate Representation***

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  The adequacy inquiry turns on whether (1) the "named plaintiffs and their counsel have any conflicts of interest with other class members" and (2) "the named plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  Defendant does not contend that these requirements are not met.

Plaintiff's interests are aligned with the class, as both he and the other Drivers stand to benefit by way of receiving damages if the case is resolved in their favor.  Based on the current record, there does not appear to be any divergence in interest between Plaintiff and the other Drivers.

According to Plaintiff, he has spent "many, many hours working on this litigation since it was filed in 2005," including attending various proceedings, from hearings, mediations, and settlement conferences to depositions and testifying at trial.   (Mot. at 21.)  Plaintiff's counsel, Osborn Law, P.C. has "[e]xtensive experience in class actions, including in employment and labor matters."  (*Id.*)  Plaintniff's other attorney, Elic Anbar, has been a trial attorney for more than 20 years and has litigated "numerous cases involving workers' compensation and workplace injury."  (*Id.* at 22.)  Plaintiff also aptly points out that both Anbar and Osborn Law, P.C. have "zealously represented Mr. Ruiz and the class members in this litigation over the last ten years."  (*Id.*)

In sum, (1) no conflicts have arisen or are likely to arise between Plaintiff and his counsel and the class and (2) Plaintiff and his counsel will prosecute this action vigorously.  Accordingly, the Court **FINDS** the adequate representation requirement of Rule 23(a)(4) is satisfied here.

## II.   Rule 23(b)(3) Requirements

A class may be certified under Rule 23(b)(3) if the Court finds that questions common to the class predominate over individualized questions and that using the class

action device is "superior" to the individual pursuit of claims.   Specifically, Rule 23 provides:

> A class action may be maintained if Rule 23(a) is satisfied and if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  The Supreme Court has stated that 23(b)(3) is "designed for situations in which class-action treatment is not as clearly called for." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (internal quotation marks omitted).  The existence of individualized issues, such as damages calculations, does not on its own demonstrate that individualized questions predominate over common ones. *See Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013).  In *Leyva*, the Ninth Circuit reversed the district court's order, which had denied class certification based on the individualized inquiries attendant to damages in a wage and hour class action. *Id.* at 513.  The *Leyva* court noted that, for purposes of liability, common questions predominated, even though the same could not be said for damages. *Id.* at 514.

### A.    *Predominance*

#### (i)    *Meal and Rest Break Claims*

Defendant argues that Plaintiff's meal and rest break claims turn largely on issues that would require individualized inquiries, such as each employee showing that he was "forced to forego his meal breaks."  (Opp'n at 14 (quoting *Perez*, 253 F.R.D. at 514).)  In particular, Defendant takes issue with Plaintiff's use of "hand-selected declarants as a way to prove who among the putative class missed a meal or rest break."  (*Id.*)  Defendant cites this Court's 2009 Class Certification Order, in which this Court held in favor of Defendant that the individualized inquiry over "whether absent class members actually received the

- 17 -

periods" would predominate.  (2009 Class Cert. Order at 10.)  Significantly, since issuing that order, the California Supreme Court clarified the law governing an employer's obligations with respect to providing meal and rest breaks, *see Brinker*, 53 Cal. 4th at 1028–40, and the Ninth Circuit has clarified the law governing class certification in employee class actions, *see, e.g.*, *Jimenez*, 765 F.3d at 1165–66 (affirming class certification order for claims that, as a result of employer's unofficial policies, employees worked unpaid overtime in violation of California law).

For purposes of *liability*, the question is not how many breaks Defendant "forced" the Drivers to miss, but instead whether Defendant had an unofficial policy of not providing breaks or created an atmosphere of discouraging Drivers from taking breaks.  The Ninth Circuit reaffirmed in *Jimenez* that "statistical sampling and representative testimony are acceptable ways to determine liability so long as the use of these techniques is not expanded into the realm of damages." *Jimenez*, 150 F.3d at 1167.  This is not a case where statistical sampling would be necessary to bear out Plaintiff's theory of liability.  As the Court understands it, statistical sampling is particularly useful where the trier of fact needs to extrapolate anecdotal evidence to the class.  By contrast, in this case, determining liability turns most significantly on the trier of fact determining what Defendant's meal and rest break policy was, and whether it violated California law.  As *Brinker* makes clear, California law places obligations on the employer to provide the opportunity for undisturbed meal breaks. *See Brinker*, 53 Cal. 4th at 1040.  Even if an employer has a formal break policy, it violates the law if it undermines that policy "by pressuring employees to perform their duties in ways that omit breaks." *Id.*

Plaintiff asserts that Defendant did not provide the opportunity for breaks and created an environment that made it difficult to take breaks.  Although statistical sampling could have some value with respect to the latter theory of liability, the Court does not think, given the relatively small size of this class, that to prove his case Plaintiff would need to produce statistically reliable data.  In the end, testimony from executives, documentary evidence such as the manifests, and testimony from the Drivers will provide sufficient

evidence from which a finder of fact can determine whether Defendant in fact had these unofficial policies in violation of California employment law.

It is true that employers are not obligated to ensure that their employees actually take the breaks they provide. *Id.* at 1038–39. Defendant will, naturally, have the opportunity to cross examine each Driver witness who testifies about Defendant's policies, and may put on evidence to persuade the trier of fact that Defendant in fact relinquished control over the Drivers for the requisite period. It may likewise put on evidence that Drivers who missed breaks did so of their own volition, perhaps undermining the notion that the missed break was due to an unofficial policy. Although Defendant takes issue with Plaintiff's "hand-selected declarants," Defendant will have the opportunity to hand-select its own declarants or witnesses to make its case against liability. *See Alcantar*, 800 F.3d at 1053 (noting that a plaintiff "need only show that there is a common contention capable of classwide resolution—not that there is a common contention that 'will be answered, on the merits, in favor of the class'").

Accordingly, Defendant's argument that individual Drivers' testimony would be insufficient to establish liability is unconvincing. As the record stands, several deponents or declarants have indicated that the schedules set by Defendant did not allow for meal or rest breaks, and a fact finder could determine from their testimony and other evidence presented so far that Defendant had an unofficial policy of not providing breaks or created a work atmosphere that discouraged taking breaks, and thus violated California law.[7]

---

[7] Defendant cites as Ninth Circuit law a portion of a passage from *Alcantar*, 800 F.3d at 1054. Defendant states:

> [C]ertification is improper because "questions as to why [class members] missed their meal and rest breaks, whether because of their employer's failure to provide them or their own choice to forgo them, would predominate over questions common to the class."

(Opp'n at 15.) A more complete excerpt of that passage reads:

> *The district court held* that even if the class met Rule 23(a)'s prerequisites, the class would still fail under Rule 23(b)(3) because questions as to why service technicians missed their meal and rest breaks, whether because of their employer's failure to provide them or their own choice to forgo them, would predominate over questions common to the class. *This conclusion is well within the district court's discretion.*

1    If Plaintiff proves liability, the damages owed to each class member for missed meal

2    and rest breaks will necessarily be a more individualized inquiry, as Defendant suggests.

3    Accordingly, it is appropriate to bifurcate this case for purposes of liability and damages.

4    *See Jimenez v. Allstate Ins. Co.*, No. LA CV10-08486 JAK, 2012 WL 1366052, at *22

5    (C.D. Cal. Apr. 18, 2012) ("The Court tentatively finds that it will allow the use [of]

6    representational testimony for the liability phase of the class trial, and will bifurcate the

7    damages phase."), *aff'd*, 765 F.3d 1161, 1168 (9th Cir. 2014) ("In crafting the class

8    certification order in this case, the district court was careful to preserve Allstate's

9    opportunity to raise any individualized defense it might have at the damages phase of the

10   proceedings.  It rejected the plaintiffs' motion to use representative testimony and sampling

11   at the damages phase, and bifurcated the proceedings.").

12   Therefore, the Court **FINDS** that common questions of law and fact predominate

13   over individualized issues because liability under Plaintiff's meal and rest break claims in

14   this case turns largely on Defendant's policies and practices, which, lawful or not, applied

15   to the entire class.

16   (ii)    Reimbursement Claims

17   Defendant suggests that the question of "whether 'each driver's salary . . . adequately

18   compensated each driver for the reasonable expenses actually incurred'" will drive the

19   resolution of this litigation, and that this individualized question will predominate over

20   common questions.  (Opp'n at 11 (quoting 2009 Class Certification Order at 12 n.5).)

21   As noted above, the Court would only reach the question of adequate compensation

22   if it were first established that Defendant (1) had a practice or policy of reimbursing Drivers

23

24   *Alcantar*, 800 F.3d at 1054 (emphasis added).  The implication of the omitted excerpts is that the question

25   of whether individualized inquiries about meal and rest breaks predominate is heavily fact- and evidence-
     dependent, and rests largely within the discretion of the district judge.  *See id.  Alcantar* does not stand

26   for the proposition that, as a matter of law, meal and rest break claims require an individualized inquiry
     that will predominate over common questions.  *See id.*  As indicated above, in the Court's discretion,

27   based on the evidence that will be used in Plaintiff's effort to prove its case with regard to common
     questions about Defendant's break practices and policies, the Court finds that common questions will

28   predominate over individualized ones.

by paying them a higher salary and (2) Defendants had "a method to apportion the enhanced compensation payments between compensation for labor performed and expense reimbursement." *Gattuso*, 42 Cal. 4th at 576.  Plaintiff alleges that neither is the case, and proving those two claims will predominate over the question of whether the Drivers' enhanced compensation was in fact sufficient.

At trial, Plaintiff may seek to establish liability by showing that Defendant did not in fact have a practice or policy of paying Drivers an enhanced salary.  If the trier of fact concludes that Defendant had such a policy, Plaintiff may attempt to prove that Defendant lacked a legally adequate method of apportioning enhanced compensation payments between compensation for labor performed and expense reimbursement.  It is only if these claims fail that the fact finder would reach the third inquiry of whether the additional lump sum payment was sufficient to cover the expenses the Drivers endured.[8]  *See Rodman v. Safeway Inc.*, No. 11-CV-03003-JST, 2015 WL 2265972, at *3 (N.D. Cal. May 14, 2015) ("[C]ourts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members.") (quoting *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir.2003)).

If, as this case proceeds, it becomes apparent that liability for Plaintiff's expense reimbursement claims hinges on individualized inquiries, Defendant may pursue other procedural protections, including decertification or dividing the class into sub-classes.  *See id.* ("If, at any stage in the class litigation, it becomes clear that 'an affirmative defense is likely to bar claims against at least some class members, then a court has available adequate procedural mechanisms,' such as placing 'class members with potentially barred claims in a separate subclass.'") (quoting *Smilow*, 323 F.3d at 39–40).  Such procedural mechanisms may be particularly useful where, as here, the class—although sufficiently numerous to satisfy Rule 23(a)—is, relative to many other class actions, fairly small.

---

[8] The Court does not in this Order reach the question of whether this third inquiry necessarily implicates individualized questions that would predominate over common ones.

Thus, because the question common to the class of whether Defendant (1) had a practice or policy of reimbursing Drivers by paying them a higher salary and (2) had a legally satisfactory method to apportion the enhanced compensation payments are the dominant inquiries for purposes of liability on Plaintiff's meal and rest break claims, the Court **FINDS** that common questions of law and fact predominate.

### B.    *Superiority*

The superiority inquiry focuses "on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (internal quotation marks omitted), *amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).  A district court has "broad discretion" in determining whether class treatment is superior.  *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir. 1975).

Resolution of the Drivers' claims would be most efficient if they were allowed to proceed on the issue of liability as a class.  It is fairly clear, in hindsight, that Defendant misunderstood its employment relationship with the Drivers.  Because Defendant was operating under the assumption the Drivers were contractors when in fact they were employees, there is at least a fair chance this distinction may give rise to liability for damages under California employment law.  It is far more efficient to determine liability in one proceeding than in 250.

There is no indication that members of the class would prefer to pursue these claims on their own, and if that is the case, they may opt out.  Similarly, there does not appear to be other related litigation, and a significant amount of the conduct complained of appears to have occurred in this jurisdiction.

Further, given the relatively small size of this class, and the apparent unity of the driver class members behind Plaintiff and class counsel's pursuit of this litigation, this case will likely remain manageable as a class action.

Thus, the Court **FINDS** that certifying this matter as a class action is superior to individual proceedings.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** Plaintiff's Motion for Class Certification for purposes of determining Defendant's liability with respect to Plaintiff's meal and rest break claims, Plaintiff's reimbursement claims, and, to the extent the legal and factual inquiries are the same as in the two aforementioned claims, Plaintiff's UCL claim.  The class certified is defined as "all current and former delivery drivers who made home deliveries for Affinity Logistics Corporation within the State of California at any time between May 18, 2001 and the date of the resolution of this Complaint."

Because Plaintiff admits that he has not properly raised his waiting time penalties and itemized wage statement claims, the Court **DENIES** Plaintiff's Motion as to those claims.

Further, the Court **APPOINTS** Plaintiff Fernando Ruiz as class representative and Elic Anbar and Osborn Law, P.C. as class counsel.

Within twenty-one (21) days of this Order, Plaintiff's counsel **SHALL LODGE** with the Court a Proposed Notice to the class members, pursuant to Rule 23(c)(2)(B).

**IT IS SO ORDERED.**

Dated:  February 1, 2016

Hon. Janis L. Sammartino
United States District Judge