UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO RUIZ, individually and on behalf of all others similarly situated,<br>Plaintiff,<br>v.<br>XPO LAST MILE, INC., formerly AFFINITY LOGISTICS CORPORATION,<br>Defendant. | Case No.: 05cv2125-JLS (KSC)<br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br>(ECF No. 312) |

Presently before the Court is Plaintiffs' Motion for Summary Judgment ("MSJ"), (ECF No. 312); Defendant Affinity Logistic Corporation's Response in Opposition re Motion for Summary Judgment ("Opp'n"), (ECF No. 320), and Plaintiffs' Reply in Support of Motion for Summary Judgment ("Reply"), (ECF No. 337). The Court held oral argument regarding the MSJ on January 26, 2017, (Hr'g Tr., ECF No. 345), and thereafter took the matter under submission. (ECF No. 343.) Having considered the Parties' arguments and the law, the Court rules as follows.

**BACKGROUND**

Defendant Affinity Logistics Corporation ("Affinity") (currently known as XPO Last Mile, Inc.) at all times relevant to this litigation was a company who provided delivery services to various California retailers, such as Sears, Home Depot, J.C. Penney, and

others. (*See* MSJ Ex. A, ECF No. 312-1.) Plaintiffs are former delivery drivers who worked for Affinity performing deliveries within the State of California on or after May 18, 2001. (MSJ 1.) Plaintiffs were considered by Defendant to be independent contractors at their time of hiring, during their employment period, and for the majority of this litigation. (*See* ECF Nos. 11–245.) However, on June 16, 2014 Plaintiffs were adjudged to instead be employees. (ECF No. 245.)

Regardless of such classification, all Plaintiffs were required to sign an Independent Truckman's Agreement ("ITA") and an Equipment Lease Agreement ("ELA") in order to work for Affinity during the relevant period. (MSJ Exs. C, D, ECF Nos. 5, 6.) In part, the two agreements set forth levels of compensation higher than most comparable employer-employee contracts, stipulated that Plaintiffs were responsible for paying their own expenses, and provided tiered "incentive payments" for Plaintiffs who timely completed deliveries at or above the ninety-four–percent threshold and for Plaintiffs who scored well on customer- and appearance-based surveys. (*Id.*) Potential employees were also shown a statement ("Revenue Estimate Sheet") that broke down what Affinity employees might make as a Contractor, including estimated earnings and expenses. (Opp'n 4–5; Hitt Decl. 25, MSJ Ex. F, ECF No. 312-8.)

During the relevant period, Affinity provided certain items to Plaintiffs, the costs of which Affinity deducted from Plaintiffs' weekly pay. (*See* MSJ Ex. J, ECF No. 312-12; Hitt Decl. ¶ 12.) These items included: background checks, insurance, damage claims, equipment, phone, in-home damage, truck leasing, truck rental, and uniforms. (*Id.*) Additionally, every Plaintiff was required to pay a "helper" to assist with deliveries, to pay for gas, and to maintain certain equipment relevant to making deliveries.[1] (*See* Hitt Decl. ¶¶ 6–7, MSJ Ex. F, ECF No. 312-8; Harris Dep. 36:3–5, 66:7–15; MSJ Ex. K, ECF No. 312-13; MSJ Ex. Q, ECF No. 312-19.) All Plaintiffs were responsible for any repairs to

---

[1] E.g., blankets, pads, straps, hand trucks, and proper tools such as a level, a power drill, and drill bits. (MSJ 9, n.9.)

merchandise damaged during delivery. (Affinity Logistics Corp. Delivery Contractor Manual SLS 2005 17, MSJ Ex. Q, ECF No. 312-19.) Furthermore, some Plaintiffs owned their own trucks and thus had additional expenses for care and maintenance for their vehicles. (*E.g.*, Cabadas Decl. ¶ 9, MSJ Ex. K, ECF No. 312-13; Henderson Decl. ¶ 9, MSJ Ex. K, ECF No. 312-13.) Affinity provided Plaintiffs with weekly pay summaries which included itemized deductions for some, but not all costs Plaintiffs paid (e.g., helper and fuel costs were not indicated on the pay summaries). (*Compare* MSJ Ex. K, ECF No. 312-13, *with* MSJ Ex. Z, ECF No. 312-28.)

Defendant did not have any specific policy regarding rest or lunch breaks, instead leaving it "to the [driver]'s discretion as to when and how long the [driver] should take for meal and rest breaks." (Hitt Decl. ¶ 15, Opp'n Ex. 4, ECF No. 320-4.) However, some of Affinity's manifests, which it daily gave to each driver to outline Plaintiffs' deliveries for the day, included a thirty-minute lunch window. (Opp'n Ex. 6, ECF No. 320-6). Some manifests' lunch windows overlapped with scheduled delivery periods; other manifests had no lunch period indicated at all. (*Id.*; MSJ Ex. R, ECF No. 312-20). Many Plaintiffs reported that they often worked twelve-hour days and that they would work the entire day without a break, (MSJ Ex. K, ECF No. 312-13), at least partially because Affinity allowed each driver to choose his delivery route for the following day based on prior performance, including frequency of timely deliveries pursuant to the daily schedule, (Hanson Dep. 20:1–4, 20:23–21:24, 28:3–17, MSJ Ex. L, ECF No. 312-14.)

On February 1, 2016 the Court granted Plaintiff Ruiz's motion for class certification solely "for purposes of determining Defendant's liability with respect to Plaintiff's meal and rest break claims, Plaintiff's reimbursement claims, and, to the extent the legal and factual inquiries are the same as in the two aforementioned claims, Plaintiff's UCL claim." (Order Granting in Part and Denying in Part Pl.'s Mot. for Class Certification ("Class Cert. Order") 23, ECF No. 289.) Plaintiffs now move for summary judgment on the first two liability issues.

/ / /

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense. Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact. *Id.* When a party seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-

moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

## ANALYSIS

Plaintiffs move for summary judgment on two grounds: that there are no triable issues of fact regarding either Plaintiffs' (1) expense reimbursement claims under California Labor Code section 2802 or (2) claims for (A) meals and (B) rest breaks under IWC Wage Order 9-2001, section 11, and California Labor Code sections 226.7 and 512. The Court addresses each in turn.

### I. Expense Reimbursement Claims; California Labor Code § 2802

California Labor Code section 2802(a) provides that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer . . . ." Section 2802(c) defines "necessary expenditures or losses" as including "all reasonable costs . . . ." Together, these provisions require an employer to "fully reimburse [its] employees for all expenses actually and necessarily incurred" in performing employment tasks. *Gattuso v. Harte-Hanks Shoppers, Inc.*, 169 P.3d 889, 902 (Cal. 2007). An employer may utilize various methods to comply with this requirement, *id.* at 897–902, including by providing employees "enhanced compensation." This is the manner by which Defendant in the present case asserts compliance, namely that (1) "Affinity did adopt a practice of reimbursing class members for their expenses by paying them higher compensation[;]" (2) Affinity notified employees pre-hiring that the higher base compensation "was intended to cover both the drivers' services and their costs[;]" and (3) Affinity listed or itemized expenses on their employees' earnings sheets. (Opp'n 7–12.)

In support of summary judgment regarding whether Defendant may on these facts legally assert compliance through enhanced compensation, Plaintiffs offer several cases with factual circumstances highly similar to those in the present case: *Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-2104SC, 2009 WL 2588879, at *4 (N.D. Cal. Aug. 19,

2009), and *Villalpando v. Exel Direct Inc.*, 161 F. Supp. 3d 873, 887 (N.D. Cal. 2016). Plaintiffs assert these cases bolster their summary-judgment arguments that (1) there is no evidence Affinity "separately apportioned expenses from wages" and (2) although the weekly pay summaries Affinity provided to its employees list deductions, they do not list reimbursements or "identify a single out-of-pocket expense." (MSJ 19–22.) Because both cases—and, indeed, Defendant's claim of compliance via "enhanced compensation" itself—rely on the California Supreme Court case of *Gattuso v. Harte–Hanks Shoppers, Inc.*, the Court first addresses that case. The Court next addresses Defendant's argument that neither of Plaintiffs' cited cases are persuasive because each was decided in a different procedural posture than the present case. The Court then turns to *Smith*'s and *Villalpando*'s interpretation of *Gattuso*, and finally to Plaintiffs' arguments.

In *Gattuso*, the Supreme Court of California endorsed three particular methods by which an employer could comply with the section 2802 reimbursement requirement. Only the third—a "lump-sum" payment constituting enhanced compensation—is relevant to this Motion for Summary Judgment. A lump-sum payment is unique from the other methods the *Gattuso* Court endorsed because it is less transparent; i.e., it combines expense reimbursement and compensation into a single payment. Specifically, the *Gattuso* Court held that

> an employer may satisfy its statutory business expense reimbursement obligation under section 2802 by paying employees enhanced compensation in the form of increases in base salary or commission rates, provided the employer establishes some means to identify the portion of overall compensation that is intended as expense reimbursement, and provided also that the amounts so identified are sufficient to fully reimburse the employees for all expenses actually and necessarily incurred.

*Id.* at 902. This requires that there be "some method or formula to identify the amount of the combined employee compensation payment that is intended to provide expense reimbursement." *Id.* at 900. As an example of when a company might appropriately apply the lump-sum method, the *Gattuso* Court described a circumstance where "an employee

drives exactly the same route day after day, so that the mileage driven varies little if at all from one day to the next . . . ." *Id.* at 899. The *Gattuso* Court further cautioned that usage of the lump-sum method is at least somewhat limited "[b]ecause wages and expense reimbursement are conceptually distinct and subject to different statutory and sometimes also contractual constraints . . . ." *Id.* at 900; *see also id.* at 899 ("As with mileage rates, an employer and an employee may agree on a particular lump sum to be paid as automobile reimbursement." (emphasis added)). However, the crux of any enhanced compensation inquiry—lump sum or otherwise—is the requirement "that employees and officials charged with enforcing the labor laws be able to differentiate between wages and expense reimbursements."[2] *Id.* at 900–01.

Effectively, there are three questions which together determine whether a Defendant has complied with its section 2802 requirements via lump-sum, enhanced compensation: (1) whether the defendant adopted "a practice or policy of reimbursing [relevant employees] for . . . expenses by paying them higher commission rates [or] base salaries[;]"(2) "if so, did [the defendant] establish a method to apportion the enhanced compensation payments between compensation for labor performed and expense reimbursement[;]" and (3) "[i]f so, was the amount paid for expense reimbursement sufficient to fully reimburse the employees for the . . . expenses they reasonably and necessarily incurred?" *See id.*[3] In the present case, Plaintiffs argue that Affinity's

---

[2] At oral argument, Defendant strenuously argued that *Gattuso*, being "made out of whole cloth[,]" should effectively be limited to the policy point that employers should not cause "employees to come out of pocket through their own wages to pay for business expenses." (Hr'g Tr. 7:9–8:1.) However, this is exactly what Defendant did (albeit unknowingly) in the present case. Defendants thought Plaintiffs were independent contractors, and thus paid them a certain amount in wages; Plaintiffs then took those wages and paid for what Defendants' classified as Plaintiffs' expenses. That is not "reimbursement" but instead requiring Plaintiffs to foot the bill for what Defendant thought were Plaintiffs' business expenses. *See Gattuso*, 169 P.3d at 900 ("The amount payable as wages is subject to various statutory restrictions, including minimum wage laws, which operate independently of, and in addition to, section 2802's obligation of an employer to fully reimburse an employee's necessary business expenses.").

[3] This varies from the traditional formulation of the elements necessary to show a violation of section 2802. *E.g.*, *Espinoza v. W. Coast Tomato Growers, LLC*, No. 14-CV-2984 W (KSC), 2016 WL 4468175, at *4 (S.D. Cal. Aug. 24, 2016) ("To prove violation of . . . section [2802], a plaintiff must demonstrate:

enhanced compensation claim fails as a matter of law under the first two *Gattuso* questions. (*See* MSJ 18.) With this framework in mind, the Court now turns to Defendant's and Plaintiffs' arguments.

As an initial matter, the Court disagrees with Defendant's argument that neither *Smith* nor *Villalpando* is persuasive because both were decided in procedural postures different than the present case. True, *Smith* addressed a motion for summary judgment brought by the defendant, rather than the plaintiff, and *Villalpando* addressed motions in limine. However, both decisions concerned a question of law applicable to the present case. *Smith* considered in part the defendant's argument that its particular lump-sum payment method complied with the California Supreme Court's command in *Gattuso*. Procedural posture notwithstanding, such a specific argument has only a binary resolution: either the payment method complies, and thus further inquiry and argument are required, or the payment method does not comply, and thus the non-compliant party is in breach of section 2802. *Smith* arrived at the latter conclusion. The Court refused to treat the payment policy at issue "as equivalent to the lump-sum payment method endorsed by the California Supreme Court in *Gattuso*." *Smith*, 2009 WL 2588879, at *4. And, because the defendant moved for summary judgment, the result in that case was that the defendant's motion for summary judgment was denied. But the same analysis might be validly applied and nonetheless lead to a different outcome when presented in a distinct procedural circumstance, such as when a party seeks via a motion in limine to preclude a Defendant from producing evidence regarding alleged section 2802-compliant lump-sum payments. *E.g.*, *Villalpando*, 161 F. Supp. 3d at 887 ("As [the defendant] has not pointed to any evidence that Class members could have determined that either their unreimbursed

(1) that he incurred expenses as an employee of the defendant; (2) that those expenses were reasonably necessary to the discharge of his duties; and (3) that the employer did not reimburse the plaintiff."). That is because here the parties do not dispute that Plaintiffs incurred expenses and that those expenses were reasonably necessary to the discharge of his duties. MSJ 16; *see* Opp'n 7–8. Accordingly, the only question in the present case is whether Defendant's payments constituted section 2802-complaint lump-sum reimbursements.

expenses or the expenses that were later deducted from their pay were actually included in their settlement pay, it appears that [the defendant] will be unable to prevail on this defense, as a matter of law."). Accordingly, because this case presents the same legal issue for resolution as *Smith* and *Villalpando*, there is no reason why the Court in the present case cannot here apply the same analysis to the same binary issue.

However, the Court neither finds *Villalpando* persuasive nor precisely agrees with the distinctions drawn in *Smith* supporting Plaintiffs' position. As an initial matter, *Villalpando* is easily distinguishable from the present case—the court there concluded that the defendant should be barred from introducing evidence of any enhanced compensation because the information distinguishing wages from expenses "only bec[a]me[] available through litigation," 161 F. Supp. 3d at 887, unlike the weekly, itemized settlement sheets in present case. *Smith*, on the other hand, presented facts highly similar to those in this case.

Ultimately, the *Smith* Court declined to conclude that the defendant's weekly earnings-sheet breakdown of expense deductions as measured against total pay complied with the spirit of *Gattuso*. This was because under the defendant's compensation "system, there was no up-front, lump-sum payment that included a means of identifying the amount being paid for labor performed and the amount being paid as reimbursement for business expenses[,]" and "[t]he only payment the drivers received occurred after expenses had already been deducted." *Smith*, 2009 WL 2588879, at *4. The *Smith* Court largely focused on the distinction between the terms "reimbursement" and "deduction," noting that the defendant's argument asked "the Court to treat these deductions as functionally equivalent to reimbursements." *Id.*; *see id.* at *3 ("One problem for [the defendant's] argument is that the amounts that [the defendant] claims are expense reimbursements appear on the Earnings Worksheets and Settlement Statements as expense deductions."). However, the semantics of labeling aggregate changes to an employee's weekly pay as either reimbursements or deductions only matters insofar as it affects the crux of the enhanced compensation inquiry, which is meant to provide employees and officials with the ability

to differentiate between wages and expenses for purposes of monitoring statutory and contractual compliance. *See Gattuso*, 169 P.3d at 901 ("An employer that chooses to link expense reimbursement to employee performance . . . runs a risk that the employee['s] [pay] . . . may be insufficient to provide full reimbursement for the . . . expenses that the employee necessarily incurred. If that happens, the employer's full reimbursement obligation under section 2802 will require it to make up the difference. . . . . This is not a reason, however, to conclude that section 2802 prohibits this method of business expense reimbursement.").

This leaves Plaintiffs' arguments that Affinity failed both to separately apportion expenses from wages and to account for a single out-of-pocket expense. Plaintiffs' own exhibit of Plaintiff Ruiz's weekly pay summaries reveal that Affinity differentiated between gross pay, expenses, and net pay. (MSJ Ex. Z, ECF No. 312-28.) This therefore indicates an intent by Affinity to segregate compensation from expenses. However, none of the pay summaries indicate a separate expense deduction for a helper, and Defendant has admitted that all Plaintiffs were required to hire and pay a helper for deliveries.[4] This alone proves fatal to Defendant's expense-apportionment argument.[5] Although Defendant argues that the Revenue Estimate Sheet disclosed the cost of the helper (and other) expense requirement(s), the Sheet provided only <u>estimates</u>, (Hansen Dep. 42:7–10 (noting Revenue

---

[4] Defendant asserts that Plaintiff Ruiz "testified that each of the deductions that Affinity told him about appeared on his weekly Earning/Expenses Sheet and that he did not incur any other business related expenses." (Opp'n 9.) However, Plaintiff Ruiz gave this deposition back in 2007, (Ruiz Dep. 1, Opp'n Ex. 1, ECF No. 320-1), and the question to which he responded was explicitly framed as: "Did you have some expenses that were not listed on here when you worked as a contractor?" (*Id.* 45:3–4.) In light of the subsequent determination that Plaintiffs were all employees rather than independent contractor, this particular testimony has no bearing on the current legal issue of whether Affinity segregated expenses from pay in a legally compliant manner.

[5] Plaintiffs argue that Affinity additionally failed to account for other out-of-pocket expenses such as fuel, (MSJ 21); and Affinity's Delivery Contractor Manual further provides that each driver must "maintain, at its expense, sufficient protective devices (blankets, pads, straps, hand trucks, etc.)[,]" (MSJ Ex. Q, ECF No. 312-19.) Although these expenses also support liability under section 2802, the additional amount of expenses for which Affinity failed to account will be relevant only to the forthcoming damages phase of these proceedings.

Estimate Sheet was to "assist in recruiting contractors" by giving "them a good idea of what their business could earn" (emphasis added); *id.* at 45:20–48:11 (cataloging increase in expense costs over the years and deponent's inability to say with certainty if sheet had ever been updated to reflect those increases)), and the subsequent actual pay summaries nowhere reveal specific expense breakdowns such as helper pay. Completely omitting from each pay summary a relevant class-wide expense would make it impossible for "officials charged with enforcing the labor laws be able to differentiate between wages and expense reimbursements," *id.* at 900–01; (*see also* Opp'n 3–5 (discussing many individualized characteristics affecting each specific driver's particular expenses and pay)), especially because here, it seems, Affinity did not even pay for the expense at all.

Given the foregoing, the Court concludes that as a matter of law Defendant failed to provide section 2802-compliant "enhanced compensation" as set forth in *Gattuso*. Therefore the Court **GRANTS** Plaintiffs' Motion for Summary Judgment on this point.

## II. Meal and Rest Break Claims; IWC Wage Order 9-2001, Section 11, and California Labor Code Sections 226.7 and 512

IWC Wage Order 9-2001, section 11, and Labor Code Sections 226.7 and 512 require employers to provide employees with a reasonable opportunity to take off-duty meal breaks of at least thirty minutes for every five hours worked. An employer must also permit ten minutes of rest for every four hours worked or "major fraction thereof." *Brinker Rest. Corp. v. Superior Court*, 273 P.3d 513, 536 (Cal. 2012). The Supreme Court of California has additionally provided that an employer must not impede or discourage employees from taking such breaks, including by pressuring employees to work despite a formal policy providing for meal breaks. *Brinker*, 273 P.3d at 536. Specifically, an employer must "relieve[] its employees of all duty, relinquish[] control over their activities and permit[] them a reasonable opportunity to take an uninterrupted 30–minute break, and . . . not impede or discourage them from doing so." *Id.* at 536–37. However, "[w]hat will suffice may vary from industry to industry," and "work by a relieved employee during a meal break does not thereby place the employer in violation of its obligations and create liability

for premium pay" when the employer has provided "[b]ona fide relief from duty and . . . relinquishing of control" over the employee. *Id.* at 37.

In the present case, Plaintiffs argue that Affinity did not have any policies or procedures in place for providing compliant meal breaks or rest periods, (MSJ 25–26), and that Affinity's "scheduling practices made it virtually impossible for [any relevant employee] to take such breaks[,]" (MSJ 27).[6] Defendant responds by noting that there is conflicting evidence regarding any unofficial policy discouraging employees from taking compliant breaks; many of Plaintiffs' declarants stated only that they were unable to take meal breaks on "some days" and many employees' daily delivery schedules "explicitly included break time . . . ." (Opp'n 12–13.) Further, Defendant argues that there is no class-wide evidence that Affinity discouraged or impeded drivers from taking compliant breaks, a necessary predicate for liability. (*Id.* 12–14.) Because the Court reaches differing conclusions regarding the meal-break and rest-period claims, it addresses each separately.

### *A. Meal-Break Claims*

As previously stated, an employer must provide a thirty-minute meal break for every five hours worked, and the break must be "off-duty." *Brinker*, 273 P.3d at 536–37. Given this standard, the Court cannot agree with Defendants' implication that the thirty-minute lunch timeslots provided for Plaintiffs on some of their daily manifests complied with Affinity's duty to provide its employees with an "uninterrupted" break where all employer control was relinquished. As an initial matter, both Plaintiffs and Defendant have attached daily manifests to their moving papers, (MSJ Ex. R, ECF No. 312-20; Opp'n Ex. 6.), and Plaintiffs' attachments almost all completely lack a timeslot for lunch, (*see generally* MSJ

---

[6] Plaintiffs seemingly slip an additional argument into their "Statement of Facts" section: that even when employees had an open slot in their delivery schedules they were required to be "on call" such that any break was non-compliant under the relevant laws. (MSJ 12.) Defendant counters by noting that Plaintiffs "designate[] no evidence as to how frequently the drivers were interrupted during their breaks or, in fact, whether they were ever interrupted at all." (Opp'n 13, n.2.) Indeed, Plaintiffs do not cite <u>any</u> evidence in their brief even supporting that such an "on-call" policy existed. (*See* MSJ 12.) Given these problems with Plaintiffs' on-call assertion, the Court does not here consider this additional argument.

Ex. R, ECF No. 312-20). Defendant's attached manifests fare only slightly better; all include a thirty-minute lunch timeslot, but each is placed directly in the middle of at least one scheduled delivery window.[7] (Opp'n Ex. 6, 1–6, ECF No. 320-6.) In fact, almost all of Defendant's attached manifests which include a thirty-minute lunch timeslot have such timeslots completely subsumed by a completed delivery period. (*See id.*) Defendant argues that such schedule overlap should not matter because "Affinity allowed its drivers to decide when and how long they should take meal and rest breaks" and that "Plaintiff testified that he took lunch every day and that he took breaks when they fit into his schedule." (*Id.* at 6.) However, Plaintiff did not say that he took legally compliant lunch breaks every day, instead stating that he would often eat in the truck and that "sometimes we do not have no time to get a break or lunch" because of Affinity's incredibly tight delivery-window scheduling and the corresponding repercussions to drivers if they failed to stay on schedule. (Ruiz Dep. 98:11–21, 181:11–82:1, Opp'n Ex. 1, ECF No. 320-1.) Further, the daily manifests that provide a thirty-minute lunch break delineate highly specific start times for each break. (Opp'n Ex. 6, 3 (12:03); *id.* at 4 (12:18); *id.* at 5 (11:54); *id.* at 6 (12:00).) Given this overall context, the sheets themselves would—at minimum—strongly suggest to any employee that they should take their break during the scheduled time. Finally, Plaintiff Ruiz's prior testimony that he took lunch every day is not

---

[7] Defendant seemingly changed its tune at oral argument slightly, saying that "we indicated in a footnote in our Opposition that it was not that we were embracing this as being our scheduling of the lunch break, but rather evidence that demonstrates we were not bothered at all, had no interest in impairing their ability to take that lunch break." (Hr'g Tr. 28:7–14; *compare* Opp'n 13, n.1 ("Affinity provided the manifests that included the daily schedule of deliveries, including a meal break for drivers. If Affinity intended to prevent drivers from taking breaks, it would not provide the drivers with manifests scheduling a break regardless of who prepared them.").) Regardless, Defendant further argued at the hearing that the delivery windows were "not a representation . . . that the delivery would take that entire time[,]" (Hr'g Tr. 13:20–25), and "drivers that testified at the first trial said that one of the reasons that they didn't have to call in to Sears and tell them that they were finished with a delivery or rearrange a schedule is that they were ahead of schedule," (*id.* at 14:11–18). However, the fundamental question here is whether Defendant impeded or discouraged employees from taking compliant meal breaks. *Brinker*, 273 P.3d at 536. And even limiting the schedules' relevance to Plaintiffs' case as merely "discouraging" compliant meal breaks due to the overwhelming lack of compliantly scheduled meal-break time, the balance of the evidence still demonstrates that Defendant's overall policies discouraged Plaintiffs from taking compliant lunch breaks.

incongruous with this interpretation, because a company may have an unofficial policy discouraging employees from taking compliant breaks that is nonetheless disregarded by certain employees.

The Court also disagrees with Defendant's argument that there is not "class wide evidence Affinity required class members to work during a particular meal break . . . ."[8] (Opp'n 15.) Although Defendant often uses the words "require" or "forced" to characterize the potential Affinity action that would trigger liability, the actual test is whether an employer "impedes or discourages" compliant breaks—a less stringent standard.[9] *See Brinker*, 273 P.3d at 536 ("Proof an employer had knowledge of employees working through meal periods will not alone subject the employer to liability for premium pay; employees cannot manipulate the flexibility granted them by employers to use their breaks

---

[8] Defendant reasserted this point at oral argument, citing *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013), for the proposition that Plaintiffs' "hand-picked Declarants" should not serve "as a basis for coming up with the experiences of the absent class." (Hr'g Tr. 162–6.) But the issue in *Espenscheid* was largely whether testimony by forty-two representative witnesses "would enable a rational determination of each class member's damages[,]" despite the numerous "difficult[ies] of computing the damages of each class member." *Id.* at 774–76. Here, by contrast, the only issue currently before the Court is whether Defendants had a <u>blanket policy</u> of impeding or discouraging Plaintiffs from taking compliant meal breaks. And such a question may be answered in part by evidence from a representative sample. *See id.* at 773 ("There would have been no problem had . . . the only issue . . . been whether [the defendant] . . . acted unlawfully.").

[9] Defendant seems conflicted on this point, admitting to the less-stringent standard on one page—"an employer triggers liability to pay an employee premium pay when it, <u>in fact,</u> impedes or discourages employees from taking an uninterrupted off-duty meal break[,]" (Opp'n 15 (emphasis original))—but later returning to the more stringent characterization—"Plaintiff and the absent class are not entitled to a class wide liability finding without first demonstrating with class wide evidence that Affinity, <u>in fact,</u> prevented the class from taking each and every non-compliant meal break[,]" (*id.* at 16 (emphasis original)). This conflict appears somewhat tied to Defendant's argument that Plaintiffs' meal-break and rest-period claims constitute a statutory tort, and thus proof of causation and damages are required to make out a *prima facie* case. (*See id.* at 14–16.) However, Plaintiffs' Motion for Summary Judgment seeks only adjudication as to "whether Affinity failed to provide its Employee Drivers with lawful rest breaks and meal periods," (MSJ 1), Defendant has provided daily manifests where meal-break periods almost always overlap with scheduled deliveries, (Opp'n Ex. 6, ECF No. 320-6), Defendant has admitted that it did not reimburse any Plaintiffs for "a missed meal period during" the time periods relevant to this action, (MSJ Ex. CC, ¶¶ 5–12, ECF No. 312-31), and many Plaintiffs have testified that they were in fact unable to take breaks during the relevant period, (MSJ 13, n.14, 27). This is sufficient to make out a *prima facie* case for purposes of determining liability, and, as the parties are aware, any calculations regarding class-wide damages—even if some are solely <u>nominal</u>—are not currently before the Court. (*See* Class Cert. Order 23.)

as they see fit to generate such liability. On the other hand, an employer may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks."). In this regard, the above-discussed evidence that the delivery manifests either provided no meal break or instead scheduled employees' meal breaks during delivery timeslots, and that many employees were on a regular basis unable to take legally compliant meal breaks—both due to tight schedules and the negative repercussions flowing from deviation from the same—is sufficient to show that Affinity actively impeded and discouraged all relevant employees from taking required meal breaks.[10] Accordingly, the Court **GRANTS** summary judgment regarding Affinity's failure to provide class members with legally compliant meal breaks.

***B. Rest-Period Claims***

As previously stated, an employer must provide ten minutes of rest for every four hours worked or "major fraction thereof." *Brinker*, 273 P.3d at 536. In the present case, Plaintiffs marshal for these claims much of the same evidence used to prove Affinity's liability for legally deficient meal-break claims. However, unlike the meal-break claims, Plaintiffs do not identify any daily schedules that list a non-compliant rest period, and Plaintiff Ruiz testified that even on "a real hard day" class members might "sometimes . . . just stop to get something to drink, snack and take it in the truck." (Ruiz. Dep. 181:22–82:1, Opp'n Ex. 1, ECF No. 320-1.) Plaintiffs' strongest evidence instead comes from many class-members' testimony that they "routinely worked longer than four hours without

---

[10] Plaintiffs also argue that Justice Werdegar's concurrence in *Brinker*, which articulated a presumption that an employer did not provide a compliant meal period when "an employer's records show no meal period for a given shift of five hours[,]" *Brinker*, 273 P.3d at 545 (Werdegar, J., concurring), should be dispositive here. *See Safeway, Inc. v. Superior Court of L.A. Cty.*, 238 Cal. App. 4th 1138, 1160 (2015) (embracing Justice Werdegar's concurrence), *review denied* (Oct. 21, 2015); *Ricaldai v. U.S. Investigations Servs., LLC*, 878 F. Supp. 2d 1038, 1043–44 (C.D. Cal. 2012) (same). However, because Justice Werdegar's concurrence did not garner the support of a majority of the *Brinker* Court, this Court does not here apply such a presumption. Nonetheless, the fact that Defendant in the present case has presented no evidence that any compliant meal periods were in fact recorded weighs strongly in favor of a violation.

having an opportunity to rest for at least ten minutes" and "almost always worked the entire day" without a rest break. (*See generally* MSJ Ex. K, ECF No. 312-13.) However, these assertions are somewhat undercut by Plaintiff Ruiz's own testimony that even on difficult days drivers would occasionally have time to at least stop and get food or drink to take with them in the truck. (*See also* Ruiz Dep. 181:14–17, Opp'n Ex. 1, ECF No. 320-1 ("If you have <u>10 to 15 minutes free</u> if you are ahead of time for the delivery, you can stop and get lunch." (emphasis added)).) This in turn lends more credence to Affinity's assertion that it left decisions regarding frequency, timing, and length of these short breaks to each driver's discretion. Thus, the only remaining evidence supporting Plaintiffs' position is the repercussions to drivers for failing to comply with the timing of their daily schedule. However, the Plaintiff-declarants do not reference this as the reason why they often did not have time to take rest breaks, and—unlike the meal-break claims—there is no information on the daily schedules to confirm that taking an off-duty break would necessarily conflict with scheduled delivery timing. This leaves a genuine dispute of material fact as to whether Affinity's tight daily scheduling rose to the level of impeding or discouraging Plaintiffs from taking legally compliant rest breaks.

In sum, the rest-period claims do not have the same, overwhelming amount of evidence pointing to only one conclusion as do the meal-break claims. To be sure, a fact finder could reasonably determine that Affinity did, in fact, have an unofficial policy discouraging or impeding employees from taking legally required rest breaks. However, the evidence before the Court does not compel that conclusion alone, and thus summary judgment on this issue is inappropriate. Accordingly, the Court **DENIES** summary judgment as to rest-period liability.

/ / /

/ / /

/ / /

/ / /

/ / /

## CONCLUSION

Given the foregoing, the Court:

(1) **GRANTS PLAINTIFF'S** Motion for Summary Judgment as to the expense reimbursement and meal-break claims; and

(2) **DENIES** Plaintiff's Motion for Summary Judgment as to the rest-period claims.

**IT IS SO ORDERED.**

Dated: February 21, 2017

Hon. Janis L. Sammartino
United States District Judge