# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO RUIZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>XPO LAST MILE, INC., formerly AFFINITY LOGISTICS CORPORATION,<br><br>Defendant. | Case No.: 5-CV-2125 JLS (KSC)<br><br>**ORDER (1) GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; AND (2) GRANTING MOTION FOR ATTORNEY FEES, COSTS AND CLASS REPRESENTATIVE AWARD**<br><br>(ECF Nos. 427, 428) |

Presently before the Court are Plaintiffs' Motion For Final Approval of Class Action Settlement, ("Final Approval MTN," ECF No. 428), and Plaintiffs' Motion for Attorney Fees, Costs and Class Representative Service Award, ("Fee MTN," ECF No. 427). Defendant filed a Statement of Non-Opposition to Plaintiffs' Motion for Final Approval of Class Action Settlement, (ECF No. 429). For reasons stated below, the Court **GRANTS** Plaintiffs' Motions.

## BACKGROUND

This case began over twelve years ago, when—on May 17, 2005—Plaintiff Fernando Ruiz filed a putative class action complaint in the Northern District of California. (*See* ECF No. 1.) Plaintiff asserted that Defendant (then known as Affinity Logistics

1

Corporation)[1] had improperly classified him and other delivery drivers as independent contractors rather than employees. (*Id.*) Plaintiff further alleged that this misclassification caused damages under several provisions of both federal and state law, including damages both for unlawful wage deductions and stemming from failures to pay overtime wages, reimburse driver expenses, and provide meal and rest periods. (*Id.*)

Approximately six months later, the case was transferred to the Southern District of California and the calendar of the Honorable John S. Rhodes. (*Id.*) Defendant moved for partial summary judgment, (ECF No. 11), which Judge Rhodes subsequently granted, ruling that Plaintiff's FLSA claims were precluded by the Federal Motor Carrier Act. (ECF No. 37.) The Parties then twice attempted to settle the suit, (ECF Nos. 41, 47), but each party felt it was too early in the litigation to pursue a fully informed settlement.

Next, the case was transferred first to the Honorable Larry A. Burns, and ultimately to this Court. Defendant again moved for summary judgment, (ECF No. 59), which the Court granted in part and denied in part, (ECF No. 79). Defendant moved for reconsideration (or, in the alternative, to certify questions of state law to the Georgia Supreme Court), (ECF No. 95); and around the same time Plaintiff moved for class certification, (ECF No. 82). The Court denied the motion for reconsideration, (ECF No. 95), and granted class certification only regarding the issue of whether Defendant had improperly classified the delivery drivers as independent contractors rather than employees, (ECF No. 105). The Parties vigorously disagreed as to the "scope" and "meaning" of the Court's class certification order. (ECF Nos. 129, 130.)

Ultimately, the Court approved long- and short-form class notice documents, (ECF No. 126), and held a bench trial in December 2009, (*see* ECF Nos. 161, 162, 163). No class member opted out. (Final Approval MTN 7.) Several months later, the Court issued a Memorandum Decision and Order finding that Defendant had properly classified the drivers as independent contractors and entered Judgment in favor of Defendant. (ECF Nos.

---

[1] Now known as XPO Last Mile, Inc., which has been formerly substituted in this action. (*See* ECF No. 288.)

186, 187.)

Plaintiffs appealed to the Ninth Circuit, (ECF Nos. 192–194), which held oral argument on December 8, 2011, (Final Approval MTN 7). The Ninth Circuit determined that California, rather than Georgia, law applied to the case, and remanded the case back to this Court with instructions to reconsider the evidence under California law. (ECF No. 202.) Now back at this Court, the Parties re-briefed their closing arguments applying California law, (ECF Nos. 209, 210, 214, 215), and on August 27, 2012, the Court issued a second Memorandum Decision and Order ruling that Defendant had properly classified the delivery drivers as independent contractors under California law, (ECF No. 216; *see also* ECF No. 217).

Plaintiffs again appealed to the Ninth Circuit, (ECF Nos. 218–220), which again reversed, holding that as a matter of law the delivery drivers were employees under California law. (ECF No. 245.) Defendant filed both a Petition for Rehearing En Banc to the Ninth Circuit and a Petition for Writ of Certiorari to the United States Supreme Court. (Final Approval MTN 8.) Both were denied. (*Id.*)

Back in this Court, and with the contours of the case more sharply in focus, Plaintiffs sought and received over 80,000 pages of documents relating to pay and expense information for approximately two-thirds of the class members. (*Id.*) Plaintiffs moved for renewed class certification, (ECF No. 279), on which the Court heard oral argument, (ECF No. 285), and which the Court granted regarding Defendant's liability to "all current and former delivery drivers who made home deliveries for Affinity Logistics Corporation within the State of California at any time between May 18, 2001 and the date of the resolution of this Complaint." (ECF No. 289.)

Plaintiffs next moved for summary judgment, arguing that the misclassification issue and underlying evidence necessarily established Defendant's liability regarding Plaintiffs' state-law claims. (ECF No. 312.) While the Parties were briefing the motion, they again attempted to settle the suit, but to no avail. (ECF No. 323.) The Court held oral argument on the motion, (ECF No. 343), but offered to hold its ruling to allow the Parties to pursue

settlement. The Parties initially agreed, however they were ultimately unable to commit to mediation. (Final Approval MTN 9.) The Court then issued an Order granting in large part Plaintiffs' motion for summary judgment, (ECF No. 353), and Plaintiffs sent out an updated notice advising the class members of the case developments and offering them an opportunity to opt out, (*see* ECF No. 370). Again, no class member opted out.

With liability established, and as the case headed towards trial on damages, the Parties agreed to attempt to mediate the case one more time. (Final Approval MTN 10.) After the Parties engaged in numerous telephonic conferences in an attempt to narrow the issues for mediation, the Parties attended a full-day mediation conference with Ms. Carole Katz, a Pittsburgh-based mediator specializing in wage-and-hour and employment issues. (*Id.*) However, the Parties were again unable to settle the case and trial was set for June 12, 2017. (*Id.*)

While continuing to pursue settlement, Plaintiffs and Defendant both subsequently filed multiple Motions *In Limine*, (ECF Nos. 376, 377, 378, 379, 380, 382), each of which the Court denied, (ECF No. 407). Trial then began as scheduled and Plaintiffs presented their expert witness, Kevin Taylor, who testified regarding Plaintiffs' damages. (Final Approval MTN 10; *see* ECF Nos. 408, 413.) Plaintiffs then rested, (ECF Nos. 408, 413), and Defendant prepared to present its case, (*see* ECF No. 408). However, the Parties continued to pursue settlement, and ultimately reached a tentative agreement prior to Defendant's presentation of evidence which the Parties put on the trial record. (*See* ECF No. 409.) Plaintiff filed a Motion for Preliminary Approval of Class Action Settlement, ("Prelim. Approval Mot.," ECF No. 419), which the Court granted, ("Order Grant Prelim. Approval," ECF No. 421). Plaintiff then filed the two present Motions.

## SETTLEMENT TERMS

The Parties have submitted a comprehensive settlement document with approximately eighteen pages of substantive terms, (Prelim. Approval Mot. Ex. A ("Settlement Agreement"), ECF No. 419-3). The Settlement Class is defined to include "any person who signed an Independent Truckman's Agreement either in his or her

4

individual capacity or through a business entity and themselves performed California-based delivery services for Affinity Logistics Corporation between May 18, 2001 and June 30, 2008." (*See* Settlement Agreement 2, 4.) According to Defendant's data, this constitutes "approximately 265" delivery drivers, "and in any event will not exceed 270." (*See id.* at 4, 7.) The Settlement Agreement provides for a $13.9 million Settlement Fund, (*id.* at 5), and "[a]fter deducting estimated attorneys' fees and costs, the costs of settlement administration, and the proposed service award, an estimated $8.5 million will be available for distribution to Plaintiffs." (Final Approval MTN 16). Class Members will each recover an "average payment of approximately $32,000." (*Id.*) None of the Settlement Fund will revert to Defendant; to the extent that any funds remain after the initial class-member distribution, "[t]he remaining funds shall be allocated and distributed" to the Class Members. (Settlement Agreement 11.)

Each Class Member will receive a portion of the Settlement Fund based on calculations directly corresponding to "the number of work weeks that each member of the Settlement Class provided Services to Defendant" during the class period. (*Id.* at 10–11 (specifying when the number of individual work weeks will be used as either the numerator or denominator based on the differing types of claims).) The Parties have also specified the percentage amount (as against the 100% settlement amount) each type of claim recovery will constitute for purposes of tax liability. (*Id.* (specifying 5%, 38%, and 57% of total settlement fund for various types of claims).) In exchange, the Class Members will release all "claims arising out of, derived from, or related to the facts and circumstances alleged in, or that could have been alleged in, the Action." (*Id.* at 4.) This release includes "all employment-related federal and state claims, except worker's compensation, but including claims under . . . California law, the federal Fair Labor Standards Act ("FLSA"), and common law claims, at any time during the Class Period." (*Id.*)

Additionally, Plaintiffs noted their intent to move the Court for a Service Award in an amount not to exceed $100,000 for named Plaintiff Fernando Ruiz, and for an award of Class Counsel Fees and Expenses not to exceed $4,865,000 and $350,000 for Costs and

5

Expenses. (*Id.* at 7–9.) Finally, Plaintiffs note claim administration fees shall be payable to Epiq Systems, Inc. in an amount not to exceed $50,000. (*Id.* at 10.) Defendants do not oppose these requests. (*See generally id.*)

## MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## I. Preliminary Matters

A threshold requirement for final approval of the settlement of a class action is the assessment of whether the Class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and the requirements of one of the types of class actions enumerated in subsection (b). *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019, 1022 (9th Cir. 1998). The Court has already certified the proposed settlement class. (*See* "Order Granting in Part and Den. in Part Pl.'s Mot. for Class Certification," ECF No. 279 (certifying class of "all current and former delivery drivers who made home deliveries for Affinity Logistics Corporation within the State of California at any time between May 18, 2001 and the date of the resolution of this Complaint").) The Court renews this finding here.

Also before granting final approval of a class-action settlement, the Court must determine that the Class received adequate notice. *Hanlon*, 150 F.3d at 1025. "Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Id.* This Court preliminarily approved the content of the Parties' Proposed Notice and proposed notification plan. (Order Grant Prelim. Approval 13.) On November 22, 2017, Charles Marr, a senior project manager employed by Epiq Class Action & Claims Solutions, the Settlement Administrator for the case, filed a declaration detailing the actions Epiq has taken with regard to this class action, including providing notice. (*See* "Marr. Decl.," ECF No. 428-3.) Mr. Marr indicates out of 261 Notices mailed to the class members, 9 remain undeliverable. (*Id.* ¶ 5.) Mr. Marr indicates Epiq has attempted to obtain updated addresses for these class members through the LexisNexis database and the Thomson Reuters CLEAR address database. (*Id.*) He also states individuals may write to Epiq or call to request the notice be mailed to them. (*Id.*) Despite this, 9 notices remain undelivered; this represents 3.4% of the class members. In similar situations, courts have found comparable

efforts by settlement administrators to provide notices to potential class members to be sufficient at the final approval stage. *See, e.g.*, *Garcia v. City of King City*, No. 14–cv–01126–BLF, 2017 WL 363257, at *5 (N.D. Cal. Jan. 25, 2017) (finding that notice was adequate where the settlement administrator made multiple attempts to provide notice to all 241 potential class members, but "35 notices were" nonetheless "returned as undeliverable from all the mailed-out notices"); *Hawthorne v. Umpqua Bank*, No. 11–cv–06700–JST, 2015 WL 1927342, at *2 (N.D. Cal. Apr. 28, 2015) (finding that notice was adequate where the administrator made multiple attempts to mail notices to potential class members and "perform[ed] address traces" where necessary, which ultimately resulted in "92.9% of the class members" receiving the notice); *Ontiveros v. Zamora*, 303 F.R.D. 356, 367 (E.D. Cal. 2014) (finding that notice was adequate where the settlement administrator "mailed notice of the settlement to the last known address of all class members" and "performed an advanced search" on individuals whose notice was returned as undeliverable).

A review of Mr. Marr's declaration and attached exhibit reveals that the Class Administrator provided notice in accordance with the notification plan. The Court does not believe further efforts will successfully provide notice to the nine remaining class members. Accordingly, the Court finds that the Settlement Class received adequate notice of the Settlement.

Under Federal Rule of Civil Procedure 23(e)(2), where the proposed settlement would bind class members, the court may approve it only after a hearing and on finding that the settlement is fair, reasonable, and adequate. On December 13, 2017, the Court held a final fairness hearing at which class counsel and defense counsel appeared. No class members, objectors, or counsel representing the same appeared at the hearing. The Court now determines whether the settlement is fair, adequate, and reasonable.

## II.     Fairness of the Settlement

The Ninth Circuit has enumerated various factors that the court should consider in determining whether a proposed settlement meets the fair, reasonable, and adequate

7

5-CV-2125 JLS (KSC)

standard, including: (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; (8) and the reaction of the class members to the proposed settlement. *Hanlon*, 150 F.3d at 1026. This determination is committed to the sound discretion of the trial judge. *Id.*

"Where a settlement is the product of arms-length negotiations conducted by capable and experienced counsel, the court begins its analysis with a presumption that the settlement is fair and reasonable." *Garner v. State Farm Mut. Auto Ins. Co.*, No. CV 08 1365 CW (EMC), 2010 WL 1687832, at *13 (N.D. Cal. Apr. 22, 2010) (quoting *Brown v. Hain Celestial Grp., Inc.*, No. 3:11-CV-03082-LB, 2016 WL 631880, at *5 (N.D. Cal. Feb. 17, 2016)). "Additionally, there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)). The Court finds the settlement is the product of arms-length negotiations between experienced attorneys. Counsel have spent extensive time on this case over its lengthy lifespan and have engaged in multiple attempts at settlement and mediation. Thus, the settlement is presumptively reasonable. The Court previously evaluated the *Hanlon* factors, (Order Grant Prelim. Approval 7–12), and restates this analysis here taking into consideration any changes or updates since the Court's prior Order.

### A. Strength of Plaintiffs' Case

Plaintiffs have a strong case regarding Defendant's liability. (*See generally* Order Granting in Part and Den. in Part Pls.' MSJ, ECF No. 353.) Once the delivery drivers were adjudged to have been employees rather than independent contractors, the fundamental way in which Defendant had formulated their contracts and treated the incidences of their employment became largely legally noncompliant. (*See generally id.*) However,

Defendant did pay the delivery drivers a higher-than-average salary based on Plaintiffs' thought-to-be independent contractor status. (*See, e.g.*, ECF No. 376.) Thus, the remaining question presented is to what extent—if at all—Defendant's higher payments should be factored into damages calculations for the delivery drivers. This is a close and unsettled question, the answer to which would here have <u>monumental</u> ramifications for the class-wide recovery. (*See, e.g.*, Prelim. Approval Mot. 19 ("[I]n the absence of case law directly addressing this argument, [Plaintiffs] must account for the possibility that a ruling in Defendant's favor would significantly limit Plaintiffs' recoverable damages.").) Accordingly, the juxtaposition between the liability and damages issues here weighs strongly in favor of the Court's approval of the settlement. The Parties have acknowledged the inherent strengths (and potential weaknesses) of Plaintiffs' case, and have reached an amicable settlement that will afford all Class Members significant recovery.

### B. *Risk, Expense, Complexity, and Likely Duration of Further Litigation*

As outlined above, the remaining damages question is close, unsettled, and susceptible to extreme outcomes in either Party's favor. Additionally, there is non-binding precedent which could counsel in favor of requiring Plaintiffs to supply receipts for each claimed expense flowing from Defendant's liability. (*Id.* (citing *Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 18–26 (Ct. App. 2007).) And Plaintiffs recognize that even if they only had to supply receipts for limited categories of expenses (and were permitted to prove other categories via inferential evidence), such a requirement and the corresponding "time and expense of marshalling and analyzing receipts (some from 16 years ago) for approximately 265 class members would be very significant and would reduce the class-based expense reimbursement recovery to a fraction of its true value." (*Id.*)

Furthermore, the trial outcome—whatever it might be—would not conclude this case. Both parties have been extremely zealous advocates, arguing, appealing, and petitioning for relief at nearly every turn. And Defendant has already indicated that if the case were to continue Defendant would, on appeal, "challenge several rulings made by this

Court, including, but not limited to: the propriety of class certification; the Court's February 21, 2017 Summary Judgment Order, the Court's December 19, 2016 Sanctions Order; and the Court's rulings on Defendant's motions *in limine*." (*Id.* at 20.) And this is to say nothing of the remaining damages issue, which implicates unsettled law both in the form of the appropriate reading (for damages purposes) of the California Supreme Court's opinion in *Gattuso v. Harte-Hanks Shoppers, Inc.*, 169 P.3d 889 (Cal. 2007), and the applicability of the Supreme Court's inferential evidence standard articulated in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), and recently revisited in *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016). Either issue could result in even greater delays, including via the issuance of a certified question to the California Supreme Court or a second petition for writ of certiorari.

In sum, given all of the foregoing, this factor weighs strongly in favor of the Court's approval of the settlement in this case.

### C. *Risk of Maintaining Class Action Status Throughout Trial*

As noted above, Defendant has already indicated that if this case proceeded through trial then Defendant would ultimately appeal the propriety of the Court's class certification order. And the class certification area is one that is particularly fraught at this time due to the Supreme Court's recent decisions, including *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), and lower courts' often-conflicting interpretations of the expansiveness of the same. This is particularly true in the present case, where damages are the only remaining issue and individual calculations (rather than employer-wide policies creating liability) are more prevalent and thus generally less amenable to class treatment. Accordingly, the settlement here obviates the potential for class decertification motions at trial or further litigation on appeal, and thus this factor favors the Court's approval of the settlement.

### D. *Amount Offered in Settlement*

Defendant has agreed to pay $13.9 million into a non-reversionary Settlement Fund, and Class Counsel attests the average recovery per class member will be approximately

$32,000. ("Osborn Decl.," ECF No. 427-2, at 12.)[2]  This is substantial recovery, especially in light of the fact that "many of [the plaintiffs] are low-wage workers who, as a practical matter, lack the resources to bring individual suits to assert their rights." (Final Approval MTN 17.)  Furthermore, Plaintiffs' Expert calculated the potential damages (which calculations Defendant vigorously attacked at trial) flowing from missed meal periods and rest breaks to be $5,891,360. The remaining damages were all from unreimbursed expenses, the category that falls most directly into the high-risk categorization described above regarding the applicability of *Gattuso* to damages and Defendant's reliance on the independent-contractor classification in setting the drivers' pay.  Plaintiffs may of course have won more at trial, but they may also have won far less, especially given the appeals contingencies outlined above.  Accordingly, this factor weighs strongly in favor of the Court's approval of the settlement.

### E. *Extent of Discovery Completed and Stage of Proceedings*

As explained above, this has been a twelve-year-long, incredibly hard-fought case. There have been two trips to the Ninth Circuit, a petition for a writ of certiorari, a request to certify a question to a state Supreme Court, and countless motions briefed, argued, and decided. Both sides are operating with full knowledge of the strengths and weaknesses of their cases, and there is little (if any) discovery that could further aid in resolving this matter.  This factor weighs strongly in favor of the Court's approval of the settlement.

### F. *Experience and Views of Counsel*

"The recommendations of plaintiffs' counsel should be given a presumption of reasonableness."  *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979).  And here, Class Counsel believes the Settlement Agreement is fair, reasonable, adequate, and in the best interest of the Settlement Class. (Final Approval MTN 18.)  Class Counsel has vigorously litigated this case and pursued the best possible resolution for the class

---

[2] By the Court's calculations, this is correct.  $13,900,000 will be put into the settlement fund.  Class Counsel requests $4,685,000 in fees, $246,889.98 in costs, $100,000 for Mr. Ruiz, and $50,000 for Epiq. The remainder of the fund, divided by 261 class members, provides for $33,785.86 per class member.

members. Furthermore, Class Counsel has "extensive experience" litigating complex class action and mass tort actions, and Class Counsel is intimately equated with the facts, strengths, and weakness of this particular case. (*Id.*) Given the foregoing, and according the appropriate weight to the judgment of these experienced counsel, this factor weighs strongly in favor of the Court's approval of the settlement.

### G. *The Presence of a Governmental Participant*

There is no government participant in this matter. This factor does not apply to the Court's analysis.

### H. *The Reaction of the Class Members to the Proposed Settlement*

Plaintiffs assert no class member has objected to the settlement. (Final Approval MTN 19). "The absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004). Given that almost every class member was served with notice of the proposed settlement, (*see* Mar Decl. ¶ 5), and no class member has objected to date, the Court finds this factor weighs in favor of approval of the settlement.

## III. Conclusion

Because all of the pertinent factors here weigh in favor of approving the Class Settlement, the Court **GRANTS** the Plaintiffs' Motion For Final Approval of Class Action Settlement.

# MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVE SERVICE AWARD

## I. Attorney Fees

Class Counsel moves for an Order approving the payment of attorneys' fees in the amount of $4,685,000 (35% of the Gross Settlement Amount), and costs of $246,889.98. (Fee MTN 8; "Supp. MTN," ECF No. 430, at 3.)

### A. *Legal Standard*

In the Ninth Circuit, a district court has discretion to apply either a lodestar method

or a percentage-of-the-fund method in calculating a class fee award in a common fund case. *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002). The Court finds the percentage-of-the-fund calculation is preferable to the lodestar approach. *See, e.g.*, *Aichele v. City of Los Angeles*, No. CV 12-10863-DMG (FFMx), 2015 WL 5286028, at *5 (C.D. Cal. Sept. 9, 2015) ("Many courts and commentators have recognized that the percentage of the available fund analysis is the preferred approach in class action fee requests because it more closely aligns the interests of the counsel and the class, i.e., class counsel directly benefit from increasing the size of the class fund and working in the most efficient manner." (citations omitted)). When applying the percentage-of-the-fund method, an attorneys' fees award of "twenty-five percent is the 'benchmark' that district courts should award." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (citing *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)); *see Fischel*, 307 F.3d at 1006. However, a district court "may adjust the benchmark when special circumstances indicate a higher or lower percentage would be appropriate." *In re Pac. Enters. Sec. Litig.*, 47 F.3d at 379 (citing *Six (6) Mexican Workers*, 904 F.2d at 1311). "Reasonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel*, 307 F.3d at 1007.

> Although not mandated by the Ninth Circuit, courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of nonpayment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's lodestar.

*Aichele*, 2015 WL 5286028, at *2 (citing *In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *18 (C.D. Cal. June 10, 2005).)

### *B.     Analysis*

Fees of $4,865,000 would be approximately 35% of the $13.9 million common fund—ten percent more than the Ninth Circuit benchmark.

The Court applies the above eight factors to Class Counsel's requested fee. First,

the Court finds that Class Counsel reached a favorable result for the Class—as noted above, the average recovery per class member will be approximately $32,000. (Osborn Decl. ¶ 62.) Further, the Court has already described the experience and skill of Class Counsel, and notes the significant effort expended by Class Counsel over the past twelve years, including two trips to the Ninth Circuit which each time granted Plaintiffs' requested relief.

Next, given the two appeals in this matter described above, the Court also finds this case has been risky for Class Counsel and full of complex issues. *See In re Pac. Enter. Sec. Litig.*, 47 F.3d at 379 (holding fees justified "because of the complexity of the issues and the risks"). As to the reaction of the class, this amount of attorney fees is authorized by the Settlement Agreement and was specifically communicated in the Notice. Not one Class Member objected to the requested award of attorney fees. This near-unanimous class approval and absence of fee-specific objections weighs in favor of the Court approving the Fee Motion. *See, e.g.*, *Singer v. Becton Dickinson & Co.*, No. 08-CV-821-IEG (BLM), 2010 WL 2196104, at *9 (S.D. Cal. June 1, 2010) (noting that 33.33% fee request was "especially" warranted "in light of the fact that not a single class member objected to Plaintiff's counsel's" request).

Finally, the Court finds the lodestar cross-check of 1.78, (Fee MTN 27), is reasonable based on the case facts and lengthy life of the case. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) (approving multiplier of 3.65); *id.* n.6 (citing appendix "finding a range of 0.6–19.6, with most (20 of 24, or 83%) from 1.0–4.0 and a bare majority (13 of 24, or 54%) in the 1.5–3.0 range[,]" and noting that "[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied" (citation omitted)).

Given the foregoing, the Court concludes that Class Counsel's requested attorney fees of $4,685,000, which constitutes 35% of the Settlement Fund, are reasonable and therefore the Court **GRANTS** Class Counsel's Fee Motion in this regard.

II. **Attorney Costs**

Additionally, Class Counsel move for reimbursement of costs in the amount of

14

5-CV-2125 JLS (KSC)

$246,889.98. (Supp. MTN 3.) The Settlement Agreement informs the class members that Class Counsel may submit an application for an award for costs not to exceed $350,000. (Settlement Agreement 9.) Class Counsel indicates its costs include fees for "copy charges, postage, expert witness fees, consultant fees, telephone and facsimile charges, transportation and lodging, and legal research." (Osborn Decl. ¶ 88; *see also* ECF No. 427-9 (itemization of costs).) Class Counsel represents these costs "were incidental and necessary to the effective representation of the class." (Osborn Decl. ¶ 87.)

The Court finds these costs reasonable. First, "[p]ostage, telephone, fax, and notice expenses" are generally recoverable. *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007). Further, legal research "is an essential tool of a modern efficient law office" and filing fees and photocopies "are also a necessary expense of litigation." *Id.* The Court also finds Class Counsel's travel costs reasonable, as Counsel has been required to travel to multiple hearings and mediations. *Id.* ("The reimbursement for travel expenses, both under 28 U.S.C. § 1920 and [Rule] 54(d), is within the broad discretion of the Court." (quoting *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1369 (1996))); *see also id.* at 1178 (concluding that "mediation expenses in this case are both reasonable and necessary" and collecting cases awarding fees for mediation expenses).

In order for the Court to award reimbursement for expert witness fees, the Court "must find that the expert testimony submitted was 'crucial or indispensable' to the litigation at hand." *Id.* at 1178 (quoting *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. at 1366). Plaintiffs request reimbursement for its expert witness Mr. Taylor, who provided testimony regarding Plaintiffs' damages during the trial in June 12, 2017. Based on the complexity of the issues and Mr. Taylor's testimony, Court finds the expert witness fees are crucial to the litigation and recoverable.

Class Counsel also requests $50,000 for the Settlement Administrator, Epiq Systems, Inc. (Fee MTN 8 n.1). The Court previously approved Plaintiffs' proposal to use Epiq as the Settlement Administrator. (Order Grant Prelim. Approval 13.) The Settlement

Agreement states costs will be payable to Epiq in an amount not to exceed $50,000; if Epiq charges less than this amount, the balance will be contributed to the settlement fund. (Settlement Agreement 10; *see also* Supp. MTN 4.) As the Court noted above, notice expenses are generally recoverable. The Court finds the Settlement Administrator expenses are recoverable. As agreed to, should Epiq charge less than $50,000, the balance shall be contributed to the settlement fund.

Accordingly, the Court concludes that all of these costs are validly recoverable and therefore **GRANTS** Class Counsel's Fee Motion in this regard. *See, e.g.*, *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (noting an attorney usually may recover "out-of-pocket expenses that 'would normally be charged to a fee paying client'" and holding that facts of the case demonstrated the reasonableness of costs for "service of summons and complaint, service of trial subpoenas, fee for defense expert at deposition, postage, investigator, copying costs, hotel bills, meals, messenger service and employment record reproduction").

### III. Conclusion

In sum, the Court **GRANTS** Class Counsel's Fee Motion as to Counsel's requested fees and costs.

### IV. Class Representative Service Award

The Ninth Circuit recognizes that named plaintiffs in class action litigation are eligible for reasonable incentive payments. *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003). Incentive awards are "fairly typical" discretionary awards "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009) (citations omitted). In deciding whether to give an incentive award, the Court may consider:

> 1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class

> representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation; and 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (citations omitted).

In the present case, Plaintiffs request the Court grant a service award to the Class Representative, Mr. Fernando Ruiz, in the amount of $100,000. (Fee MTN 32.) The Settlement Agreement provides an incentive award of up to $100,000 to Mr. Ruiz. (Settlement Agreement 11.) The Settlement Agreement states that this award "is intended to compensate the Plaintiff, who greatly helped this case by starting the lawsuit, investing substantial time to assist with the case, and providing testimony and documents." (*Id.* at 11.) No class member objected. And although such a high incentive award is usually reserved for "mega-fund" cases, *see, e.g.*, *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *18 (N.D. Cal. Sept. 2, 2015) (authorizing $80,000 and $120,000 service awards in case with $415,000,000 settlement fund and collecting similar "mega-fund" cases), there is little question that Mr. Ruiz here deserves such a service award. Since 2005, Mr. Ruiz has vigorously protected the rights of the class members:

> He organized and attended approximately one-half dozen meetings with other drivers at the outset of the litigation; he collected documents from other drivers, particularly in the San Diego area; he provided his own documents; he participated in discussions with Class Counsel to explain Defendant's operations; he responded to written discovery; he sat for a deposition; he testified at two trials; he attended six mediations, including traveling to New York for three days in May 2017 for a mediation in Newark, New Jersey; he helped identify and locate Class Members (a task he continues doing today in order to maximize Class Member participation in the settlement); and, as the Court is aware, Mr. Ruiz attended virtually every Court conference, hearing and oral argument.

(Fee MTN 32.) This evidences the substantial time and effort Mr. Ruiz has put into this case over its lifespan. Class Counsel also note Mr. Ruiz obtained no personal benefit from the case other than the settlement funds he expects to receive. (*Id.* at 32.) In fact, Mr. Ruiz

believes he was unable to obtain employment as a delivery driver for a few years as a result of his name being associated with this case. (*Id.*) Given the foregoing, the Court **GRANTS** the Class Counsel's Fee Motion regarding Class Representative Service Award and awards $100,000 to Mr. Ruiz.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Attorneys' Fees and Costs and Class Representative Service Award.

### GLOBAL CONCLUSION

For the reasons stated above, the Court:

1. **GRANTS** Plaintiffs' Motion for Final Approval of Class Action Settlement, (ECF No. 428);
2. **GRANTS** Plaintiffs' Motion for Attorneys' Fees and Costs and Class Representative Service Award (ECF No. 427);
3. As such, the Court **APPROVES** $4,865,000 in attorney fees to Class Counsel;
4. **APPROVES** $246,889.98 in costs to Class Counsel;
5. **APPROVES** a $100,000 award to Mr. Fernando Ruiz;
6. **APPROVES** a $50,000 payment to Epiq as settlement administrator;
7. **DISMISSES** this action **WITH PREJUDICE** with the terms of the Settlement.

**IT IS SO ORDERED.**

Dated: December 20, 2017

Hon. Janis L. Sammartino
United States District Judge